**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL TECKU; DAVID FINKELSTEIN; LAWRENCE TJOK; and ADRIENNE CERULO, individually and on behalf of all others similarly situated, | CIVIL ACTION NO.: 1:20-cv-07327 |
| *Plaintiffs,* | |
| v. | |
| YIELDSTREET INC.; YIELDSTREET MANAGEMENT, LLC; YS ALTNOTES I, LLC; YS ALTNOTES II, LLC; and MICHAEL WEISZ, | |
| *Defendants.* | |

---

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Michael Tecku, David Finkelstein, Lawrence Tjok, and Adrienne Cerulo (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, hereby file the following Amended Class Action Complaint against YieldStreet, Inc.; YieldStreet Management LLC; YS ALTNOTES I, LLC; and YS ALTNOTES II, LLC (collectively, "YieldStreet,"), as well as against YieldStreet's control person Michael Weisz, and allege on personal knowledge, investigation of their counsel, and information and belief, as follows:

### NATURE OF ACTION

1.      In July 2013 the Securities and Exchange Commission enacted Rule 506(c) permitting general solicitation of accredited investors. YieldStreet was formed soon thereafter, promising to provide accredited investors with "access to innovative income generating products."

2.      YieldStreet aggressively markets its "innovative products" to the general public through social media and direct email campaigns that drive potential investors to YieldStreet's

1

online investment portal, www.YieldStreet.com. That online portal serves as a one-stop shop through which investors can peruse, self-accredit, and purchase investment products that YieldStreet's registered investment advising arm has pre-screened and selected for sale on the YieldStreet platform.

3.      Most of YieldStreet's products are debt instruments—specifically, "borrower payment dependent notes" ("BPDNs"), which are defined in YieldStreet's private placement memorandum as debt obligations tied to the performance of an underlying loan made by a special purpose vehicle formed in connection with each BPDN offering. The SPVs raise funds for these loans by issuing a "series" of BPDNs to the investors that YieldStreet solicits via its web portal. Once the target amount of the offering is raised through BPDN sales, the SPV lends the funds to an undisclosed borrower in the particular industry or market advertised in the offering, *e.g.*, vessel deconstruction or oil and gas, who uses the loan proceeds to acquire and monetize a tangible asset (*e.g.*, a ship or an oil well). Ideally, the sale or other disposition of the asset will generate funds sufficient to repay the principal balance due to the SPV, and eventually, YieldStreet's noteholders.

4.      YieldStreet's potential investors do not have access to the underlying data—or accompanying risks—informing a particular transaction offered on the YieldStreet platform. Investors are completely reliant on YieldStreet's due diligence of the borrower and the potential investment. This information imbalance is particularly acute in the traditionally idiosyncratic markets in which YieldStreet's product offerings are concentrated, and which the general public otherwise lacks the ability to independently assess.

5.      Full transparency is therefore critical to the integrity of the YieldStreet model. YieldStreet's investors must rely solely on YieldStreet to gather and provide accurate information

about the undisclosed borrower's business, creditworthiness, reputation, and valuation of the collateral securing the loan.

6.      Unfortunately, that transparency is sorely lacking. As of August 2020, as reported by the Wall Street Journal, the SEC is actively investigating YieldStreet's business dealings, and the Federal Bureau of Investigation is seeking information on YieldStreet's practices and interactions with customers, including how the firm marketed certain deals. This complaint focuses on false and misleading statements YieldStreet made to investors to induce them to purchase certain YieldStreet investment products.

7.      All of the investments at issue in this Complaint were offered pursuant to YieldStreet's April 5, 2018 and/or January 16, 2019 private placement memoranda. Both of those documents included blatant misrepresentations about YieldStreet's past performance—specifically, the false claim that no product offered on YieldStreet's online platform had suffered any principal loss. In reality, a confidential email authored by YieldStreet's president, Michael Weisz, in <u>July 2017</u> acknowledged that a YieldStreet "rideshare expansion" fund had gone into default, and in fact, principal remains outstanding on that loan to this day. YieldStreet affirmatively misrepresented this fact—lied—to the unwitting public to lull them into believing that YieldStreet's team had a fully successful track record sourcing and structuring performing deals in the nuanced markets YieldStreet promotes.

8.      YieldStreet misrepresented other facts to potential investors in an attempt to falsely portray its "innovative" products as stable and reflective of YieldStreet's purported market experience and expertise. For example, YieldStreet touted its multi-stage "due diligence" process as a means of screening the products offered on its platform, yet failed to disclose that its credit committee had no experience whatsoever vetting or structuring deals in the niche industries in

which YieldStreet products are offered to investors. As a result, YieldStreet's approval of a product for sale on its platform is meaningless; essentially the 'blind leading the blind,' as the saying goes.

9.      YieldStreet tried to deflect its investment team's lack of experience by claiming reliance on "asset class experts" to help originate, structure, and service YieldStreet's deals. This, too, was false, as behind closed doors these experts' recommendations and warnings were ignored by YieldStreet's president, Michael Weisz, who exercised complete control over YieldStreet's investment decisions. Upon information and belief, Mr. Weisz based credit decisions in part on what would maximize YieldStreet's management fee receipts, without regard to the potential loss of investor funds—a classic 'other people's money' paradigm.

10.      The end result is that claims of no principal loss, in-depth "diligence," and reliance on "asset class experts" notwithstanding, YieldStreet's products are poorly sourced and structured, with a **default rate five times higher than even that of so-called "junk bonds."** YieldStreet's riskier-than-junk bond investments, however, are mass-marketed to the general public and may be purchased within a matter of minutes by anyone with access to a computer who self-certifies that they earn over $200,000 a year.

11.      The implosion of YieldStreet's ill-fated "vessel deconstruction" portfolio illustrates the bed of lies upon which the entire YieldStreet model is premised. These funds, which comprise the vast majority of YieldStreet's marine finance portfolio, collapsed in spectacular fashion in the spring of 2020, culminating in a rapid-fire series of defaults that evaporated nearly $90 million of investor funds in the process.

12.      Vessel deconstruction lending is an incredibly volatile calculus requiring extensive knowledge of cutthroat borrowers, multi-million-dollar vessels, foreign financial markets, international marine logistics, and other information not accessible to the general public. Investors

in YieldStreet's vessel deconstruction funds necessarily relied on YieldStreet's experience and expertise to navigate these entry barriers and attendant risks.

13.     While YieldStreet advertised that its Marine Finance team has decades of experience in the shipping industry, it failed to disclose that no one at YieldStreet had any experience whatsoever actually structuring vessel demolition deals. Whatever "Marine Finance" experience that YieldStreet purportedly had was in areas other than vessel deconstruction. In the face of this knowledge vacuum, and undisclosed to investors, all decisions were made almost solely by YieldStreet's president, Mr. Weisz, who acted as a "one man credit committee" with complete control over all aspects of YieldStreet's lending decisions, including which borrower should receive loans, for what amounts, and on what terms.

14.     Against this backdrop Mr. Weisz made the decision to pioneer a new "short term" lending model across YieldStreet's vessel deconstruction portfolio. This ill-conceived model was a structural mismatch that gave borrowers only a six-month window of time to acquire a vessel, transport it around the world for demolition, and then realize profits from the scrapped metals. The landscape for these deals can and does change on a moment's notice and thus requires time, space, and flexibility for successful completion—none of which are possible in the six-month window of time YieldStreet allowed. None of the lenders that occupy this space utilize this short-term model for these very reasons, and in fact, the "asset class expert" that YieldStreet retained to help build its vessel deconstruction portfolio **specifically warned Mr. Weisz <u>not</u> to use the "short term" lending model he was contemplating.**

15.     Compounding the problem, Mr. Weisz planned to issue multiple vessel deconstruction loans at once, and then concentrate them with a **single borrower group**. This created an inevitable scenario whereby any one of the externalities that commonly occur in the

course of vessel deconstruction would trigger sequential defaults that torpedoed the entire portfolio.

16.     Simply put, YieldStreet's overexposed, concentrated loan model was doomed to fail—a "sinking ship," both literally and figuratively.

17.     Duped investors were purchasing YieldStreet's vessel products at a fever-pace, and YieldStreet did not want to slow that. Use of Mr. Weisz' favored short-term facilities allowed YieldStreet to individually package loans to the same borrower through a series of dedicated special purpose vehicles, leading to rapid platform growth that allowed YieldStreet to collect fees far in excess of what would have been made available had it lent the same amount of money to that same borrower through a traditional single revolving credit facility. YieldStreet's true motivation was and is to manufacture a valuable (if not inflated) sale or acquisition price for the company based on a multiple of the fees earned on the portfolio it built. Caution was thus thrown to the winds in building that portfolio, as were the duties of candor and disclosure that YieldStreet owed to its potential investors.

18.     The end result was that YieldStreet's marine portfolio was almost solely reliant on the ability of a single overleveraged buyer to miraculously satisfy the terms of YieldStreet's ill-founded loan structure. Unsurprisingly, that buyer was unable to do so.

19.     None of these red flags were disclosed to YieldStreet's investors. As far as they knew, YieldStreet's "experienced" credit committee, "comprehensive" diligence process, and third-party industry experts operated in tandem to develop a viable investment structure appropriate for the vessel deconstruction industry.  Investors were never told that they were essentially guinea pigs whose hard-earned money was being managed by industry novices pioneering a lending model that YieldStreet knew was doomed to fail. They were never informed

that YieldStreet's investment decisions were driven by a desire to inflate its own financials, even if meant the entirety of its vessel deconstruction portfolio was unreasonably concentrated with a single borrower group.

20.     YieldStreet's mismanagement started to come to light in March 2020, when one by one its vessel deconstruction funds started to default. Instead of owning up to its misdeeds, YieldStreet has gone on the offensive, accusing the borrower and asset class expert (whose advice YieldStreet ignored) of "fraud" and "mismanagement." In reality, Mr. Weisz and Yieldstreet are to blame, as they have built an entire portfolio on the premise of ill-founded and/or poorly sourced deal structures created to maximize YieldStreet's management fees. Even worse, they lied to investors to induce them to fund those deals.

21.     The vessel deconstruction defaults alone represent a double-digit percentage of all of YieldStreet's assets under management, but they also underscore the systemic flaws across the YieldStreet model. Consistent therewith, YieldStreet offerings across a number of its portfolios, including oil and gas, art, and real estate, have defaulted as well. **As of the end of the first quarter of 2020, nearly 1/3 of YieldStreet's entire portfolio was in default. Clearly something is rotten at 300 Park Avenue.**

22.     This is a class action complaint brought on behalf of every individual who invested in YieldStreet's defaulted vessel deconstruction and/or oil & gas funds on the basis of the false and misleading statements and omissions described herein.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds

$5,000,000, in the aggregate, exclusive of interest and costs, and the number of claimants exceeds 500 persons.

24.     This Court has personal jurisdiction over the Defendants as all maintain their principal places of business in and/or are citizens of the State of New York. As such, they have purposefully availed themselves of and established minimum contacts with the State.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because all Defendants reside in this district.

## PARTIES

26.     Plaintiff Michael Tecku is, and was at all times mentioned herein, an individual citizen of the State of Texas, and currently resides in that state.

27.     Plaintiff David Finkelstein is, and was at all times mentioned herein, an individual citizen of the State of Florida.

28.     Plaintiff Lawrence Tjok is, and was at all times mentioned herein, an individual citizen of the State of New Jersey, and currently resides in that state.

29.     Plaintiff Adrienne Cerulo is, and was at all times mentioned herein, an individual citizen of the State of Connecticut, and currently resides in that state.

30.     Defendant YieldStreet Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 300 Park Avenue, New York, New York 10022.

31.     Defendant YieldStreet Management, LLC ("YieldStreet Management") is an entity organized under the laws of the State of Delaware, with its principal place of business located at 300 Park Avenue, New York, New York 10022. YieldStreet Management's sole member is

YieldStreet, Inc. YieldStreet Management is registered as an Investment Advisor with the Securities Exchange Commission pursuant to the Investment Advisors Act of 1940.

32.     Defendant YS ALTNOTES I, LLC ("ALTNOTES I") is an entity organized under the laws of the State of Delaware, with its principal place of business located at 300 Park Avenue, New York, New York, 10022.

33.     Defendant YS ALTNOTES II, LLC (together with ALTNOTES I, "ALTNOTES") is an entity organized under the laws of the State of Delaware, with its principal place of business located at 300 Park Avenue, New York, New York 10022.

34.     Defendant Michael Weisz ("Mr. Weisz") is, and was at all times mentioned herein, an individual citizen of the State of New York, and currently resides in the State. Mr. Weisz is the President and co-founder of YieldStreet, Inc., YieldStreet Management, and ALTNOTES (collectively, "YieldStreet"). In this capacity he exercises complete control over YieldStreet's investment decisions and therefore serves as YieldStreet's control person under applicable Delaware law.

## FACTUAL ALLEGATIONS

A.  YieldStreet's Formation and Investment Structure

35.     In July 2013 the Securities and Exchange Commission enacted rule 506(c) permitting general solicitation of accredited investors.

36.     YieldStreet was formed soon thereafter, promising to provide accredited investors with "access to innovative income generating products."

37.     These "innovative products" include asset-based investment opportunities in idiosyncratic markets not typically available to the investing public at large, such as fine arts, commercial real estate, or vessel deconstruction.

38.     YieldStreet markets and sells its products to the public through its Investment Portal, www.yieldstreet.com. Behind that façade, YieldStreet has created a complex web of subsidiaries and special purpose vehicles that together provide the framework for the investments YieldStreet solicits.

39.     When selling these products YieldStreet markets itself to investors as a fiduciary, using language that tells investors that their interests always come first and that they should put their trust in YieldStreet. At the heart of YieldStreet's fiduciary message is its "commitment" to act as "an investor first company." For example, in its Resource Center, YieldStreet states that "[a]s **an investor-first company**, we always appreciate hearing feedback from our investor community." Its marketing blog repeats that same theme: "[o]ver the past three years, YieldStreet has built a new wealth creation model by taking an **investor first** approach and growing a community of 100,000…." YieldStreet repeats the "investor first" fiduciary commitment in marketing materials filed with the SEC. One of those documents provides that "[a]s **an investor-first company**, YieldStreet is delighted to offer what we believe is a first-of-its-kind product that allows us to further deliver on our mission to provide novel investing opportunities." Finally, in its Portfolio Overview landing page, YieldStreet again uses this term, stating that "[a]s **an investor-first company,** we are dedicated to continually improving how we share information with you regarding your investments." (emphases added).

40.     YieldStreet has also used other "fiduciary" language in its marketing to prospective investors, such as claiming on its website that YieldStreet is the investor's **"partner"**: "With YieldStreet as **her partner**, Joan earns passive income—giving her additional income to fuel her dreams and move her life forward." Likewise, in public letters to potential investors on the

YieldStreet website, the President and CEO of YieldStreet repeats the same fiduciary language: "**As your partner** on this journey, we're curious to know more about you." (emphases added).

41.     YieldStreet also openly admits that their investors put their trust and confidence in YieldStreet to guide them—on the website the CEO and President greet potential investors with a message: "Thank you for putting **your trust in us**." (emphasis added).

42.     Most, if not all, of the products YieldStreet offers to its trusting partners are debt instruments—specifically, "borrower payment dependent notes" ("BPDNs"), which are defined in YieldStreet's private placement memoranda as debt obligations tied to the performance of an underlying loan made by a special purpose vehicle. YieldStreet describes this as a "new legal structure" that allows YieldStreet to solicit more accredited investors than would be permitted in the case of a traditional equity investment.

43.     A dedicated special-purpose investment vehicle ("SPV") is formed in connection with each BPDN offering. These SPVs will originate, fund, and service the loans underpinning YieldStreet's repayment obligation.

44.     The SPVs raise funds for these loans by issuing a "series" of BPDNs to investors that YieldStreet solicits via its web portal. (Technically, all BPDNs were issued by YieldStreet's subsidiaries, "ALTNOTES I or ALTNOTES II," on behalf of the SPV.) Once the target amount of the offering is raised through BPDN sales, the SPV will lend the money to an undisclosed borrower in the particular industry or market advertised in the offering, *e.g.*, vessel deconstruction or oil and gas. The borrower is then obligated to repay the loan in time to allow YieldStreet to repay BPDN holders on or before the specified maturity date.

45.     YieldStreet Management is solely responsible for making decisions as to the particular products that will be offered for sale on the YieldStreet platform pursuant to the

SPV/BPDN structure described above. In exchange for its investment advisory services, YieldStreet Management receives fees commensurate with the outstanding capital contribution balance for each SPV.

46.     YieldStreet boasts of a multi-step vetting process intended to screen potential offerings and provide investors with the information they need to make an informed purchasing decision. After that vetting process is complete, YieldStreet offers approved products for sale through its internet portal.

47.     YieldStreet markets its products aggressively, touting on its website and in its offering materials the potential for double-digit interest and, ***at all times relevant hereto, the fact that YieldStreet had never lost any principal on a deal.***

48.     YieldStreet also solicits investor participation in each BPDN offering through individual "Series Note Supplements." While these Supplements are unique to a particular SPV, all are part of a continuous offering by one of the two ALTNOTES entities under their original registration statement filed with the SEC, in accordance with Rule 415 of the Securities Act of 1933.

49.     To the investing public, YieldStreet, Inc. and its various subsidiaries—including but not limited to, YieldStreet Management, ALTNOTES, and the SPVs—operate as a cohesive whole under the "YieldStreet" moniker. All BPDNs are purchased through YieldStreet's web portal, and all information about those investments flows through that portal. The private placement memoranda that YieldStreet provides to potential investors state that the company is directly "dependent on the [Portal]." Consistent therewith, the BPDNs tell investors to direct all questions through "Investments@YieldStreet.com," and all communications sent to investors about their defaulted products or otherwise come from the "YieldStreet Team."

50.     YieldStreet Management is responsible for the investment advice that YieldStreet communicates through its customer-only investor portal. Consistent therewith, YieldStreet Management's Form ADV reflects that YieldStreet Management primarily conducts its advisory business under the name "YieldStreet."

51.     Much of the advice that YieldStreet communicates to its customers is communicated through the above-referenced Series Note Supplements, which bear the "YieldStreet" name and logo in the bottom corner of each document.

52.     YieldStreet's private placement memoranda define these Series Note Supplements as "the authoritative description of any series of Notes offered by the Company." Together, the applicable Series Note Supplement, private placement memorandum, and indenture, comprise the package of offering documents furnished to individual investors.

53.     Series Note Supplements are prepared by YieldStreet Management, in its capacity as Manager of ALTNOTES.

54.     Series Note Supplements are created only for those deals that YieldStreet chooses to offer to its customers through its online portal. Each Supplement provides specific details about the individualized offering, which are communicated using language like "Why We Like This Opportunity." Series Note Supplements also include glowing reviews of the offering's originator.

55.     All of the statements made in Series Note Supplements are based on information compiled by YieldStreet Management during its diligence process.

56.     YieldStreet has exclusive access to the underlying data informing the contents of the Series Note Supplements.

57.     Series Note Supplements are only available to YieldStreet's investors, and then only through YieldStreet's private online portal. In each Series Note Supplement YieldStreet

expressly acknowledges that the information furnished is for use by investors considering whether to invest in the particular offering featured therein.

58.     Those investors who choose to invest in an offering following their review of the applicable Series Note Supplement and other offering documents do so by purchasing a BPDN through YieldStreet's website.

59.     BPDNs are issued subject to an "Indenture Agreement" between YieldStreet and Delaware Trust Company ("Trustee"), located at 251 Little Falls Drive, Wilmington, DE 19808. BPDN purchasers are intended beneficiaries of that Indenture Agreement. They are specifically named in the Indenture, which provides that all BPDNs are "entitled to the same benefits under this Indenture."  The Subscription Agreement that investors execute to confirm their purchase of an interest in a YieldStreet product likewise incorporates and is subject to the Indenture Agreement. YieldStreet's private placement memoranda further state that the Indenture Agreement "contains provisions that define [purchaser's] rights under the Notes," as well as "the obligations of [YieldStreet] under the Notes." The Indenture also provides the terms for payments to be made directly to BPDN holders, and further vests in the Trustee certain rights to act on noteholders' behalf. Some or all of the terms governing Plaintiffs' relationship with YieldStreet were thus negotiated in Delaware by the Trustee, a Delaware citizen.

60.     YieldStreet's private placement memoranda provide that the Delaware Trustee will, as security for the BPDNs, receive a pledge of the membership interests in the particular SPV and its collateral, as well as all monies due to or held by the SPV for eventual payment to noteholders. The Trustee then acts as the secured party for the benefit of the noteholders. In the event a borrower defaults, the Trustee has the right to become paying agent under the BPDNs and to exercise all rights with respect to the pledged collateral, again on behalf of the noteholders. Accordingly, some

or all objects of the Plaintiffs' agreement with YieldStreet were performed in Delaware, by a Delaware citizen.

B.  YieldStreet Used Misleading Offering Documents
    to Induce the Public to Purchase its Products.

61.    YieldStreet induced investors to participate in its "innovative" product offerings by representing that it possessed the knowledge and expertise necessary to bridge the information gap between the general public and the niche industries in which YieldStreet offered investment opportunities.

62.    YieldStreet attempted to demonstrate this purported knowledge and expertise by telling its investors that none of the investments offered on YieldStreet's online platform had ever lost any principal. This statement was included in the private placement memoranda for ALTNOTES I and II, dated April 5, 2018 and January 16, 2019, respectively. YieldStreet also featured this statement prominently on its website until the summer of 2020.

63.    The statement that none of YieldStreet's offerings had suffered any principal loss was false when made. A rideshare fleet expansion fund that YieldStreet offered on its platform— "YieldStreet Quest II, LLC"—had in fact gone into default in July 2017.  A confidential email sent by Michael Weisz (via the investments@yieldstreet.com address noted above) on July 26, 2017 confirms this default, and that the borrower (Quest Livery Leasing) had in fact entered into a liquidation plan intended to ensure the "best possible recovery." As of this filing more than half of the principal balance remains outstanding on that fund.

64.    Prospective investors looking for a means to gauge YieldStreet's abilities were given a false sense of security by YieldStreet's misstatements about its past performance. The false claim that none of its investments have ever gone bad engendered confidence in YieldStreet's "innovative" and unproven model.

65.     As of March 2020, approximately 15 percent of the entire YieldStreet portfolio was in default. This default rate is approximately 5 times higher than the rate at which traditional "junk bonds" go into default.

66.     Each series of now-defaulted YieldStreet BPDNs—including but not limited to, its Vessel Deconstruction Funds (as defined *infra*), Louisiana Oil & Gas Fund, and others—was issued by either ALTNOTES I or ALTNOTES II. Accordingly, every investor who purchased an interest in one of YieldStreet's now-defaulted funds did so on the basis of this materially false statement about YieldStreet's supposed lack of principal loss.

67.     YieldStreet's lies about its past performance were just the tip of the iceberg. As set forth below, YieldStreet's defaults are the product of systemic, and undisclosed, inadequacies in its deal screening process. These failures are aptly illustrated by exploring the rise and fall of YieldStreet's "vessel deconstruction funds," which demonstrates the stark differences between how YieldStreet claims to operate versus how it actually operates.

C.  YieldStreet's Marketing of its Vessel Deconstruction Funds

68.     Soon after the ALTNOTES I private placement memorandum was distributed, YieldStreet launched its "Marine Finance" line as a new asset class under the BPDN framework. YieldStreet's offering materials lauded its marine finance loans as a "first-of-a-kind investment product" that would combine "sophisticated structuring" and YieldStreet's "40 years of Marine industry experience" to offer "flexible capital to originators in the Marine industry."

69.     YieldStreet's Marine Finance line eventually grew to represent a substantial portion of YieldStreet's overall portfolio. The majority of these deals were vessel deconstruction transactions whereby investor funds were raised through a BPDN offering and then loaned (through the dedicated SPV) to an undisclosed borrower for the purpose of acquiring, transporting,

16

and deconstructing a particular vessel for demolition, with the goal of selling the scrap for a profit over the transaction price. (Hereafter, these offerings are referred to collectively as "Vessel Deconstruction Fund(s), as defined in more detail *infra.*").

70.    The vessel deconstruction industry is a volatile sector— trade publications proudly refer to industry participants as "cutthroat"—that requires extensive and specialized industry knowledge to properly navigate.

71.    The vessels themselves are multi-million-dollar purchases made by a segment of international buyers possessing the requisite industry knowledge to assess the condition of the vessel and the market for same, as well as the business wherewithal to oversee the deconstruction process from acquisition to transport to demolition and ultimate realization of proceeds.

72.    The deconstruction process can proceed across multiple continents, sometimes in developing nations that lack stable infrastructures. As a result, the process is often complicated, and slowed, by external factors ranging from catastrophic weather conditions to civil turmoil.

73.    For these reasons, a passive investment in the vessel deconstruction industry is simply not possible. Entry into the space requires significant capital beyond the reach of most any individual investor; an extensive network of contacts; expertise vetting the vessel purchase itself; ability to structure a deal that adequately accounts for typical industry risks while still preserving the opportunity for a return on investment; and, critically, an ability to deal with the externalities that can and will arise during the demolition process.

74.    YieldStreet induced investors to participate in its Vessel Deconstruction Funds by claiming it possessed the knowledge and expertise to bridge this gap and make entry into the vessel deconstruction market feasible for the general public.

75.    YieldStreet attempted to demonstrate this claimed knowledge and expertise by stating in its private placement memoranda that none of the investments offered on YieldStreet's online platform had ever lost any principal.  As set forth above, this claim was false, as YieldStreet had in fact experienced a principal loss in its rideshare fleet expansion fund by the time this statement was first made in April 2018. Every investor who purchased an interest in one of YieldStreet's Vessel Deconstruction Funds did so on the basis of this false statement.

76.    YieldStreet made other false and misleading statements to induce investors to participate in a Vessel Deconstruction product. For example, YieldStreet claimed to utilize a three-stage "vetting process" as a way to screen potential offerings. The Series Note Supplements offered for each of the Vessel Deconstruction Funds described this as a "diligence" process.

77.    Stage one of that process claimed to rely on an initial analysis performed by the "originator" that YieldStreet consulted to identify potential vessel deconstruction opportunities. Yieldstreet promotes these originators as "experts within their asset class" with "established credit policies that align with its lending methodology." YieldStreet's private placement memoranda state that YieldStreet will rely on the originator's background and expertise in determining whether to participate in an opportunity, and also to advise YieldStreet as to how to structure the loan terms for those opportunities that YieldStreet chooses to offer on its web platform.

78.    At all relevant times hereto, Global Marine Transport Capital ("Global Marine") served as this asset class expert for YieldStreet's vessel deconstruction line.

79.    The Series Note Supplements YieldStreet used to market its vessel deconstruction products stated that YieldStreet relied on Global Marine to, *inter alia*, identify potential lending opportunities and advise YieldStreet on lending methodologies.

80.     The Series Note Supplements specifically highlighted Global Marine's expertise by describing its "extensive lending experience, unique proprietary relationships and the limited number of qualified capital providers in the shipping industry."

81.     Potential deals that survived Global Marine's initial scrutiny were presented to YieldStreet, which then began its own underwriting process. This underwriting process was the second stage of diligence that YieldStreet promised to investors.

82.     YieldStreet's prospectus makes clear that YieldStreet is solely responsible for "evaluating potential investment opportunities" and determining whether they are "suitable for YieldStreet's platform" on a deal-by-deal basis. YieldStreet's Form ADV likewise confirms that YieldStreet has discretionary authority over the SPVs' investment decisions.

83.     YieldStreet's prospectus states that a credit committee is tasked with this conducting this "independent analysis," and further states this committee's process and composition will vary as necessary to reflect the specific nature of the investment product at issue.

84.     YieldStreet's private placement memorandum describes the "general credit standards" YieldStreet's credit committee will apply as part of its underwriting analysis. These standards include YieldStreet's independent assessments of, *inter alia*, the background and experience of the borrower; necessary collateralization of the loan to protect investors against default; and appropriate structuring for the borrower's particular industry.

85.     YieldStreet's Series Note Supplements also stated that YieldStreet would use Global Marine's pre-offering evaluation of the proposed deal to help inform YieldStreet's analysis.

86.     As set forth below, **none of the foregoing occurred as promised**. YieldStreet promised to take certain steps that it knew it would not perform or was otherwise incapable of performing. As a result, key facts developed through stages one and two of the due diligence

process for YieldStreet's entire Vessel Deconstruction portfolio were omitted and/or misrepresented to potential investors. These misrepresentations and omissions marred the third stage of YieldStreet's vetting process—the so-called "investor education" phase—with misinformation, rendering it utterly meaningless.

D.   YieldStreet's Claims Were False and Misleading

87.   The industry-standard paradigm for vessel deconstruction lending is a revolving credit facility, with a loan duration in the 1-to-4-year range.

88.   The use of a revolving credit facility allows the necessary time, space, and flexibility to complete the steps in the demolition process, where external factors can and often do prevent the borrower from completing those steps by any arbitrary deadline. As an example, weather conditions may preclude entry into a necessary port, or an emerging county where demolition is set to take place may plunge into instability, delaying deconstruction for an indeterminate period of time.

89.   The revolver model also gives the lender better control over its outstanding capital, which is of paramount importance in an unpredictable industry like vessel deconstruction. While a revolving facility may turn over multiple times during the life of the loan, any subsequent extensions first require repayment of outstanding debt, allowing the facility to grow incrementally as the lender develops confidence in the borrower's abilities.

90.   Consistent with the foregoing, YieldStreet's early public statements, including statements in its Form ADV for 2018 and also on its web portal, indicated that YieldStreet's vessel deconstruction products were intended to have durations of 1-4 years.

91.   In fact, the first vessel deconstruction product that YieldStreet marketed followed this model: a $25 million revolving facility via "YS GM MarFinII LLC", a Delaware LLC, with a

2-year term that was issued on or around June 1, 2018 and subsequently amended in late 2018 to increase the total loan amount of $37 million ("Vessel Deconstruction Fund I").

92.     Demand for this and other YieldStreet marine offerings was robust. YieldStreet wanted to offer additional products but was limited in its ability to do so by the conservative nature of the revolver structure.

93.     Accordingly, in or around October 2018 YieldStreet's principal, Michael Weisz, conceptualized a lending model that had never before been tested in the vessel deconstruction space: abandoning the risk-conscious revolver model in favor of an extremely short-term product that would require repayment—and thus completion of the entire deconstruction process—in just a 6-month time frame.

94.     The short-term model he was considering would allow YieldStreet to rapidly, albeit recklessly, expand the burgeoning (and unproven) Vessel Deconstruction platform in a much shorter period of time. This expansion would in turn allow YieldStreet to realize increased management fees, without regard to the performance of the underlying loans. For example, a $25 million revolver facility may turn over three times in two years, resulting in a total of $75 million lent out and subsequently repaid. However, YieldStreet's fees would be capped based on the total amount outstanding at any given time. In contrast, issuing 6 short-term facilities totaling $75 million simultaneously to that same borrower allowed YieldStreet to realize management fees on the full $75 million across the six separate deals in a matter of months, not years.

95.     YieldStreet's management fees were and remain sacrosanct for Mr. Weisz, as his personal motivation is believed to be to inflate YieldStreet's fee collections, however and as rapidly as possible, in order to manufacture a higher resale multiple supporting an eventual sale of

the company and/or higher valuation in connection with a SPAC offering. (Given YieldStreet's spectacular and public missteps, that exit strategy is likely on hold.)

96.     Global Marine, the "asset class expert" YieldStreet brought in to help develop and implement the credit policies and lending methodology used across the Vessel Deconstruction Funds, advised Mr. Weisz that his unproven and unconventional six-month lending model was a structural mismatch for the volatile vessel deconstruction industry. Global Marine warned YieldStreet in no uncertain terms that leaving borrowers only six months to acquire a vessel, transport it around the world for demolition, and then realize profits from the scrapped metals, was impractical and contrary to established marine vessel deconstruction financing norms.

97.     The risks inherent in the short-term model were magnified by Mr. Weisz' desire to issue so many short-term products at one time, which would raise the platform's total exposure many times over in a very short period of time, without waiting to see if the model would work.

98.     Mr. Weisz ignored Global Marine's advice, even though YieldStreet's offering documents stated that YieldStreet would rely on Global Marine's expertise and recommendations.

99.     In October 2018 Mr. Weisz flew to Dubai for a closed-door meeting with the principals of the North Star Group, who at the time were the borrowers on what was YieldStreet's one and only vessel deconstruction loan, to discuss Mr. Weisz' new short term lending concept.

100.     Although Global Marine was YieldStreet's originator for its vessel deconstruction line, and in fact had helped develop the entire YieldStreet Marine Finance platform, its personnel were locked out of the meeting because Mr. Weisz knew that they would have cautioned against use of the short-term model he was planning to propose.

101.     During this meeting Mr. Weisz in fact functioned as a one-man credit committee, unilaterally deciding to pursue the short-term model in order to realize additional management fees

in a shorter time frame, regardless of the increased risk to YieldStreet's investors. Mr. Weisz' actions were directly contrary to the representations in YieldStreet's Series Note Supplements that all deals were the product of an informed decision by a multi-party credit committee where each member of the credit committee had supposed veto power over a transaction.

102.    By the end of the Dubai meeting Mr. Weisz and the North Star Group had agreed to pioneer the new short-term lending model.

103.    Because the North Star group was the only contact that YieldStreet's novice Marine Finance team had in the deconstruction industry, all of the short-term products YieldStreet was preparing to offer were would necessarily be concentrated through North Star.

104.    Before the end of 2018 Global Marine again attempted to dissuade Mr. Weisz from structuring additional marine vessel deconstruction deals using his desired short-term model, and further warned YieldStreet against concentrating all of these short-term products with a single borrower that comprised all, or virtually all, of YieldStreet's marine portfolio. Global Marine was well-positioned to opine on the risks of YieldStreet becoming over-exposed to the North Star group, as Global Marine had "spent three years engaged in a business relationship with the [North Star group] and can also vouch for their abilities," as recognized in YieldStreet's Series Note Supplements.

105.    Mr. Weisz again ignored Global Marine's advice, notwithstanding that he and YieldStreet's nominal marine team lacked the experience to assess the viability of the short-term model on their own. Mr. Weisz ignored Global Marine's advice even though YieldStreet had represented to its investors that YieldStreet specifically relied upon Global Marine as an "asset class expert" to develop lending strategies.

106.    YieldStreet thus set out to grow its vessel deconstruction platform by concentration, which is particularly dangerous in an industry as volatile as this one.

107.    The combination of a poorly conceived lending model that grew too quickly and was overconcentrated in a single borrower set up a scenario that was doomed to fail. The entire platform would exist on a razor's edge, whereby one default could torpedo YieldStreet's entire marine platform.

108.    Mr. Weisz ignored these concerns. His sole focus was believed to be the ramping up the amount of capital under the YieldStreet umbrella, and the management fees (and resale or acquisition potential) that came along with it.

109.    Accordingly, soon thereafter YieldStreet began marketing a series of short-term vessel deconstruction products in rapid-fire succession.

110.    Critically, YieldStreet never updated its private placement memoranda, its Form ADVs, or its Series Note Supplements to reflect the fact that it was (i) using an unproven lending model; that (ii) the asset class experts so prominently highlighted in those same documents had explicitly warned against using; that (iii) Michael Weisz would act as a one-man credit committee, and (iv) that Mr. Weisz lacked any experience in Marine Vessel Deconstructing financing.

111.    YieldStreet likewise never disclosed to investors that all of these unproved products were being concentrated with the same borrower group. At one point, approximately 80 percent of YieldStreet's marine platform was concentrated amongst the same or related borrowers.

112.    YieldStreet had a duty to disclose this information to investors considering purchasing BPDNs. These investors should have been told that they were guinea pigs pioneering a risky and unproved loan structure in a volatile industry.

113.    YieldStreet also failed to disclose to investors that its "team" did not have the experience necessary to vet and structure a vessel deconstruction loan—and in fact, had never been involved in any such loans before joining YieldStreet.

114.    Notably, while YieldStreet's Form ADV disclosed its team's lack of experience in other areas (for example, its "limited experience in entering into hedging transactions" such that it "may have to purchase or develop such expertise"), nowhere did YieldStreet did disclose that its Marine Finance team had never been involved in a marine deconstruction deal. This is particularly misleading because the ADV purported to disclose certain risks that were specific to YieldStreet's marine finance line.

115.    A competent lender needs to be able to vet size, structure, and process. YieldStreet had no one on its team who could do this, and its promises to evaluate loan opportunities are meaningless if it lacks the wherewithal to do so effectively. YieldStreet's investors should have been given an accurate representation of YieldStreet's capabilities. Investors had a right to know that in addition to pioneering a new loan model, they were also the crash test dummies for the YieldStreet team struggling to figure out the high-risk vessel deconstruction industry.

116.    All of the foregoing were material facts that should have been, but were not, disclosed to YieldStreet's investors when the following Funds were formed and marketed:

  i.   $12.5 million raised to increase Vessel Deconstruction I from $25 million to $37.5 million on or about December 18, 2018;

  ii.  $16.05 million raised by YS GM MF VIII LLC, pertaining to YieldStreet's Short Term Vessel Refinancing Fund, on or around March 22, 2019;

  iii. $12.65 million raised by YS GM MF VII LLC, pertaining to YieldStreet's Vessel Deconstruction Fund III, on or around March 31, 2019;

  iv.  $9 million raised by YS GM MF IX LLC, pertaining to YieldStreet's Vessel Deconstruction Fund IV, on or around May 29, 2019; and

   v. $14.5 million raised by YS GM MF X LLC, pertaining to YieldStreet's Vessel Deconstruction Fund VI, on or around September 11, 2019.

(together, the "Vessel Deconstruction Funds.")

117. YieldStreet's investors were lured into purchasing their interests in YieldStreet's Vessel Deconstruction Funds on the basis of YieldStreet's misrepresentations and omissions described above.

118. YieldStreet's omissions were material. YieldStreet's investors relied on YieldStreet's claimed expertise in making innovative products available to the masses who otherwise have no lens into the industry. These investors should have been apprised of the true extent, or lack thereof, of that experience, and further, that the "asset class experts" YieldStreet claimed to rely on had explicitly warned YieldStreet against both selling the unproven short-term products and overconcentrating that exposure with the same borrower group.

119. Indeed, YieldStreet's knowing failure to disclose these material facts renders illusory the entire "vetting" or "diligence" process described in its private placement memorandum, Series Note Supplements, and other offering documents.

120. Unsurprisingly, the entirety of YieldStreet's vessel deconstruction portfolio came crashing down in March 2020, when the very risks YieldStreet had ignored came to fruition. Its overleveraged borrower was unable to repay a short-term loan before its maturity date, and the dominos began to fall from there.

121. Approximately $90 million in vessel deconstruction loans are now in default.

122. YieldStreet has denied culpability for the defaults, accusing Global Marine of "fraud." Indeed, suing its originators for fraud is a common tactic for YieldStreet when its deals go bad.

E.   <u>YieldStreet's Funds Across a Wide Variety of Sectors Have Defaulted</u>

123.    As of March 2020, YieldStreet's portfolio snapshot reflected that marine defaults represented approximately one-half of YieldStreet's total defaults across its entire portfolio—meaning that tens of millions of dollars' worth of other loans are also in default.

124.    One of those defaulted loans is YieldStreet's "Louisiana Oil and Gas" Fund, with approximately $12 million in principal outstanding. YieldStreet formed "YS ARNA OG Fin I LLC" ("ARNA") to serve as the SPV for this Fund (hereafter, "Oil & Gas Fund").

125.    In or around October 2018, ALTNOTES I—the same YieldStreet subsidiary that issued BPDNs for a number of the Vessel Deconstruction Funds—issued $12 million worth of BPDNs to raise money for the Oil & Gas Fund, which funds ARNA then lent to a group of borrowers for the purpose of purchasing an interest in an oil and gas well.

126.    ALTNOTES, I solicited investors to participate in the Oil & Gas Fund through a Series Note Supplement issued in or around September 2018 stating that "[c]urrent production is approximately 13.5M cubic feet of gas equivalent per day (mmcf/day) or 2.2k barrels of oil equivalent (BOE) from 21 producing O&G wells."

127.    This was not true. In YieldStreet's own words, "in September 2018, production volume was nearly half [its projection]: 11.3 million cubic feet per day."  YieldStreet thus induced investors to purchase interests in the Oil & Gas Fund through production data that was off in the order of tens of millions of cubic feet per month. This misstatement was both material and critical because, as the Series Note Supplement made clear, production generates cash flow for the borrower, and that cash flow was intended to support the repayment of the loan securing the BPDNs.

128.    The same private placement memoranda, prospectus, and Form ADV used to induce investors to purchase interests in the Vessel Deconstruction Funds were used to induce investors to participate in the Oil & Gas Fund. Accordingly, all of the misrepresentations and omissions underpinning YieldStreet's Vessel Deconstruction Funds—its claims of a meaningful and informed diligence process, and reliance on "asset class experts"—were also present with respect to the Oil & Gas Fund.

129.    Consistent therewith, YieldStreet's "credit committee," which is solely responsible for "evaluating potential investment opportunities" and has discretionary authority over all investment decisions, knew that it was relying upon stale data yet failed to request updated performance metrics for the wells securing the Oil & Gas loan.

130.    Even though the Series Note Supplement identified numerous third-party experts tasked with servicing the Oil & Gas loan—including but not limited to, an obligation to provide monthly production and financial reports—YieldStreet either did not know what to ask for, or did not care to ask for it, as again, it was the investors' money, not YieldStreet's, at risk.

131.    YieldStreet's registered investment advising arm thus recommended that YieldStreet and its investors participate in that loan on the basis of stale data that was nearly 6 months old by the time Oil & Gas BPDNs were issued, a lifetime in the oil and gas industry.

132.    Potential investors were misled into believing that the data they were being given was "current," as stated in the Oil & Gas Series Note Supplement.

133.    The Oil & Gas Fund passed its target maturity date in June 2020. The Fund is now in default. As of this date virtually all of $12,000,000 principal balance remains outstanding.

134.    In typical fashion, YieldStreet has again sued the originator of the Oil & Gas Fund for "fraud."

135.    The same offering documents that contained the core misrepresentations that induced investors to participate in the Vessel Deconstruction and Oil & Gas Funds, including the false claims of no prior principal loss in any prior Yieldstreet deals, an informed diligence process, and reliance on asset-class experts, were used to induce investors to participate in a number of now-defaulted offerings, including but not limited to various commercial and residential real estate funds, litigation finance funds , and, an aptly-collateralized equity investment in a fertilizer plant.

136.    YieldStreet's "Post War & Contemporary Art" portfolio ("Art Fund") is yet another instance of a diligence failure coupled with misrepresentations to potential investors.

137.    The Art Fund lent approximately $13.7 million to an entity formed by Inigo Philbrick. The borrower defaulted in October 2019, and soon thereafter, Philbrook was arrested and charged with wire fraud and aggravated identity theft.

138.    YieldStreet's wholly owned subsidiary, Athena Art Finance, performed diligence on Philbrook prior to issuing the loan. Philbrook called YieldStreet's diligence laughable, consisting of a handwritten two-page "financial disclosure" document without any third-party verification.

139.    YieldStreet marketed the art fund using a Series Note Supplement describing "Why We Like This Opportunity" and promising a "first priority lien on a pool of Post War & Contemporary artworks" securing the loan, including the painting "Humidity" by Jean Michael Basquiat.

140.    YieldStreet took possession of "Humidity" following Philbrick's default; however, two lenders have asserted priming liens on the painting, notwithstanding YieldStreet's claim of a first-priority position.

141.     Art Fund investors were due to receive their principal and interest payments by March 31, 2020. They have not received payment, and instead await YieldStreet's efforts to invalidate the two priming liens its own diligence failed to identify.

F.    The Named Plaintiffs' Experience

142.    On or about December 21, 2018, Plaintiff Lawrence Tjok purchased a borrower payment dependent note from YS ALTNOTES I, LLC, a beneficially owned subsidiary of YieldStreet, Inc., for the price of $25,000. Mr. Tjok also purchased $25,000 in the same offering on June 12, 2018. The notes were issued under Special Purpose Vehicle (SPV) YS GM Marfin II LLC in the offering known as YieldStreet's Vessel Deconstruction Fund I and was offered as part of a continuous offering pursuant to Rule 415 of the Securities Act of 1933.

143.    On or about April 11, 2019, Plaintiff Lawrence Tjok purchased a borrower payment dependent note from YS ALTNOTES II, LLC, a beneficially owned subsidiary of YieldStreet, Inc., for the price of $25,000. The note was issued under Special Purpose Vehicle (SPV) YS GM MF VIII LLC in the offering known as YieldStreet's Short Term Vessel Refinancing Fund and was offered as part of a continuous offering pursuant to Rule 415 of the Securities Act of 1933.

144.    On or about April 22, 2019, Plaintiff Lawrence Tjok purchased a borrower payment dependent note from YS ALTNOTES II, LLC, a beneficially owned subsidiary of YieldStreet, Inc., for the price of $25,000. The note was issued under Special Purpose Vehicle (SPV) YS GM MF VII LLC in the offering known as YieldStreet's Vessel Deconstruction Fund III and was offered as part of a continuous offering pursuant to Rule 415 of the Securities Act of 1933.

145.    On October 9, 2018, Plaintiff Lawrence Tjok purchased a borrower payment dependent note from YS ALTNOTES I, LLC, a beneficially owned subsidiary of YieldStreet, Inc., for the price of $25,000. The note was issued under Special Purpose Vehicle (SPV) ARNA OGFin

I LLC in the offering known as YieldStreet's Louisiana Oil & Gas Fund and was offered as part of a continuous offering pursuant to Rule 415 of the Securities Act of 1933.

146.    On or about June 19, 2019, Plaintiff Michael Tecku purchased a borrower payment dependent note from YS ALTNOTES II, LLC, a beneficially owned subsidiary of YieldStreet, Inc., for the price of $100,000. The note was issued under Special Purpose Vehicle (SPV) YS GM MF IX LLC in the offering known as YieldStreet's Vessel Deconstruction Fund IV and was offered as part of a continuous offering pursuant to Rule 415 of the Securities Act of 1933.

147.    On or about September 29, 2019, Plaintiff David Finkelstein purchased a borrower dependent payment note from YS ALNOTES I, LLC, a beneficially owned subsidiary of YieldStreet, Inc., for the price of $150,000. The note was issued under Special Purpose Vehicle (SPV) YS GM MF X, LLC in the offering known as YieldStreet's Vessel Deconstruction Fund VI and was offered as part of a continuous offering pursuant to Rule 415 of the Securities Act of 1933.

148.    On or about October 3, 2019, Plaintiff Adrienne Cerulo purchased a borrower payment dependent note from YS ALTNOTES I, LLC, a beneficially owned subsidiary of YieldStreet, Inc., for the price of $30,000. The note was issued under Special Purpose Vehicle (SPV) YS GM MF X LLC in the offering known as YieldStreet's Vessel Deconstruction Fund IV and was offered as part of a continuous offering pursuant to Rule 415 of the Securities Act of 1933.

149.    Plaintiffs received YieldStreet's offering materials through YieldStreet's investor portal and reviewed those materials prior to purchasing BPDNs from ALTNOTES, as confirmed by their acknowledgements in their respective BPDNs and Subscription Agreements.

150.    Plaintiffs did not receive the principal they were owed on the stated maturity dates for their BPDNs. All of the funds described herein are currently in default.

G.  <u>Class Action Allegations</u>

151.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

152.   Plaintiffs bring this action individually and on behalf of all other persons similarly situated (hereinafter referred to as "the Class") pursuant to Federal Rule of Civil Procedure 23.

153.   Plaintiffs propose the following Class definition(s), subject to amendment as appropriate:

> All persons who purchased a Borrower Payment Dependent Note (BPDN) issued by YS ALTNOTES I or YS ALTNOTES II in connection with the following offerings:
>
>    i.   Vessel Deconstruction I;
>
>   ii.   Short Term Vessel Refinancing Fund;
>
>  iii.   Vessel Deconstruction Fund III;
>
>  iv.   Vessel Deconstruction Fund IV;
>
>   v.   Vessel Deconstruction Fund VI; and
>
>  vi.   Louisiana Oil & Gas.

154.   Plaintiffs reserve the right to amend this Complaint to assert claims on behalf of additional classes or subclasses of investors in any of the other defaulted funds described herein, insofar as some of the misrepresentations and omissions identified in this complaint were common to all YieldStreet offerings.

155.   Collectively, all these persons identified in the Class definition(s) above will be referred to as "Class members." Plaintiffs represent, and are members of, the Class. Excluded from the Class are Defendants, any entities in which Defendants have a controlling interest, and Defendants' agents and employees, and any Judge to whom this action is assigned and any member

of such Judge's staff and immediate family. Plaintiffs do not know the exact number of members in the Class, but reasonably believe that Class members number, at a minimum, to be more than 500. Further, the Class can be identified easily through records maintained by YieldStreet.

156.   The joinder of all Class members is impracticable due to the number of Class members. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class(es).

157.   The claims of Plaintiff are typical of the claims of the Class(es) they seek to represent. Plaintiff and other Class members invested in BPDNs issued by one or both ALTNOTES entities during the relevant time period. All of their purchases were based on the same set of offering documents and other information made available by YieldStreet. A material misrepresentation or omission to one investor is thus the same for all investors.

158.   There are well-defined, nearly identical, common questions of law and fact affecting all parties that predominate over questions that may affect individual Class members, including but not limited to the following:

     i.   Whether any of the materials Defendants provided prior to any offering described herein contained material misrepresentations or omissions about YieldStreet's prior performance, including its false claim of no principal loss on any products offered on its web platform;

    ii.   Whether any of the materials Defendants provided prior to any offering described herein contained material misrepresentations or omissions about YieldStreet's diligence capabilities and/or industry experience;

   iii.   Whether any of the materials Defendants provided prior to any offering described herein contained material misrepresentations or omissions about YieldStreet's reliance on "asset class experts" to inform YieldStreet's participation in the subject transaction;

iv.   Whether Defendants made investment decisions related to the defaulted funds based on YieldStreet's own self-interest, to wit, the desire to extract maximum fees for the purpose of driving up the resale value of YieldStreet;

v.   Whether the fact that use of a "short term" lending model in the vessel deconstruction field was contrary to industry standards and in fact had never been done before was material and should have been disclosed by YieldStreet;

vi.   Whether the fact that the asset-class expert YieldStreet claimed to employ to develop lending methodologies had expressly warned against use of a "short term" lending model was material and should have been disclosed by YieldStreet;

vii.   Whether the fact that the asset-class expert YieldStreet claimed to employ to develop lending methodologies had expressly warned against using the "short term" lending model to grow the marine platform at the rate YieldStreet was proposing was material and should have been disclosed by YieldStreet;

viii.   Whether the fact that all or virtually all of the Vessel Deconstruction loans YieldStreet made were placed with the same borrowing group, creating an unreasonable concentration of risk, was material and should have been disclosed by YieldStreet;

ix.   Whether YieldStreet's claim that it relied on the advice of asset class experts in soliciting the Vessel Deconstruction offerings was a material misrepresentation;

x.   Whether the fact that no one on YieldStreet's credit committee had any meaningful experience in the vessel deconstruction industry that would have allowed them to properly vet proposed deconstruction deals was material and should have been disclosed by YieldStreet;

xi.   Whether Defendants knew or reasonably should have known that their "short term" lending model was not viable in the vessel deconstruction industry;

xii.   Whether YieldStreet's representation of "current" production values in the Series Note Supplement used to market the Oil & Gas Fund was knowingly and materially misleading; and

xiii.   Whether Mr. Weisz acted as an uninformed "one man credit committee" in determining whether YieldStreet would offer any of the investment products described herein.

159.   These and other common issues predominate over any individual issues. The focus of these claims is on the conduct of YieldStreet and the contents of its offering documents and other public statements, which did not vary as between class members. Resolution of these

common questions will drive the claims of all Class members toward judgment or resolution; they involve a "fatal similarity" for purposes of the claims of all class members.

160.    For all of these reasons, a class action is the superior method for the fair and efficient adjudication of this controversy.

161.    Plaintiffs and members of the Class(es) have been harmed and/or continue to be harmed by the foregoing and other acts of YieldStreet and its control persons like Mr. Weisz, including but not limited to, the loss of funds used to purchase BPDNs that were marketed and sold on the basis of material omissions and/or misrepresentations.

162.    Plaintiffs seek damages on behalf of themselves and all Class members, including but not limited to return of their investments, with the interest YieldStreet represented would be paid, as well as consequential damages in an amount to be proven at trial.

163.    Plaintiffs will fairly and adequately represent and protect the interests of the Class and have no interests which are antagonistic to any member of the Class.

164.    Plaintiff has retained counsel experienced in handling class action claims involving fraud and securities violations. Plaintiffs' counsel is also experienced in prosecuting the claims of investors against entities that have engaged in malfeasance with respect to investments.

165.    Class-wide relief is essential to resolve the claims regarding all potential investors relating to all responsible parties in an equitable, even-handed fashion.

166.    Plaintiffs therefore seeks certification of the Class(es) pursuant to Rules 23(b)(1)(A) and (b)(3).

167.    Plaintiffs seek certification of a Rule 23(b)(1)(A) class. Adjudicating Defendants' liability for the facts and claims alleged here poses a substantial risk of inconsistent or varying

adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendants if a class is not certified.

168.    Plaintiffs seek certification of a Rule 23(b)(3) class. As detailed above, common questions regarding Defendants' conduct predominate over any individual issues, and a class action is superior to the alternative of hundreds or even thousands of individual cases involving the same core facts and claims addressed to YieldStreet's conduct.

169.    In the alternative, Plaintiff seeks certification of an "issues" class pursuant to Rule 23(c)(4). This class would incorporate, and allow for the adjudication of, all issues the Court adjudges to be common to members of the class and subclass, such as one or more of the common issues identified by Plaintiff in ¶ 159, *supra*.

## CAUSES OF ACTION

### Count One: Fraudulent Inducement

### (against all Defendants)

170.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

171.    This is a claim for common law fraudulent inducement, including inducement by fraudulent concealment.

172.    YieldStreet fraudulently induced Plaintiffs to purchase BPDNs in the Vessel Deconstruction and Oil & Gas funds through various misrepresentations concerning its prior history and false claims of no principal loss; its uninformed diligence process; its inability to interpret data and proposed deal terms and convey that information to potential investors in a meaningful and accurate fashion; and its purported reliance on asset-class experts to develop viable deal structures.

173.     YieldStreet knew that its statements of no principal loss were false and/or misleading when made, as Mr. Weisz, on behalf of YieldStreet, had informed investors in one of YieldStreet's ridesharing funds of a default through an email sent in July 2017.

174.     YieldStreet knew that its statements in its Series Note Supplements soliciting interests in its Vessel Deconstruction Funds that claimed reliance on Global Marine to develop lending methodologies were false and/or misleading when made. These statements were made after Global Marine had advised YieldStreet not to implement the short-term loan structure, not to increase the overall exposure of the platform so quickly, and not to overconcentrate its portfolio with a particular buyer—none of which was disclosed to investors.

175.     YieldStreet's omissions and misrepresentations falsely portrayed the true nature of the vessel deconstruction products YieldStreet was offering and were therefore material.

176.     YieldStreet knew that its statement in the Series Note Supplement used to solicit interests in the Oil & Gas Fund claiming that production data for the oil and gas wells that would generate cash flow to repay the loan was "current" was false. YieldStreet knew that the data it had received was nearly 6 months old at the time this statement was made.

177.     On this same basis, YieldStreet's statements suggesting that its offerings were the product of an informed diligence process that made all material information available to investors were also false and misleading when made.

178.     YieldStreet therefore fraudulently induced Plaintiffs by offering BPDNs in the Vessel Deconstruction and Oil & Gas funds without disclosing a number of material facts as set forth above, including but not limited to:

      i.   that previous deals offered on its web portal had in fact lost principal;

ii.   that investors in the Vessel Deconstruction Funds would be guinea pigs pioneering an unproven model developed by a lending team that had no prior experience in the vessel deconstruction industry;

iii.   that the use of a short-term loan facility in the vessel deconstruction field was contrary to industry standards and in fact had never before been utilized in the fashion YieldStreet was proposing;

iv.   that the asset-class expert YieldStreet claimed to employ to develop lending methodologies for the Vessel Deconstruction Funds had expressly warned YieldStreet against use of a "short term" lending model;

v.   that the asset-class expert YieldStreet claimed to employ to develop lending methodologies for the Vessel Deconstruction Funds had expressly warned YieldStreet against using the "short term" lending model to grow the marine platform at the rate YieldStreet was proposing;

vi.   that all or virtually all of the vessel deconstruction loans YieldStreet made were placed with the same borrowing group, creating an unreasonable concentration of risk that increased with each subsequent loan;

vii.   that no one on YieldStreet's marine finance team had any meaningful experience in the vessel deconstruction industry that would have allowed them to properly vet or structure proposed deconstruction deals;

viii.   that YieldStreet's and Mr. Weisz' motive in offering the short-term products across the vessel deconstruction verticals was to ramp up the total amount of loans outstanding in as short of a time frame as possible to capitalize on investor demand, without regard to whether the model was viable;

ix.   that YieldStreet's and Mr. Weisz' motive in offering the short-term products across the Vessel Deconstruction verticals was to maximize the amount of fees payable to YieldStreet Management, without regard to whether the model was viable;

x.   that Mr. Weisz acted as a "one man credit committee" for YieldStreet and made decisions contrary to the advice of those around him; and

xi.   that YieldStreet had failed to obtain accurate and current production data prior to offering interests in the Oil & Gas Fund.

179.   These misstatements and omissions concerned information regarding YieldStreet's internal business operations and financial motivations. YieldStreet had special knowledge of these facts, which were otherwise unavailable to investors.

38

180.    YieldStreet also had sole and exclusive access to information learned during the due diligence processes for the Vessel Deconstruction and Oil & Gas funds, and on this basis also had special knowledge of facts otherwise unavailable to investors.

181.    Each of the foregoing omissions, if made known, would have impacted a reasonable investor's decision to purchase a BPDN from YieldStreet.

182.    ALTNOTES I and ALTNOTES II, as the issuer of the Vessel Deconstruction and Oil & Gas notes, are responsible for misrepresentations and omissions contained in the Series Note Supplements and other documents used to sell the Vessel Deconstruction and Oil & Gas Funds.

183.    YieldStreet, Inc. and YieldStreet Management are also responsible for misrepresentations and omissions contained in the Series Note Supplements and other offering materials used to sell the Vessel Deconstruction and Oil & Gas funds because these documents: (i) were drafted by one or both of these entities; (ii) were marketed and made available to investors exclusively through the YieldStreet web portal; (iii) contained statements regarding information within the exclusive control of one or both of these entities, and/or; (iv) bore the YieldStreet logo. YieldStreet, Inc. and YieldStreet Management also had full ownership and managerial control over ALTNOTES I and ALTNOTES II.

184.    Each Class member reasonably relied on the information made available by YieldStreet in the offering documents. Core misrepresentations including the false claims of no prior principal loss in any prior Yieldstreet deals, an informed diligence process, and reliance on asset-class experts were uniformly misstated in the same offering documents made available to all investors in the Vessel Deconstruction and Oil & Gas Funds. These misrepresentations and omissions were relied on by all BPDN purchasers, as they acknowledged in executing their Subscription Agreements.

185.    YieldStreet intended to and did in fact use its misleading offering documents to induce investors to purchase a BPDN from YieldStreet. YieldStreet's intent to defraud may be inferred from, *inter alia*, the fact that YieldStreet had ready knowledge of and access to true information that contradicted its public statements; that YieldStreet concealed information that if made available to the public would have severely undermined confidence in both its lending models and diligence capabilities; and that YieldStreet's true motivation was not to protect investor funds, but rather to artificially increase its management fees to support a higher resale/acquisition price for the company.

186.    YieldStreet's other defaulted offerings reflect that its misrepresentations concerning its diligence capabilities were part of a larger pattern and practice not unique to the Vessel Deconstruction and Oil & Gas funds. YieldStreet repeatedly loaned money to untrustworthy borrowers who YieldStreet is now suing for fraud, and who otherwise failed to deliver collateral as promised.

187.    YieldStreet's exclusive access to information about the deals it offered, along with the novelty of its crowdfunding model and the SEC's recently relaxed advertising restrictions on crowdfunded investments, also provided YieldStreet an opportunity to further its own financial interest by concealing the truth from its investors.

188.    The foregoing facts also demonstrate that Defendants are liable under a theory of constructive fraud. *See DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 282 (S.D.N.Y. 2014) ("Constructive fraud requires establishing the same elements as actual fraud except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties.") (citation omitted).

189.    Plaintiffs are entitled to all available damages on the basis of the foregoing material omissions and misrepresentations that induced them to purchase these securities, including but not limited to, recovery of the consideration paid for the securities, interest, and all other damages recoverable under law.

### Count Two: Aiding & Abetting Fraud

### (alternative theory as to all Defendants)

190.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

191.    As set forth *supra*, to the investing public, YieldStreet, Inc. and its various subsidiaries operate as a cohesive whole under the "YieldStreet" moniker.

192.    Consistent with this approach, each entity's participation in the issuance, offering and/or promotion of the Vessel Deconstruction and Oil & Gas funds was largely without distinction, making each of the affiliates liable as primary violators. Nevertheless, out of an abundance of caution, Plaintiffs allege that if any of the entities are found not to be primary perpetrators of the fraud, the foregoing allegations establish that each Defendant had knowledge of the fraud and provided substantial assistance in furtherance of same, thus rendering them liable as aiders and abettors who induced Plaintiffs and the Class Members to invest in YieldStreet's Vessel Deconstruction and Oil & Gas funds on the basis of fraudulent statements and omissions..

### Count Three: Violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. 240.10b–5(b))

### (against all Defendants)

193.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

194.    During the Class Period, YieldStreet disseminated or approved the false statements specified above to induce Plaintiffs and the Class Members to purchase YieldStreet's Vessel Deconstruction and Oil & Gas notes.

195.    YieldStreet, Inc. and YieldStreet Management prepared the offering documents containing false and misleading statements, including but not limited to the Series Note Supplements and private placement memoranda used to promote the Vessel Deconstruction and Oil & Gas funds to YieldStreet's potential investors. ALTNOTES I and II issued BPDNs in connection with the Vessel Deconstruction and Oil & Gas funds on the basis of these same and misleading statements, which include:

    i.    that previous deals offered on its web portal had in fact lost principal;

    ii.    that investors in the Vessel Deconstruction Funds would be guinea pigs pioneering an unproven model developed by a lending team that had no prior experience in the vessel deconstruction industry;

    iii.    that the use of a short-term loan facility in the vessel deconstruction field was contrary to industry standards and in fact had never before been utilized in the fashion YieldStreet was proposing;

    iv.    that the asset-class expert YieldStreet claimed to employ to develop lending methodologies for the Vessel Deconstruction funds had expressly warned YieldStreet against use of a "short term" lending model;

    v.    that the asset-class expert YieldStreet claimed to employ to develop lending methodologies for the Vessel Deconstruction Funds had expressly warned YieldStreet against using the "short term" lending model to grow the marine platform at the rate YieldStreet was proposing;

    vi.    that all or virtually all of the Vessel Deconstruction loans YieldStreet made were placed with the same borrowing group, creating an unreasonable concentration of risk that increased with each subsequent loan;

    vii.    that no one on YieldStreet's marine finance team had any meaningful experience in the vessel deconstruction industry that would have allowed them to properly vet or structure proposed deconstruction deals;

    viii.    that YieldStreet's and Mr. Weisz' motive in offering the short-term products across the vessel deconstruction verticals was to ramp up the total amount of loans outstanding in as short of a time frame as possible to capitalize on investor demand, without regard to whether the model was viable;

    ix.    that YieldStreet's and Mr. Weisz' motive in offering the short-term products across the vessel deconstruction verticals was to maximize the amount of fees payable to YieldStreet Management, without regard to whether the model was viable;

    x.    that Mr. Weisz acted as a "one man credit committee" for YieldStreet and made decisions contrary to the advice of those around him; and

    xi.    that YieldStreet had failed to obtain accurate and current production data prior to offering interests in the Oil & Gas Fund.

196.    YieldStreet had a duty to disclose the information it concealed from investors considering an investment in the Vessel Deconstruction and Oil & Gas funds insofar as these misstatements and omissions concerned information regarding YieldStreet's internal business operations and financial motivations and therefore were exclusively within YieldStreet's knowledge.

197.    YieldStreet also had sole and exclusive access to information learned during the diligence processes for the Vessel Deconstruction and Oil & Gas funds, and on this basis also had special knowledge of facts otherwise unavailable to investors.

198.    YieldStreet had special knowledge of facts otherwise unavailable to investors, including but not limited to, the fact that the asset class experts supposedly retained to advise YieldStreet in connection with its Vessel Deconstruction loans had expressly warned YieldStreet not to make them, and/or that the production data relied upon in the Oil & Gas offering materials was not "current" at all but was in fact several months old.

199.    Each Class member reasonably relied on the information made available by YieldStreet in the offering documents. Core misrepresentations including the false claims of no prior principal loss in any prior Yieldstreet deals, an informed diligence process, and reliance on

43

asset-class experts were uniformly misstated in the same offering documents made available to all investors in the Vessel Deconstruction and Oil & Gas Funds. These misrepresentations and omissions were relied on by all BPDN purchasers, as they acknowledged in executing their Subscription Agreements.

200.    YieldStreet intended to and did in fact use its misleading offering documents to induce investors to purchase a BPDN from YieldStreet. YieldStreet's intent to defraud may be inferred from, *inter alia*, the fact that YieldStreet had ready knowledge of and access to true information that contradicted its public statements; that YieldStreet concealed information that if made available to the public would have severely undermined confidence in both its lending models and diligence capabilities; and that YieldStreet's true motivation was not to protect investor funds, but rather to artificially increase its management fees to support a higher resale/acquisition price for the company.

201.    YieldStreet's other defaulted offerings reflect that its misrepresentations concerning its diligence capabilities were part of a larger pattern and practice not unique to the Vessel Deconstruction and Oil & Gas funds. YieldStreet repeatedly loaned money to untrustworthy borrowers who YieldStreet is now suing for fraud, and who otherwise failed to deliver collateral as promised.

202.    YieldStreet's superior and exclusive knowledge of material facts not knowable to investors, the novelty of YieldStreet's crowdfunding model and the SEC's recently relaxed advertising restrictions also provided YieldStreet an opportunity to further its own financial interest by concealing the truth from its investors.

203.    All of the foregoing misstatements and omissions were made "in connection with the purchase or sale of securities, namely, the Vessel Deconstruction and Oil & Gas funds.

204.    Plaintiffs and the class claimants have suffered damages in that, in reliance on the misrepresentations and omissions made by YieldStreet, and Michael Weisz, they were induced to purchase the Notes. Plaintiff and class claimants would not have purchased the BPDNs if they had been aware of the above-referenced information revealing the true nature of the Vessel Deconstruction and Oil & Gas investments.

205.    As YieldStreet's president and "one man credit committee," Mr. Weisz had actual knowledge of and participation in the dissemination of the above-referenced misrepresentations and omissions.

206.    Mr. Weisz had actual knowledge that the information YieldStreet was providing to potential investors about YieldStreet's prior history and claims of no past principal loss was materially false and/or misleading, based upon, *inter alia*, the fact that he, on behalf of YieldStreet, had authored an email in July 2017 acknowledging that one of YieldStreet's deals had defaulted with outstanding principal still owed to this day.

207.    Mr. Weisz had actual knowledge that other information YieldStreet was providing to potential investors was materially false and/or misleading, based upon, *inter alia*, his interactions with Global Marine in which Mr. Weisz was advised, repeatedly, of the dangers of:

     i.    using the short-term lending model in the vessel deconstruction industry;

     ii.    the rapid expansion of YieldStreet's marine line through use of that model; and

     iii.    the overconcentration of these reckless loans with the same borrowing group, creating a scenario whereby a single borrower's inability to pay would torpedo YieldStreet's entire deconstruction portfolio.

208.    Mr. Weisz' actual knowledge is further evidenced by his attempts to exclude Global Marine from his October 2018 meeting with the Vessel Deconstruction borrowers in Dubai.

209.     Plaintiffs are entitled to all available damages on the basis of the foregoing material omissions and misrepresentations that induced them to purchase these securities, including but not limited to, recovery of the consideration paid for the securities, interest, and all other costs recoverable under law.

210.     YieldStreet and Michael Weisz therefore violated Section 10(b) of the 1934 Act and Rule 10b-5.

**Count Four: Control Person Liability under the Securities Exchange Act of 1934, §20(a), (15 U.S.C.A. § 78t(a))**

**(against Michael Weisz)**

211.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

212.     As YieldStreet's president and "one man credit committee," Mr. Weisz is liable as a control person for the violations giving rise to liability under Section 20(a) of the Exchange Act.

213.     Mr. Weisz had actual knowledge that the information YieldStreet was providing to potential investors about YieldStreet's prior history and claims of no past principal loss was materially false and/or misleading, based upon, *inter alia*, the fact that he, on behalf of YieldStreet, had authored an email in July 2017 acknowledging that one of YieldStreet's deals had defaulted with outstanding principal still owed to this day.

214.     Mr. Weisz had actual knowledge that the information YieldStreet was providing to potential investors was materially false and/or misleading, based upon, *inter alia*, his interactions with Global Marine in which Mr. Weisz was advised, repeatedly, of the dangers of:

    i.   using the short-term lending model in the vessel deconstruction industry;

    ii.  the rapid expansion of YieldStreet's marine line through use of that model; and

iii. the overconcentration of these reckless loans with the same borrowing group, creating a scenario whereby a single borrower's inability to pay would torpedo YieldStreet's entire deconstruction portfolio.

215. Mr. Weisz, as YieldStreet's president and co-founder, was likewise aware that neither he nor the other nominal members of YieldStreet's marine finance team had the requisite experience to vet or structure vessel deconstruction deals or otherwise carry out the diligence process promised in YieldStreet's offering materials. Mr. Weisz therefore knew that statements about YieldStreet's experience and diligence process pertaining to the vessel deconstruction industry were false when made.

216. Mr. Weisz, as YieldStreet's president and co-founder, was likewise aware that YieldStreet was soliciting interests in its Oil & Gas Fund on the basis of outdated production data that had not been updated for several months prior to the offering.

217. Mr. Weisz, as YieldStreet's "one man credit committee," had actual control over its offerings, including both the Vessel Deconstruction and Oil & Gas portfolios.

218. Mr. Weisz exercised this actual control to cause YieldStreet to pioneer the short-term lending model across its Vessel Deconstruction portfolios, over the objection of the asset class expert supposedly advising the company.

219. The foregoing resulted in Plaintiffs and the Class Members being induced to purchase notes in YieldStreet's Vessel Deconstruction and Oil & Gas Funds. Mr. Weisz is therefore liable for all damages available damages to Plaintiffs under Section 20(a), including but not limited to, recovery of the consideration paid for the securities, interest, and attorneys' fees.

**Count Five: Breach of Fiduciary Duty**

**(against YieldStreet Management and YieldStreet Inc.)**

220.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

221.    YieldStreet Management is a registered investment adviser, as acknowledged in the Form ADVs it has filed with the SEC since 2017 or earlier.

222.    According to YieldStreet Management's Form ADV, YieldStreet Inc. is a control person owning at least 75% of the stock of YieldStreet Management.

223.    At all material times to this Complaint, Defendants were Plaintiffs' investment advisors and/or associated with Plaintiffs' investment advisors within the meaning and contemplation of the securities laws of the United States and applicable state law.

224.    YieldStreet Inc. and YieldStreet Management were in an "investment advisory relationship" with Plaintiffs when soliciting and managing the investments in ALTNOTES I, ALTNOTES II, the BPDNs and/or the SPVs as evidenced by the following:

225.    Plaintiffs placed their trust and confidence in YieldStreet to help select, oversee, and manage investments solicited by YieldStreet. YieldStreet invited this trust by touting its unique and specialized expertise in asset backed lending and investments. The emails, website descriptions, and other marketing materials YieldStreet developed to promote its Vessel Deconstruction and Oil & Gas Funds highlighted this supposed expertise in investment advice contained in the Series Note Supplements directly to YieldStreet's customers.

226.    Yieldstreet Management authored investment advice directly for the benefit of YieldStreet customers considering a potential investment in a YieldStreet product. That investment

advice was communicated to YieldStreet's customers in "Series Note Supplements" that were promoted by YieldStreet, Inc. on documents bearing a "YieldStreet" logo.

227.   In each Series Note Supplement, YieldStreet and YieldStreet Management advise each client "Why We Like This Opportunity," listing specific reasons why Defendants are advising YieldStreet's customers to invest in that particular asset backed loan. For example, in one of the Vessel Deconstruction Supplements, YieldStreet and YieldStreet Management advised each investor that:

### Why We Like This Opportunity

- ☐ The Loan is secured by a first mortgage lien on the Vessel. The Vessel is additionally protected by a suite of customary insurances such as Hull and Machinery Insurance, Protection and Indemnity Insurance, War Risk Insurance and Mortgagees Interest Insurance.
- ☐ The Vessel has already been committed for sale to a recycling buyer at a pre-specified sale price and delivery between 25 November and 31 December 2019.  This provides for short-term exit visibility at a price that adequately covers the proposed loan advance.
- ☐ The Loan amount represents 79.7% of the Vessel's estimated scrap value, 70.1% of the Vessel's purchase price, and 68.8% of the Vessel's sale price. The Vessel's scrap value is based on the Vessel's weight in steel and other commodities.
- ☐ The Sponsor is required to pay down a portion of the Loan if the Vessel's scrap value becomes less than 120.0% of the Loan amount. This requirement helps mitigate the effect of local steel price fluctuations.
- ☐ A corporate guarantee by the Sponsor and personal guarantees by its Principals are in place. The personal net worth statement provided indicates the Principals' total net worth to be $28.5M as of April 2019.
- ☐ The Sponsor generated revenue of over $444M in 2018 as one of the premier buyers of recycling tonnage worldwide with over 40 years' experience.
- ☐ Since 2015, the Originator has closed on $530.5M across 53 marine finance transactions with one default to date that accounts for 2.4% of its total loan amounts funded.

228.   Series Note Supplements containing information like this were distributed to each Plaintiff and Class Member, as prospective investors, to induce them to invest in YieldStreet's Vessel Deconstruction and Oil & Gas funds. Defendants knew or should have known that Plaintiffs would rely on this information, and on Defendant's unique and specialized knowledge in asset backed lending in deciding whether to invest. Indeed, the Series Note Supplements state in bold that **"The information contained herein was prepared to assist interested parties in making their own evaluation of purchasing Notes."**

229.    YieldStreet Inc. and YieldStreet Management are the sole source(s) of information concerning each YieldStreet offering. They also provided direct advice about these offerings intended to induce YieldStreet's customers to invest. There is no way for investors to conduct their own due diligence, because YieldStreet and YieldStreet Management intentionally hid the names of all borrowers and detailed borrower information relating to each asset backed loan at issue in this lawsuit. Simply put, YieldStreet Inc. and YieldStreet Management are in complete control of the flow of information that they receive and disseminate to potential investors.

230.    These actions and circumstances also created a special relationship of trust and confidence imposing a duty to monitor the accuracy of information concerning its offerings. It was foreseeable that investors would rely upon YieldStreet's information based on the unique relationship it had with investors enrolled on the YieldStreet platform, including but not limited, to, YieldStreet's unique offerings and sole access to information about those offerings.

231.    YieldStreet readily accepts the responsibility to vet each investment and then advise potential clients about "Why We Like This Investment" in the Series Note Supplements. In doing so with respect to the Vessel Deconstruction and Oil & Gas funds, YieldStreet advised, and solicited, each potential investor in those funds—including Plaintiffs and the Class Members.

232.    Moreover, YieldStreet Management is paid a fee to perform all the due diligence on YieldStreet's offerings. YieldStreet Management is also paid a fee to manage those investments. YieldStreet's fees come directly from the Plaintiffs' invested capital and include "Listing Fees," "loan origination fees," "loan extension and modification fees," "loan processing, loan documentation and similar fees," "other loan fees," and "loan servicing fees."

233.    Consistent with the foregoing, YieldStreet markets itself to investors as a "fiduciary," using language that tells investors that their interests always come first and that they

should put their trust in YieldStreet. At the heart of YieldStreet's fiduciary message is its commitment to act as "an investor first company."

234.    YieldStreet has also used other "fiduciary" language in its marketing to prospective investors, stating on its website, and in investor letters, that YieldStreet is the investor's "partner."

235.    YieldStreet also acknowledges it has the "trust" of its investors, like when officers Michael Weisz and Milind Mihere thanked investors for placing their "trust" in YieldStreet in an end of the year letter.

236.    This language is not without consequence—YieldStreet cannot present itself as a fiduciary, a partner who investors can trust to put them first, without incurring fiduciary liabilities.

237.    Investment advisors like YieldStreet Management owe fiduciary duties to investors, which include affirmative duties of utmost good faith, full and fair disclosure of all material facts, and an affirmative obligation to employ reasonable care to avoid misleading clients.

238.    Promoters like YieldStreet Inc. owe these same duties as well.

239.    YieldStreet Management breached its fiduciary duties by, *inter alia*, falsely claiming that no deal offered on the YieldStreet web portal had ever lost principal:

> "While investments have been offered through the Platform by the Company's affiliates prior to this Offering and as of the date of this Memorandum have suffered no principal loss…"

240.    This misstatement gave investors a false sense of confidence in YieldStreet Management's recommendations when, in fact, the default rate for YieldStreet's investments is five times higher than even that of "junk bonds." The false claims about the historical past performance of YieldStreet's investments were trumpeted to potential investors in YieldStreet's offering materials and on the YieldStreet website, although that misrepresentation has been since deleted from the website.

241.   Plaintiffs would not have invested in YieldStreet's defaulted Funds if YieldStreet had provided truthful and accurate information about its default rates. There is a substantial likelihood that the disclosure of the omitted facts as alleged in this action would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available.

242.   YieldStreet Management also breached its fiduciary duties by, *inter alia*, misrepresenting its diligence process and/or capabilities with respect to its Vessel Deconstruction Funds.

243.   Additionally, YieldStreet Management breached its fiduciary duties by, *inter alia*, failing to disclose that the expert it had purportedly relied upon to structure its Vessel Deconstruction loans had warned YieldStreet against using the short-term lending model.

244.   YieldStreet Management further breached its fiduciary duties by, *inter alia*, failing to disclose that the expert it had purportedly relied upon to structure its Vessel Deconstruction loans had warned YieldStreet against increasing the portfolio's exposure in rapid-growth fashion.

245.   YieldStreet Management breached its fiduciary duties by, *inter alia*, failing to disclose that the expert it had purportedly relied upon to structure its Vessel Deconstruction loans had warned YieldStreet against concentrating all or virtually all of its deconstruction portfolio's exposure with a single borrower group.

246.   Plaintiffs would not have invested in YieldStreet's Vessel Deconstruction Funds if Plaintiffs had known that YieldStreet had no meaningful ability to vet and/or structure the marine products it offered for sale on its platform, and further, had been warned against using them by one of the few "qualified capital providers in the shipping industry."

247. YieldStreet Management also breached its fiduciary duties by failing to ensure that the production data it represented to investors as "current" and that would support repayment of the Oil & Gas loan was in fact accurate and up to date.

248. Plaintiffs would not have invested in YieldStreet's Oil & Gas Fund if Plaintiffs had known that the oil and gas production stated in the Series Note Supplement was actually many millions of cubic feet less than stated.

249. Plaintiffs are entitled to all legal and equitable damages available for the foregoing breaches of fiduciary duties, including but not limited to, rescission of their purchases and disgorgement of all fees received by YieldStreet Management.

## Count Six: Aiding & Abetting Breach of Fiduciary Duty

## (against Michael Weisz)

250. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

251. As detailed throughout this Complaint, Michael Weisz was intimately involved in the day-to-day operations of YieldStreet, as well as with the specific transactions at issue. As detailed herein, Mr. Weisz had actual knowledge of all of YieldStreet's misrepresentations, knew Plaintiffs were likely to rely on them, and yet concealed them, all while causing YieldStreet to push forward soliciting interests in the Vessel Deconstruction and Oil & Gas funds.

252. Mr. Weisz therefore knowingly assisted YieldStreet in conveying these statements to prospective investors.

253. As a direct and proximate cause of the substantial assistance provided by Mr. Weisz, Plaintiffs and other Class Members were damaged and are entitled to damages in an amount to be proven at trial.

**Count Seven: Negligent Misrepresentation**

**(against YieldStreet)**

254.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

255.    YieldStreet had a unique and distinct relationship with the investors it enrolled on the YieldStreet platform. This relationship was formed after YieldStreet solicited investors by holding itself out as the offeror of novel investment opportunities and "innovative products," and then used its platform to establish itself as the exclusive source of information regarding its offerings. These actions made it foreseeable that potential investors would rely on YieldStreet's representations.

256.    YieldStreet also had special knowledge about facts concerning its business, operations, and financial motivations that were otherwise unavailable to investors. This special knowledge included, *inter alia*,

    i.    information contradicting its claim that it had never suffered a principal loss, evidenced by the July 2017 email sent by Michael Weisz;

    ii.    information contradicting its claim that it relied on asset class experts to structure loans for the Marine Finance Fund, including but not limited to how YieldStreet ignored Global Marine's advice advising YieldStreet not to implement the short-term loan structure across YieldStreet's Vessel Deconstruction portfolio;

    iii.    knowledge that its products were not subject to an informed diligence process, despite claims to the contrary made in the offering materials; and

    iv.    ready access to information evidencing the production data used for the Oil and Gas Fund offerings was inaccurate.

257.    Yieldstreet had a duty to disclose these and other misstatements to its potential investors in light of the unique and distinct relationship YieldStreet cultivated with them. This is particularly true insofar as YieldStreet knew that the misrepresentations it made in connection with

its offerings were of critical import to Plaintiffs and the Class Members as they evaluated these investments.

258.    YieldStreet breached that duty by failing to disclose the truth to Plaintiffs and the Class Members, thus inducing them to invest in YieldStreet's Vessel Deconstruction and Oil & Gas offerings.

259.    YieldStreet is therefore liable for all damages available damages that Plaintiffs suffered as a result of YieldStreet's negligent misrepresentations, including but not limited to, recovery of the consideration paid for the securities, interest, and all other damages recoverable under law.

## DEMAND FOR JURY TRIAL

260.    Plaintiffs demand a trial by jury on all counts so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court grant Plaintiffs and all Class members the following relief against the Defendants:

i.   For all recoverable compensatory and other damages sustained by Plaintiffs and the Class;

ii.  For the rescission of all investments made by Plaintiffs and Class Members in YieldStreet's Vessel Deconstruction Funds and Oil & Gas Fund;

iii. An award of attorneys' fees and costs to counsel for Plaintiffs and the Class to the extent permitted by applicable law;

iv.  An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class or Classes and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class; and

v.   Such other relief as the Court deems just and proper.

Dated May 17, 2021                 Respectfully submitted,

                                   By:   /s/ Daniel Centner
                                   **PEIFFER WOLF CARR KANE & CONWAY, APLC**
                                   Daniel B. Centner
                                   Joseph Peiffer (will seek admission *pro hac vice*)
                                   1519 Robert C. Blakes Sr. Drive
                                   New Orleans, LA 70130
                                   Telephone: (504) 523-2434
                                   Facsimile: (504) 608-1465
                                   jpeiffer@peifferwolf.com
                                   dcentner@peifferwolf.com

                                   **PEIFFER WOLF CARR KANE & CONWAY, APLC**
                                   Jason J. Kane (admitted in New York; will seek admission
                                   per Local Rule 1.3)
                                   1150-J Pittsford-Victor Road, 1st Floor
                                   Pittsford, NY 14534
                                   Telephone: (585) 310-5140
                                   Facsimile: (504) 608-1465
                                   jkane@peifferwolf.com

                                   **SONN LAW GROUP, P.A.**
                                   Jeffrey R. Sonn, Esq. (will seek admission *pro hac vice*)
                                   Adolfo J. Anzola, Esq. (admitted in SDNY)
                                   One Turnberry Place
                                   19495 Biscayne Blvd., Suite 607
                                   Aventura, FL 33180
                                   Telephone: (305) 912-3000
                                   Facsimile: (786) 485-1501
                                   jsonn@sonnlaw.com
                                   aanzola@sonnlaw.com
                                   service@sonnlaw.com

                                   *Attorneys for Plaintiffs and the Proposed Class*
                                   Telephone: (305) 912-3000
                                   Facsimile: (786) 485-1501
                                   jsonn@sonnlaw.com
                                   aanzola@sonnlaw.com
                                   service@sonnlaw.com

                                   *Attorneys for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of May 2021, a copy of the foregoing **AMENDED CLASS ACTION COMPLAINT** was served on all counsel of record through operation of the Court's CM/ECF filing system.

_____/s/Daniel Centner_____