UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL TECKU, et al.,

                             Plaintiffs,

         - against -

YIELDSTREET, INC., et al.,

                             Defendants.

20 Civ. 7327 (VM)

DECISION AND ORDER

VICTOR MARRERO, United States District Judge.

Plaintiffs Michael Tecku, David Finkelstein, and Lawrence Tjok, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), bring this action against Yieldstreet Inc., Yieldstreet Management LLC ("Yieldstreet Management"), YS ALTNOTES I LLC ("ALTNOTES I"), YS ALTNOTES II LLC ("ALTNOTES II") (collectively, "Yieldstreet"), and Michael Weisz ("Weisz," and together with Yieldstreet, "Defendants"), alleging seven causes of action stemming from alleged monetary loss after Plaintiffs invested in Defendants' security offerings. (See "Corrected Amended Complaint" or "CAC," Dkt. No. 51.)

Defendants previously moved to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. (See Dkt. No. 24.) Plaintiff's original complaint alleged three causes of action, the first two of which alleged violations of Delaware

1

law and the third breach of fiduciary duty. (See "Complaint,"
Dkt. No. 4.) After deciding that Plaintiffs had sufficiently
demonstrated standing, the Court determined that Delaware law
does not apply to this action and that a claim of breach of
fiduciary duty was at least plausible at the motion to dismiss
stage. (See "MTD Order," Dkt. No. 34 at 13-16.) The Court
dismissed the first and second counts without prejudice and
allowed Plaintiffs to file an amended complaint, (see id.),
which Plaintiffs did,[1] alleging seven causes of action under
the Securities and Exchange Act of 1934 and common law. (See
Dkt. No. 35.)

Now before the Court is Defendants' premotion letter for
dismissal of the Corrected Amended Complaint (see "Motion,"
Dkt. No. 36), as well as supplemental briefing (see "Timeline"
or "Suppl. Brief," Dkt. No. 40), which the Court construes as
a motion to dismiss the Corrected Amended Complaint pursuant
to Rule 12(b)(6) of the Federal Rules of Civil Procedure
("Rule 12(b)(6)").[2]  For the reasons discussed below,
Defendants' Motion is denied as to all claims.

---

[1] Plaintiffs moved unopposed to correct their Amended Complaint to remove
Adrienne Cerulo as a named/lead plaintiff. (See Dkt. No. 43.) The Court
granted Plaintiffs' motion (see Dkt. No. 44) and the operative complaint
is the Corrected Amended Complaint.

[2] See Kapitalforeningen Lægernes Invest. V. United Techs. Corp., 779 F.
App'x 69, 70 (2d Cir. 2019) (affirming the district court ruling deeming
an exchange of letters as a motion to dismiss).

# I.   **BACKGROUND**

A. FACTUAL BACKGROUND[3]

Defendant Yieldstreet Inc. is an investment company that offers innovative investment products to accredited investors. Yieldstreet Inc. offers investors access to their investment products, mainly debt instruments, through an online investment portal which displays products that Yieldstreet Inc. has prescreened and selected for sale on its platform. Yieldstreet Inc. markets itself as an "investor-first" company which acts as the investor's "partner." (CAC ¶¶ 39-40.) Yieldstreet Inc. has subsidiaries that include Yieldstreet Management, an investment advisor registered with the Securities Exchange Commission, and ALTNOTES I and ALTNOTES II (together with ALTNOTES I, the "ALTNOTES entities"). To the investing public, Yieldstreet, Inc. and its subsidiaries operate as a cohesive whole under the moniker "Yieldstreet." Weisz is the president and co-founder of Yieldstreet Inc. and its subsidiaries. In his capacity, Weisz

_____

[3]   The factual recitation set forth below, except as otherwise noted, derives from the Corrected Amended Complaint and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v. Tech Fin. Grp., Inc., 282 F.3d 147, 152 (2d Cir. 2002). Except when specifically quoted, no further citation will be made to the Corrected Amended Complaint or the documents referred to therein.

Because the Corrected Amended Complaint is substantially similar to the facts alleged in the Complaint, the recitation of facts in the Court's MTD Order is incorporated herein with alterations where necessary to reflect the facts alleged within the operative complaint.

exercises complete control over Yieldstreet's investment decisions. Plaintiffs are all individual investors in Yieldstreet's investment products.

Yieldstreet's investment-product portfolio consists largely of debt instruments known as borrower payment dependent notes ("BPDNs"). These investment products comprise debt obligations tied to the performance of a specific underlying loan made by a Yieldstreet created special purpose vehicle ("SPV") formed in connection with the offering. In essence, the SPV raises funds from investors through Yieldstreet and then lends the funds raised to an undisclosed borrower in the industry advertised by Yieldstreet for that particular BPDN. All BPDNs are issued by the ALTNOTES entities on behalf of the SPVs. In the investor's ideal world, that borrower would then use the funds to buy a specific asset that generates funds sufficient to repay the loan, including interest, by the specified maturity date, ultimately generating a profit for investors in the BPDN.

Yieldstreet Management is solely responsible for making decisions as to which products it will offer for sale on the Yieldstreet platform. Yieldstreet Management also operates under the business name "Yieldstreet." Yieldstreet Management receives fees commensurate with the outstanding capital contribution balance for each SPV.

Yieldstreet does not offer its investors access to the underlying data or risk-assessment analysis for any particular investment on the Yieldstreet platform. Investors rely instead on Yieldstreet's due diligence in selecting the borrower and potential investment. Investors also rely on Yieldstreet's transparency in transmitting any material information to potential investors through offering documents which include applicable Series Note Supplements ("SNS"),[4] private placement memoranda, and indentures.

Plaintiffs contend that Yieldstreet has not been transparent in its communications to potential investors. Plaintiffs allege that Yieldstreet misrepresented material facts about the stability and attractiveness of their investment products in its offering documents. Specifically, Plaintiffs claim that Yieldstreet made false statements in Yieldstreet's April 5, 2018 and January 16, 2019 private placement memoranda ("ALTNOTES I PPM" and "ALTNOTES II PPM," respectively, and collectively, the "PPMs"). As one example, Plaintiffs allege that Yieldstreet falsely told its investors via the PPMs that "none of the investments offered on Yieldstreet's online platform had ever lost any principal."

---

[4] Yieldstreet's private placement memoranda define Series Note Supplements as "the authoritative description of any series of Notes offered by the Company." (Id. ¶ 52.) The SNS are unique to specific SPVs, but all are part of a continuous offering by the ALTNOTES entities. Yieldstreet Management manages the ALTNOTES entities and prepares the SNS.

(Id. ¶ 62.) In addition, Plaintiffs contend that Yieldstreet offered certain classes of investments subject to numerous false or misleading statements or omissions.

1. Vessel Deconstruction Funds

After the ALTNOTES I PPM was distributed to investors, Yieldstreet began offering a "Marine Finance" line of investment products (the "Vessel Deconstruction Funds"). These deals were largely vessel-deconstruction transactions in which the SPV lent the investor-generated balance to a borrower who would purchase a particular vessel for deconstruction with the goal of selling the scrap for profit.

Plaintiffs allege that the vessel deconstruction industry is a particularly volatile one requiring a high degree of industry knowledge to successfully navigate. For example, Plaintiffs allege that "the deconstruction process can proceed across multiple continents, sometimes in developing nations that lack stable infrastructures. As a result, the process is often complicated, and slowed, by external factors ranging from catastrophic weather conditions to civil turmoil." (Id. ¶ 72.) Thus, prior to Yieldstreet, Plaintiffs allege individual investors could not passively invest in this industry which otherwise required "significant capital beyond the reach of most any individual investor; [and] an extensive network of contacts," as well as expertise

6

in vetting the vessel purchase, structuring a successful deal, and handling externalities that may arise during the demolition process. (Id. ¶ 73.)

Plaintiffs allege Yieldstreet induced investors to invest in this volatile industry through false or misleading statements regarding their three-step diligence process laid out for investors in the SNS for each BPDN offering. In the first step, Yieldstreet represented that they relied on Global Marine Transport Capital ("Global Marine") to identify potential vessel-deconstruction opportunities and vet transactions that do not fit its lending methodology. Global Marine purportedly had expertise in the industry, lending experience, and the contacts necessary to identify attractive investments.

Deals that survive Global Marine's vetting went on to the second step, which included an independent analysis of the investment opportunity by Yieldstreet through its underwriting -- a process in which a multi-party credit committee with veto powers reviewed the transaction. Yieldstreet's independent assessment included examining "the background and experience of the borrower; necessary collateralization of the loan to protect investors against default; and appropriate structuring for the borrower's particular industry." (Id. 84.) Plaintiffs contend that

Yieldstreet performed neither the first nor second step as promised, and key facts developed through steps one and two of the vetting process were then omitted or misrepresented to potential investors.

Specifically, Plaintiffs allege that after the high demand for Yieldstreet's first vessel-deconstruction offering, in October 2018 Yieldstreet abandoned the industry-standard model for loans in this space -- revolving credit facilities with one-to-four-year lifespans -- for much higher-risk short-term loans, a model conceptualized and championed by Weisz. Plaintiffs allege that Global Marine advised Weisz that this short-term lending model was a structural mismatch for vessel deconstruction and that the short timeframe to pay back these loans was impractical in such a volatile industry subject to unavoidable externalities and delays. According to Plaintiffs, the industry-standard loans purportedly make sense in this space and result in more stable and successful investments, but Yieldstreet moved away from that model because it did not generate large management fees. Instead, the high-risk short-term model brought more lucrative fees for Yieldstreet.

In October 2018, Weisz flew to Dubai for a closed-door meeting with the North Star Group ("North Star"), the borrowers on Yieldstreet's initial vessel-deconstruction

offering, to discuss the short-term lending concept. Global Marine was not invited and did not attend. At this meeting, Weisz and North Star agreed to future investments, concentrated through North Star, using the short-term lending model.

In late 2018, Global Marine again warned Weisz of the risks associated with a short-term loan structure and further warned Weisz that such risk was magnified by funneling those products through a single borrower: North Star. Plaintiffs assert that Global Marine was familiar with North Star and, therefore, was well-positioned to opine on the risks of over-exposure, and that Weisz again ignored Global Marine's advice.

In a series of new vessel-deconstruction offerings from December 2018 through September 2019, Yieldstreet used the new, short-term lending model. Plaintiffs contend that the series of events described above rendered statements in the SNS for these new offerings false or misleading. Specifically, Plaintiffs allege that the following information was either false, misleading, or omitted from the offering documents for the five vessel deconstruction investment opportunities offered between December 18, 2018 to September 11, 2019:

- Yieldstreet was using an unproven lending model;

9

- The asset-class experts (Global Marine) so prominently highlighted in those documents had explicitly warned against using that model;

- Weisz would act as a one-man credit committee;

- Weisz lacked experience in Marine Vessel Deconstructing financing;

- All of the investment products were being concentrated with the same borrower group; and

- Yieldstreet, while disclosing other instances of inexperience, did not disclose that its management team did not have the experience necessary to vet and structure a vessel-deconstruction loan -- and in fact, had never been involved in any such loans before joining Yieldstreet.

Plaintiffs allege that in March 2020, the investments went into default as a result of the overleveraged borrower (presumably North Star) being unable to repay the short-term loans. Now, Plaintiffs allege $90 million in these vessel-deconstruction loans are in default. Defendants dispute that these investments are in default.

2. Other Yieldstreet Investments

Plaintiffs allege that the Vessel Deconstruction Funds represent only a small portion of Yieldstreet's portfolio,

and other portions of that portfolio were similarly misleading, risky, and ultimately led to default. For example, Plaintiffs allege that an entity called Louisiana Oil and Gas fund (the "Oil and Gas Fund"), formed under ALTNOTES I, lent money for the purchase of an oil and gas well. The SNS for this Fund stated that "[c]urrent production is approximately 13.5M cubic feet of gas equivalent per day (mmcf/day) or 2.2k barrels of oil equivalent (BOE) from 21 producing O&G wells." (Id. ¶ 126.) Plaintiffs allege this information was false, and Yieldstreet itself stated "in September 2018, production volume was nearly half [its projection]: 11.3 million cubic feet per day." (Id. ¶ 127.) Plaintiffs claim production volume projections are material information because production volume generates cash flow, which in turn supports repayment of the loan.

Another example Plaintiffs raise is Yieldstreet's "Post War & Contemporary Art" portfolio (the "Art Fund"). The Art Fund lent approximately $13.7 million to an entity formed by an individual who was later charged with wire fraud and aggravated identity theft. Yieldstreet marketed the Art Fund in offering documents promising a "first priority lien on a pool of Post War & Contemporary artworks" to secure the loan. (Id. ¶ 139.) Now, two other lenders have asserted priming liens against one of the artworks.

11

Just as in the case of the Vessel Deconstruction Funds, Plaintiffs again allege that the Oil and Gas Fund and Art Fund suffered from a similar mismanaged and misrepresented vetting process that resulted in incomplete and incorrect data informing the investment. Plaintiffs contend these Funds are now also in default.

B. <u>PROCEDURAL HISTORY</u>

On September 10, 2020, Plaintiffs filed a Complaint on behalf of themselves and all persons who purchased BPDNs in connection with the PPMs and SNS. Plaintiffs alleged two violations of the Delaware Code against all Defendants and one count of breach of fiduciary duty against Yieldstreet Management. On April 26, 2021, the Court dismissed without prejudice the first two counts of Plaintiffs' three-count complaint on the basis that Delaware law did not apply to this action. The Court determined that the breach of fiduciary duty claim remained and allowed Plaintiffs to file the Amended Complaint.

On May 17, 2021, Plaintiffs filed the Corrected Amended Complaint, alleging seven causes of action. Count One alleges fraudulent inducement. Count Two, brought as an alternative theory, alleges aiding and abetting fraud. Count Three alleges violations of Section 10(b) ("Section 10(b)") of the Securities Exchange Act of 1934 (the "Exchange Act") and

Securities Exchange Commission Rule 10b-5 ("Rule 10b-5"). <u>See</u>
15 U.S.C. §78j(b); 17 C.F.R. § 240.10b-5. Count Four, brought
against Weisz only, alleges violations of Section 20(a)
("Section 20(a)") of the Exchange Act. <u>See</u> 15 U.S.C. § 78t(a).
The remaining counts are for common law breach of fiduciary
duty against Yieldstreet Management and Yieldstreet Inc.
(Count Five); aiding and abetting breach of fiduciary duty
against Weisz (Count Six); and negligent misrepresentation
against Yieldstreet (Count Seven).

By letter dated June 1, 2021, Defendants informed
Plaintiffs of alleged deficiencies in the Amended Complaint
and noted their intent to move to dismiss. (<u>See</u> "Def. Ltr.,"
Dkt. No. 36-1.) By letter dated June 8, 2021, Plaintiffs
responded to Defendant's letter. (<u>See</u> "Pl. Opp'n," Dkt. No.
36-2.)

Unable to come to an agreement, Defendants wrote to the
Court on July 1, 2021, outlining the dispute and requesting
leave to file a motion to dismiss. (<u>See</u> Motion.) On July 30,
2021, the Court directed the parties to submit limited further
briefing. (<u>See</u> Dkt. No. 38.) Defendants submitted a
supplemental brief on August 13, 2021, including various
exhibits for the Court's consideration. (<u>See</u> Suppl. Brief)
Plaintiffs responded on August 27, 2021 (<u>see</u> "Pl. Suppl.

Resp.," Dkt. No. 45), and Defendants filed a reply on September 3, 2021. (See "Def. Suppl. Reply," Dkt. No. 46.)

C. THE PARTIES' ARGUMENTS

Defendants argue that Plaintiffs' claims sounding in fraud must fail because the pleading is void of particularized facts. Mainly, Defendants contend that Plaintiffs have not alleged facts to adequately substantiate any false statement or omission. Even if a false statement or omission existed, Defendants argue that the offering documents contain disclosures that foreclose investors' reliance on statements included within. Defendants also allege that Plaintiffs have not attributed the misstatements and omissions to any particular defendant, precluding liability under Janus Capital Group., Inc. v. First Derivative Traders, 564 U.S. 135 (2011), nor have Plaintiffs pled facts giving rise to an inference of scienter. Additionally, Defendants argue that Plaintiffs' fiduciary duty claim is allegedly contradicted by the plain language of the subscription agreements Plaintiffs signed, and Plaintiffs have failed to plead that any Defendant provided personalized advice to investors. And finally, Defendants assert that the negligent misrepresentation claim must fail because Plaintiffs do not plead the "special relationship" required under New York law to sustain such a claim.

14

Plaintiffs respond that they have adequately pled their claims to hold Defendants liable for misstatements and for concealing material information that Yieldstreet and Weisz learned throughout a misrepresented diligence process. Plaintiffs argue that the disclosures in the PPMs do not protect Defendants, and Defendants knew key statements in the SNS were false when distributed. Further, Plaintiffs contend that Yieldstreet Management and Yieldstreet, Inc. are fiduciaries, and that they have alleged enough facts to give rise to an inference of Yieldstreet's "special relationship" with investors.

## II.   LEGAL STANDARDS

"To survive a motion to dismiss [pursuant to Federal Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The task of the Court in

ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted). The Court must accept all well-pleaded factual allegations in the Complaint as true and draw all reasonable inference in Plaintiffs' favor. See Chambers, 282 F.3d at 152 (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2011)).

However, plaintiffs claiming fraud -- including securities fraud concerning material misstatements and omissions -- must also satisfy the heightened pleading requirements of Federal Rule of Procedure 9(b) ("Rule 9(b)"), which requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

In addition, the passage of the Private Securities Litigation Reform Act ("PSLRA") in 1995 altered the landscape of securities litigation by, among other things, requiring that plaintiffs alleging securities fraud specify each statement they contend is misleading and the reason the

16

statement is misleading, as well as particularize pleadings concerning scienter. See Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified at 15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5). The enhanced standards of the PSLRA are set forth in sections 21D(b)(1) and 21D(b)(2) of the Act. Section 21D(b)(1) requires that in connection with any private action arising under the statute in which plaintiffs allege to have been misled by defendants' untrue statements or omissions of material fact,

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

Section 21D(b)(2) mandates that in actions under the PSLRA a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Section 21D(b)(3)(A) mandates dismissal of complaints that fail to satisfy the pleading standards described in the above sections. In combination, these statutes and rules set forth the hurdles a plaintiff must clear in order to state a claim for a violation of Section 10(b) or Rule 10b-5.

### III.   **DISCUSSION**

A. SECTION 10(b) AND RULE 10b-5 VIOLATIONS

In pertinent part, Section 10(b) declares it unlawful for any person, directly or indirectly, by the use of any means of interstate commerce, the mail, or national securities exchange:

> to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5, promulgated by the SEC to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999). Under Rule 10b-5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Section 10(b) operates as a "broad" prohibition against manipulation, whether in the form of false statements or market manipulation. United States v. Royer, 549 F.3d 886, 900 (2d Cir. 2008); see ATSI, 493 F.3d at 99.

Plaintiffs in this case allege misrepresentations or omissions of material fact. To state a claim for misrepresentation or omission under Section 10(b) and Rule 10b-5, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) the plaintiff's reliance was the proximate cause of its injury."[5] ATSI, 493 F.3d at 104; see Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).

Defendants argue that the Court must dismiss the Corrected Amended Complaint because Plaintiffs have failed to adequately plead (1) the falsity of Defendants' statements, (2) Defendants' duty to disclose omitted facts, (3) scienter, and (4) reasonable reliance pursuant to Section 10(b) and

---

[5] These elements are the same as those required to prove common law fraud under New York law, though a Section 10(b)(5) violation has the additional requirement that the fraud occurred in connection with the sale of securities. See Harborview Value Masterfund, L.P. v. Freeline Sports, Inc., No. 11 Civ. 1638, 2012 WL 612358, at *6 (S.D.N.Y. Feb. 23, 2012).

Rule 10b-5.[6] The Court does not agree. For the following reasons, Defendants' motion regarding these claims is denied.

### 1. False or Misleading Statements or Omissions

A plaintiff's first obligation in pleading a securities fraud claim based on a misrepresentation is to allege that the defendant made a false or misleading statement, or an omission of material information. See Acito v. IMCERA Grp., 47 F.3d 47, 52 (2d Cir. 1995). In order to properly plead fraud claims pursuant to Rule 9(b) and the PLSRA, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI, 493 F.3d at 99. The same pleading requirements apply to omissions. See Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996).

An omission is actionable "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Although "Rule 10b-5 imposes no duty to disclose all material,

---

[6] Defendants do not challenge the materiality of the statements in question, that the statements were made in connection with the purchase or sale of securities, or loss causation. See ATSI, 493 F.3d at 105 (stating elements of prima facie case for misrepresentation or omission under Section 10(b)). Thus, the Court need not address these issues.

nonpublic information, once a party chooses to speak, it has a 'duty to be both accurate and complete.'" <u>Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.</u>, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010) (<u>quoting</u> <u>Caiola v. Citibank, N.A., N.Y.</u>, 295 F.3d 312, 331 (2d Cir. 2002)); <u>see also</u> <u>Time Warner</u>, 9 F.3d at 268 ("[O]ne circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading.").

Whether a misstatement or omission is material is "an inherently fact-specific finding . . . that is satisfied when a plaintiff alleges a statement or omission that a reasonable investor would have considered significant in making investment decisions." <u>Litwin v. Blackstone Grp. L.P.</u>, 634 F.3d 706, 716-17 (2d Cir. 2011) (quotation marks and citations omitted). Since materiality is a mixed question of law and fact, "a complaint may not properly be dismissed . . . on the ground that the alleged misrepresentations or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." <u>ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.</u>, 553 F.3d 187, 197 (2d Cir. 2009) (quotation marks omitted).

Plaintiffs allege that Yieldstreet should be held liable for multiple fraudulent statements and omissions, each of which is addressed below.

### a. "Principal Loss" Statement

Defendants contend that at the core of Plaintiffs' fraud claim is an alleged statement that "does not appear anywhere in the relevant offering documents." (See Motion at 1-2.) Plaintiffs disagree and allege that the PPMs include the statement that no product offered on Yieldstreet's platform has suffered any principal loss (see e.g., CAC ¶¶ 7, 47, 63, 75). They allege this statement is misleading because prior to the issuance of the PPMs, Weisz acknowledged in an email to investors that a Yieldstreet offering for a rideshare fleet expansion fund (the "Rideshare Fund") had gone into default and "principal remains outstanding." (Id. ¶ 7; see also id. ¶ 63.) Defendants respond that even if such a statement denying loss existed, it was not false or misleading because no principal has been lost, so "at most Plaintiffs have pled [] that some borrowers defaulted, but an 'active collection is ongoing.'" (Motion at 2 (quoting MTD Order at 13).)

The statement at issue in this action in fact appears in both PPMs[7]:

---

[7] For the purposes of deciding a motion to dismiss under Rule 12(b)(6), the Second Circuit has "deemed a complaint to include any . . . documents that the plaintiffs either possessed or knew about and upon which they

> [I]nvestments have been offered through the
> Platform by the Company's affiliates prior to this
> Offering and as of the date of this Memorandum have
> suffered no principal loss . . . .

(Dkt. No. 41-1 at 35; Dkt. No. 41-2 at 41; <u>see</u> <u>also</u> Pl. Opp'n
at 1 n.1.)

At bottom, the parties disagree on whether a fund having
"outstanding principal" is the same as the fund having
suffered "principal loss." Plaintiffs understand these terms
to have the same meaning, (<u>see</u> CAC ¶ 75 ("Yieldstreet had in
fact experienced a principal loss in its rideshare fleet
expansion fund by the time this statement was made.")), while
Defendants do not. (<u>See</u> Motion at 2.) Defendants rely on the
Court's prior MTD Order which found that based on materials
presented to the Court, the Funds did not yet appear to be in
default since active collection was ongoing for many BDPNs.
(<u>See</u> MTD Order at 13.)

Here, Plaintiffs call into question the status of the
Rideshare Fund, but Defendants have not presented materials
to contradict Plaintiffs' allegation that this fund is in
default. Considering that on a motion to dismiss the Court

---

relied in bringing the suit." <u>Rothman v. Gregor</u>, 220 F.3d 81, 89 (2d Cir.
2000). The Court may consider these documents in deciding a motion to
dismiss without converting the proceeding to one for summary judgment.
<u>See</u> <u>Int'l Audiotext Network v. Am. Tel. & Tel. Co.</u>, 62 F.3d 69, 72 (2d
Cir. 1995); <u>Brass v. Am. Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir.
1993).

must accept all reasonable inferences and resolve all doubts in favor of the non-moving party, see Kaluczky v. City of White Plains, 57 F.3d 202, 206 (2d Cir. 1995), the Court concludes that outstanding principal on a defaulted loan plausibly constitutes "principal loss." Whether the term "principal loss" has a different meaning, or evidence exists that the Rideshare Fund was not in default, are issues for resolution at a later stage. On a motion to dismiss, Plaintiffs have sufficiently specified a false or misleading statement in the PPMs.

### b. Volume Production Statement

Defendants also take issue with Plaintiffs' allegation that Yieldstreet should be held liable for the overrepresentation of gas production volume in the SNS for the Oil and Gas Fund. (See CAC ¶ 127.) Although post-offering Yieldstreet disclosed that the production volume figure in the SNS was incorrect, (see id.), Defendants correctly point out that the Corrected Amended Complaint lacks any allegation that Yieldstreet *knew* the information for September 2018 was incorrect in October 2018 when the SNS was issued. See Medina v. Termor Video, Inc., No. 13 Civ. 8364, 2015 WL 1000011 (S.D.N.Y. Mar. 5, 2015) ("[K]nowledge on day-120 does not mean Defendants 'knew' or 'must have known' on day-1.").

Aside from no explicit allegation of knowledge, the CAC also lacks any facts that could support an inference that Defendants knew of the decline at the time the SNS was issued.[8] Cf. McKenna v. SMART Techs. Inc., No. 11 Civ. 7673, 2012 WL 3589655 (S.D.N.Y. Aug. 21, 2012) (court inferred knowledge of change in demand at time of offering based on complaint's allegations of employees' access to internal reports and identification of the reports containing contrary); see In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("A statement believed to be true when made, but later shown to be false, is insufficient.") As such, the production volume figure cannot serve as the basis for a fraud claim.

c. Omissions

Plaintiffs characterize the rest of their allegations as Yieldstreet's failure to disclose material information. A failure to disclose information is actionable only when the corporation is subject to a duty to disclose the information. See Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015). Under Rule 10b-5, "such a duty arises when there is 'a corporate insider trad[ing] on confidential information,' a 'statute or regulation requiring disclosure,'

---

[8] In their opposition, Plaintiffs state that in other litigation Yieldstreet admitted to providing its investors overinflated production figures, but Plaintiffs neither cite to this litigation nor, most importantly, allege that Yieldstreet knew the figures were false when provided. (See Pl. Opp'n at 3.)

or a corporate statement that would otherwise be 'inaccurate, incomplete or misleading.'" Id. (quoting Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)). Thus, "Rule 10b-5 imposes no duty to disclose all material, nonpublic information, [but] once a party chooses to speak, it has a 'duty to be both accurate and complete.'" Plumbers' Union Local No. 12, 753 F. Supp. at 180 (S.D.N.Y. 2010) (quoting Caiola, 295 F.3d at 331).

Plaintiffs characterize a majority of the alleged omissions as information "that a reasonable investor would have wanted to know." (Pl. Suppl. Response at 1; see Pl. Opp'n at 1.) It is clear, however, that "[a] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." Time Warner, 9 F.3d at 267. The only allegations that relate to prior statements by Defendants, and thus are potentially actionable under Section 10(b), concern Yieldstreet's experience cited in the Form ADV and the diligence process represented in the SNS.

### i. Inexperience Omission

Plaintiffs allege that "Yieldstreet's Form ADV disclosed the Yieldstreet team's lack of experience in other areas," but "nowhere did Yieldstreet [] disclose that its Marine

Finance team had never been involved in a marine deconstruction deal." (CAC ¶ 114.)

The Court is not persuaded by an argument that if a company chooses to highlight its inexperience in some areas, the company has a duty to disclose all its inexperience, theoretically including inexperience that has no relevance to the parties' dispute. First, the undisclosed inexperience does not render the included statements misleading -- Plaintiffs did not allege that Yieldstreet said these are the *only* areas of inexperience. And second, concluding otherwise would lead to the undesirable outcome of companies choosing not to disclose any inexperience to protect against needing to disclose all. Yieldstreet's alleged inexperience in marine deconstruction deals is merely information that Plaintiffs would have liked to know, see <u>Time Warner</u>, 9 F.3d at 267, and not an actionable omission that renders its included statements false or incomplete. See <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 563 U.S. 27, 44 (2011) ("Disclosure is required . . . only when necessary to make statements made, in light of the circumstances in which they were made, not misleading.").

ii. <u>"Diligence Process" Omissions</u>

Plaintiffs' other omission arguments concern the diligence process described in the Vessel Deconstruction

Funds offering documents. During stage one of the diligence process, Global Marine is supposed to identify and perform an initial analysis on potential investment opportunities that align with Global Marine's lending methodology and present them to Yieldstreet. (See CAC ¶¶ 77, 81.) Yieldstreet then evaluates the potential opportunity and completes an underwriting process. (See id. ¶¶ 81-82.) During this underwriting process, a credit committee is tasked with conducting an independent analysis according to "general credit standards." (See id. ¶¶ 83-84.)

Plaintiffs allege that in October 2018 Weisz "went rogue" and instead of relying on Global Marine, and in fact acting against its advice, conceptualized his own lending model -- a short-term product that would require repayment in a six-month time frame. (See id. ¶ 93.) The alleged fact that Weisz identified and vetted his own potential opportunity in October 2018 renders false the diligence process promised in the SNS for five post-October 2018 deal offerings.

Stage two of the diligence process also proceeded contrary to the representation in the SNS. Plaintiffs allege that in October 2018 Weisz flew to Dubai for a closed-door meeting with principals of the only vessel deconstruction borrower at the time, North Star Group. (See id. ¶ 99.) As alleged, this meeting proceeded contrary to the SNS -- all

deals were supposed to be the product of an informed decision by a multi-party credit committee with veto powers. (See id. ¶ 104.) Instead, Weisz proceeded as a "one-man credit committee" approving the transaction in a closed-door meeting with North Star. (See id.)

Plaintiffs argue that Defendants had a duty to update the SNS to accurately represent stage one and two of the diligence process, or at least disclose the intervening events, prior to offering products detailed in the SNS in December 2018 and from April through September 2019. (See Pl. Suppl. Response at 2; see also Suppl. Brief at 2 (detailing timeline of offerings).)

Defendants dispute that these events affected the offering documents for the deals that closed after the October 2018 meeting. (See Suppl. Brief at 2.) Defendants' argument is unpersuasive. Plaintiffs' allegations create a strong inference of a duty to disclose this information to potential investors because the October 2018 events rendered the diligence process in the SNS misleading or false. See In re Beacon Assocs. Litig., 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010) (defendant had "continuing duty to update or correct past statements when they became known to be misleading."); In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) ("duty to update applies to 'a statement

made misleading by intervening events, even if the statement was true when made.'") (citing Overton v. Todman & Co., 478 F.3d 479, 487 (2d Cir. 2007)). Even if the SNS statements were accurate when published, the intervening events of October 2018 rendered the statements false, requiring Defendants to at least update investors that the diligence process differed from the process outlined in the document.

Because any remaining alleged omissions are untethered to specific statements made by Defendants, Plaintiffs fail to sufficiently establish a duty to disclose the information.[9] Thus, in summary, the allegations that satisfy the first element of a fraud claim under Section 10(b) are the "Principal Loss" Statement in the PPMs and the "Diligence Process" Omissions in the SNS for the December 2018 and April through September 2019 Vessel Deconstruction Fund offerings.[10]

---

[9] Under applicable New York law, a defendant also has a duty to disclose information "when the parties stand in a fiduciary or confidential relationship with each other; [] [or] 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Harbinger Cap. Partners LLC v. Deere & Co., 632 F. App'x 653, 656 (2d Cir. 2015). In addition to the alleged omissions tied to specific statements in the SNS, Plaintiffs allege that Yieldstreet had a duty to disclose to investors in the Vessel Deconstruction Funds that the company would use an unproven lending model and concentrate loans with one borrowing group. (See CAC ¶ 178–80; Pl. Suppl. Response at 1.) However, Plaintiffs fail to adequately allege that these facts amount to fraud. Plaintiffs state that these facts are "information that a reasonable investor would have wanted to know," (Pl. Suppl. Response at 1), but this allegation is insufficient to meet the heightened and particularized pleading standards of Rule 9(b) and the PSLRA.

[10] The Court is persuaded that the "Principal Loss" Statement and "Diligence Process" Omissions, although not challenged by Defendants,

2. <u>Scienter</u>

Scienter, "a mental state embracing intent to deceive, manipulate or defraud," <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319 (2007), is a required element of fraud. In order to plead a "strong inference" of scienter, plaintiffs must allege with particularity either (a) "facts to show that the defendant has both motive and opportunity to commit fraud[;]" or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138 (2d Cir. 2001) (quotation marks omitted). In assessing whether a plaintiff has pled scienter, courts consider whether all the facts, taken together, give rise to an inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314.

A complaint has sufficiently alleged a "strong inference" of a "motive and opportunity to commit fraud" if it pleads facts showing that the defendant "benefited in some concrete and personal way from the purported fraud." <u>Novak v. Kasaks</u>, 216 F.3d 300, 307-08 (2d Cir. 2000). "Motives that

---

were material. <u>See Rombach v. Chang</u>, 355 F.3d 164 (2d Cir. 2004) (setting forth test for materiality under Section 10(b)); <u>see</u> <u>also</u> <u>Operating Local Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC</u>, 595 F.3d 86, 91 (2d Cir. 2010) (concluding a complaint may not be dismissed for immateriality unless the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").

are common to most corporate officers . . . do not constitute 'motive' for the purpose[]" of establishing scienter. ECA, 553 F.3d at 198. Examples of general motives that fail to support a strong inference of scienter include "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." Kalnit, 264 F.3d at 139.

In order to plead opportunity, a plaintiff must "show that the individual defendants possessed 'the means and likely prospect of achieving concrete benefits by the means alleged.'" In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 297 (S.D.N.Y. 2008) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)). The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer. See, e.g., In re AstraZeneca Sec. Litig., 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008); Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

Where plaintiffs fail to allege scienter through motive and opportunity, the securities fraud claim may still be

sufficiently stated by allegations demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness," Kalnit, 264 F.3d at 138-39, but "'the strength of the circumstantial allegations must be correspondingly greater.'" Id. at 142 (quoting Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987)). A plaintiff pleading the conscious misbehavior of recklessness theory of scienter must allege conduct which is "'highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Id. at 142 (quoting Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000)).

Specifically, a complaint sufficiently pleads scienter where it alleges defendants had "'knowledge of facts or access to information contradicting their public statements.'" Id. (quoting Novak, 216 F.3d at 308). Sufficient evidence of recklessness exists if the factual allegations demonstrate that defendants (1) possessed knowledge of facts or access to information contradicting their public statements, or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.'" Novak, 216 F.3d at 308.

The Second Circuit has cautioned that there are important limitations on the scope of liability based on reckless conduct. One of those limits is refusing to allow plaintiffs to proceed with allegations of "fraud by hindsight." Novak, 216 F.3d at 309 (citing Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999). Allegations that defendants should have anticipated future events and made earlier disclosures does not suffice to make out a claim of fraud. See Acito, 47 F.3d at 53.

To summarize:

The required strong inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 194 (2d Cir. 2008).

Finally, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, 551 U.S. at 323. A strong inference of scienter "must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.

34

Defendants challenge the sufficiency of Plaintiffs' allegations concerning scienter on the basis that Plaintiffs have not alleged any Defendant "*knew* a statement was false or misleading when made." (Def. Suppl. Reply at 3.) Despite Defendants' contention, Plaintiffs have pled sufficient facts to give rise to a strong inference of scienter.

Here, Plaintiffs allege that Yieldstreet knew the "Principal Loss" Statement was false when made in the 2018 and 2019 PPMs because Weisz, on behalf of Yieldstreet, informed ridesharing fund investors by email in July 2017 that the fund was in default. (See CAC ¶ 173.) Including the statement in the PPMs gave investors false confidence in Yieldstreet's capabilities. (See id.)

As for the "Diligence Process" Omissions, because they are omissions Defendants are incorrect that Plaintiffs needed to allege that Yieldstreet knew the diligence statements were false when made in the SNS. Instead, Plaintiffs sufficiently allege that Yieldstreet knew the diligence statements in the SNS distributed to investors for offerings in December 2018 and throughout 2019 were rendered misleading after the company's participation in the October 2018 intervening events. Plaintiffs allege that Yieldstreet failed to disclose that it was not relying on the "asset-class expert" or multi-party credit committee because this information would

severely undermine the public's confidence in Yieldstreet's diligence process. (See id. ¶ 185.) Aside from promoting a false sense of confidence, Plaintiffs add that Yieldstreet's motive in pursuing these unvetted and short-term transactions was to expand its platform in a shorter period, which would in turn allow it to realize increased management fees without regard to loan performance. (See id. ¶ 94.)

Taken collectively, these factual allegations establish a reasonable inference that the fraud Plaintiffs claim motivated the Defendants' wrongful conduct in this case is just as likely as all other non-culpable explanations. As such, Plaintiffs have satisfied their burden with regards to pleading scienter.

### 3. Reasonable Reliance

A plaintiff claiming securities fraud under Section 10(b) and Rule 10b-5 must also establish that it reasonably relied on the defendant's alleged misrepresentations or omissions, and that the fraud caused the plaintiff's loss. Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003). "In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Id.

"In the case of omissions, reliance on the omitted information may be presumed where such information is material." <u>Black v. Finantra Capital, Inc.</u>, 418 F.3d 203, 209 (2d Cir. 2005).

Causation is not subject to the heightened pleading standards of Rule 9(b) or the PSLRA. <u>See</u> <u>In re Citigroup Inc. Sec. Litig.</u>, 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010) ("Loss causation need not be pled with particularity."). Instead, a short and plain statement suffices, as required under Rule 8 of the Federal Rules of Civil Procedure. Loss causation requires a link between the alleged misconduct and the ultimate economic harm suffered by the plaintiff. The Second Circuit has found that a plaintiff must claim that "the loss [was] foreseeable and that the loss [was] caused by the materialization of the concealed risk." <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 173 (2d Cir. 2005).

A plaintiff must also plead transaction causation. <u>See</u> <u>ATSI</u>, 493 F.3d at 106. Transaction causation requires a showing that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 172 (2d Cir. 2005 (quotation marks omitted).

Defendants contend[11] that since the PPMs include "cautionary disclosures," Plaintiffs are foreclosed from alleging that they relied on the statements contained within the offering documents. (See Suppl. Brief at 1; Def. Suppl. Reply at 2.) Specific to the "Principal Loss Statement," Defendants point to the warning that "the performance of previous investments may not be indicative of future performance of the Company's investments relating to corresponding Notes." (Motion at 2 n.6 (quoting the PPMs).) Additionally, Defendants point out that the PPMs contained a disclosure stating that Yieldstreet "may use strategies not described herein" when managing the loan (Suppl. Brief at 1.)

The Court is unpersuaded that this cautionary language "warn[s] investors of exactly the risk the plaintiffs claim was not disclosed." (Def. Suppl. Reply at 2 (quoting Olkey v. Hyperion 1999 Term Tr., Inc., 98 F.3d 2, 5 (2d Cir. 1996)).) First, stating that past investments are not indicative of future performance does not convey that past investments may be misrepresented within the documents. Second, a warning that Yieldstreet may use other strategies to manage the loan is not only unrelated to the diligence process, but also is

---

[11] Defendants also challenge reliance on the basis that the intervening events occurred after the offerings, but the Timeline that Defendants submit as their Supplemental Brief contradicts this conclusion. (See Suppl. Brief at 1-2).

a forward-looking warning that does not apply to the circumstances here. When investors relied upon the SNS for the offerings in December 2018 and throughout 2019, the intervening events had already occurred.

Plaintiffs properly plead transaction causation. The Corrected Amended Complaint states that each Plaintiff relied on the information in the offering documents in purchasing the BPDNs, especially since investors had no "lens into the industry," and Plaintiffs "would not have purchased the BPDNs if they had been aware of the [] information revealing the true nature" of the Vessel Deconstruction investment.[12] (CAC ¶¶ 118, 184, 204, 246.) Therefore, Plaintiffs present sufficient factual allegations to support the claim that "but for the misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." <u>Lentell</u>, 396 F.3d at 172 (quotation marks omitted).

### 4. Liability

Having concluded that Plaintiffs sufficiently allege claims of fraud, the Court must address Defendants' argument contesting liability for these statements. Defendants contend

---

[12] Further, "[i]n the case of omissions, reliance on the omitted information may be presumed where such information is material." <u>Black v. Finantra Capital, Inc.</u>, 418 F.3d 203, 209 (2d Cir. 2005).

that Plaintiffs have not attributed these misstatements to
any specific defendant, in contravention of <u>Janus Capital
Grp., Inc. v. First Derivative Traders</u>, 564 U.S. 135 (2011).
(<u>See</u> Motion at 3.) Defendants argue that Plaintiffs "assume
that every Defendant is to blame for everything," without
identifying which entity contests liability. (<u>Id.</u>) In
response, Plaintiffs argue that the Corrected Amended
Complaint sufficiently alleges that Yieldstreet "operate[d]
as a cohesive whole" in carrying out the fraudulent statements
and omissions, citing to specific allegations in the
Corrected Amended Complaint describing the role each
Yieldstreet Defendant played. (<u>See</u> Pl. Opp'n at 3.)

     In <u>Janus</u>, a class of stockholders filed a Section 10(b)
action against Janus Capital Group, Inc. ("JCG") and its
wholly owned subsidiary Janus Capital Management L.L.C.
("JCM") over allegedly false statements made in mutual fund
prospectuses filed by Janus Investment Fund, for which JCM
was the investment advisor and administrator. The false
statements allegedly affected the price of JCG's stocks. The
Supreme Court held that, because the false statements were
made by the Janus Investment Fund and not by JCM, JCM could
not be held liable under Section 10(b), despite the entity's
assistance in preparing the statement. <u>Id.</u> at 2305. The Court
limited liability for Section 10(b)violations to parties that

actually "make" misstatements of material fact and explained that the party who "makes" the misstatement is "the person or entity with ultimate authority over the [mis]statement, including its content and whether and how to communicate it." Id. at 2302.[13] In the ordinary case, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed." Id.

Here, the PPMs and SNS were issued by the Yieldstreet subsidiaries ALTNOTES I and ALTNOTES II. Plaintiffs allege that Yieldstreet, Inc. and Yieldstreet Management had "full ownership and managerial control" over these entities. (CAC ¶ 183.) More specifically, the allegations include that the ALTNOTES entities are beneficially owned subsidiaries of Yieldstreet, Inc. (id. ¶¶ 142-43), Yieldstreet Management was the manager of these entities (id. ¶ 53), Yieldstreet, Inc. is Yieldstreet Management's sole member (id. ¶ 31), and Weisz is the President and co-founder of Yieldstreet, Inc., Yieldstreet Management, and the ALTNOTES entities (id. ¶34). Additionally, the Yieldstreet entities collectively drafted the offering documents (id. ¶ 183), Yieldstreet Management

---

[13] "Since each party is liable only for their own misstatements, Janus implies that each party is only liable for their own omissions as well." Ho v. Duoyuan Global Water, Inc., 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012)).

was wholly responsible for the information communicated through the SNS (id. ¶¶ 50-51), the SNS bear the "Yieldstreet" name and logo at the bottom of each page (id. ¶ 51.), and Yieldstreet, Inc. ultimately provided the offering documents to investors through its online portal. (Id. ¶ 49). These allegations adequately allege that Yieldstreet, Inc. and Yieldstreet Management had control over the content of the offering documents and the ultimate decision of whether to communicate these statements. See In re Virtus Inv. Partners, Inc. Sec. Litig., No. 15 Civ. 1249, 2016 WL 3647959, at *7 (S.D.N.Y. July 1, 2016) ("[A]llegations of control, coupled with the fact that the Virtus Partners logo was printed in bold on the first page of the prospectuses, are sufficient to allege that Virtus Partners had authority over the information . . . to make its statements attributable to Virtus Partners"); In re Puda Coal Sec. Inc., Litig., 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014) (attributing statements in prospectus to underwriter where underwriters drafted prospectus jointly, the prospectus prominently displayed underwriters' names, and underwriters solicited investors for the offering and distributed the prospectus to investors); c.f. Janus, 564 U.S. at 147 (rejecting primary liability of investment adviser where "nothing on the face of the prospectuses indicate[d] that any statements therein came

from [the investment adviser] rather than [the investment
fund] -- a legally independent entity with its own board of
trustees"); Kuwait Inv. Office v. Am. Intern. Group, Inc.,
128 F. Supp. 3d 792, 811 (S.D.N.Y. 2015) (rejecting primary
liability where defendants had "no role in the business
structure of the speaking entity").

Thus, at this stage, Plaintiffs have plausibly pled that
Yieldstreet Inc., Yieldstreet Management, and the ALTNOTES
entities as issuer of the documents, are "makers" of the false
statement and omissions in the PPMs and SNS.[14] Accordingly,
Defendants' motion to dismiss Count Three against the
Yieldstreet Defendants is denied.

B. SECTION 20(a)

Separately, "Section 20(a) of the Exchange Act imposes
derivative liability on parties controlling persons who
commit Exchange Act violations." In re Vivendi, S.A. Sec.
Litig., 838 F.3d 223, 238 n.6 (2d Cir. 2016) (quotations
omitted). Section 20(a) provides:

> Every person who, directly or indirectly, controls
> any person liable under any provision of this
> chapter or of any rule or regulation thereunder
> shall also be liable jointly and severally with and
> to the same extent as such controlled person to any
> person whom such controlled person is liable,
> unless the controlling person acted in good faith

---

[14] To the extent that Plaintiffs seek to hold Weisz personally liable for
the statements in the offering documents, that claim is dismissed. The
Amended Complaint is devoid of allegations that give rise to any inference
that Weisz made the statements in the offering documents.

> and did not directly or indirectly induce the act
> or acts constituting the violation or cause of
> action."

15 U.S.C. § 78t(a). Liability for Section 20(a) violations is derivative of liability for Section 10(b) violations. See Securities Exchange Comm. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996), cert. denied, 522 U.S. 812 (1997). In order to establish a prima facie case of liability under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108.

To establish the second element of control over the primary violator, a plaintiff must show that the defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2; see also First Jersey, 101 F.3d at 1472-73. "To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 1881514, *3 (S.D.N.Y. Aug. 5, 2005); Cohen v. Stevanovich, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010). Moreover, a Section

20(a) defendant "must not only have actual control over the primary violator, but have 'actual control over the *transaction* in question.'" In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (emphasis in original) (quoting In re Global Crossing, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005)).

Because fraud is not an essential element of a Section 20(a) claim, Plaintiffs need not plead control in accordance with the particularity required under Rule 9(b). See In re Bristol Myers Squibb Co. Sec. Litig., F. Supp. 2d 148, 170-71 (S.D.N.Y. 2008); Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 235 (S.D.N.Y. 2008). Instead, control may be pled in accordance with the notice pleading standard described in Rule 8(a). See In re Alstom SA, 454 F. Supp. 2d 187, 210 (S.D.N.Y. 2006). Where Rule 8(a)'s pleading standard governs, dismissal is not warranted as long as the complaint furnishes adequate notice of the basis of the plaintiff's claim and "relief could be granted under [some] set of facts consistent with the allegations." In re Global Crossing, No. 02 Civ. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) (quotation marks omitted).

However, the heightened pleading standards of the PSLRA apply with respect to the third prong of a Section 20(a) claim, which requires plaintiffs to allege facts

demonstrating that the defendant was a culpable participant. See Alstom, 406 F. Supp. 2d at 491 (quoting 15 U.S.C. § 78u-4(b)(2)). In order to plead culpable participation then, Plaintiffs must plead with particularity "facts giving rise to a strong inference that the defendant acted with the requisite state of mind," i.e., scienter. Id.; see also Global Crossing, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005) (requiring that Section 20(a) plaintiffs allege with particularity that the controlling person "knew or should have known" that the primary violator was engaging in fraudulent conduct). In order to withstand a motion to dismiss, a Section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness. See In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 414-17 (S.D.N.Y. 2001) ("This Court is persuaded that recklessness is the appropriate minimum standard of culpability that plaintiffs must plead under § 20(a)."); Cohen, 722 F. Supp. 2d at 435.

Finally, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (quotation marks omitted).

Weisz moves to dismiss Plaintiffs' Section 20(a) claim on the grounds that there was no primary violation, but if there was, Plaintiffs show insufficient control by merely alleging that Weisz was the "boss." (Pl. Opp'n at 4 (citing ATSI, 493 F.3d at 108 (outlining elements of Section 20(a) claim: (1) primary violation; (2) control of the primary violator; and (3) the controlling person was a culpable participant).) Further, Weisz contends that Plaintiffs do not adequately plead that he was "a culpable participant in the controlled [entity's] fraud." (Def. Ltr. at 4 (quoting ATSI, 493 F.3d at 108).)

To the extent that Plaintiffs sufficiently allege a predicate violation of Section 10(b), they satisfy the first element of a control person claim under Section 20(a). See Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). Therefore, because the Plaintiffs have alleged a primary violation based on the statement and omissions in the offering documents, Plaintiffs adequately allege the first element of a Section 20(a) claim.

The remaining elements of control person liability are also met. At this stage, Plaintiffs' allegations give rise to a reasonable inference that Weisz had control of the primary violator, Yieldstreet. Weisz is not only the president and

co-founder of Yieldstreet Inc. and its subsidiaries, but in his capacity, Weisz exercises complete control over Yieldstreet's investment decisions. (See CAC ¶¶ 9, 34.) Plaintiffs have demonstrated as such by asserting that Weisz had the authority to close the deal with North Star as the sole representative for Yieldstreet and ignored Global Marine's advice. (See id. ¶¶ 98, 102, 104.) Further, Weisz's alleged involvement in the underlying actions giving rise to the fraud also meet the pleading standards of Rule 9(b). (See id. ¶¶ 7, 207-08.) Plaintiffs have sufficiently alleged that Weisz "knew or should have known" that Yieldstreet was engaging in fraudulent conduct. Global Crossing, 2005 WL 1907005, at *12; see also In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 486-87 (S.D.N.Y. 2004) (finding sufficient allegations of knowledge where individuals attended board meeting during which improperly recorded earnings were discussed and individuals later signed statements that reported false earnings).

Accepting Plaintiffs' allegations as true and drawing all reasonable inferences and resolving all doubts in Plaintiffs' favor, the Court finds that Plaintiffs have pled Weisz and Yieldstreet's management were one and the same, and Weisz had sufficient culpability based on his alleged actions to make out the remaining elements of a Section 20(a) control

person liability claim. See Katz, 542 F. Supp. 2d at 276 ("Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss.") Accordingly, Defendant's motion to dismiss is denied as to Count Four.

C. COMMON LAW CLAIMS

Defendants additionally move to dismiss Plaintiffs' remaining common law claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligent misrepresentation – Counts Five, Six and Seven.[15]

### 1. Breach of Fiduciary Duty

As decided in the Court's MTD Order, Defendants' motion to dismiss the breach of fiduciary duty claim against Yieldstreet Management LLC is denied. (See MTD Order at 16-18.) The Corrected Amended Complaint adds Yieldstreet Inc. as a defendant to this claim on the basis that Yieldstreet Inc. had special knowledge and expertise, formed and promoted the investments, and also authored the communications to investors. (See CAC ¶¶ 222-48; Pl. Opp'n at 4.) For the

---

[15] As discussed above, Defendants' motion to dismiss Plaintiffs' claim of common law fraud, Count One, is denied as to the Yieldstreet Defendants. A finding of a Section 10(b) violation satisfies the requirements to prove common law fraud under New York law. See Harborview Value Masterfund, L.P. v. Freeline Sports, Inc., No. 11 Civ. 1638, 2012 WL 612358, at *6 (S.D.N.Y. Feb. 23, 2012). Further, because Count Two, aiding and abetting fraud, is pled as an alternative theory to Count One, the Court does not address the claim at this stage.

reasons stated in the MTD Order, and with the same skepticism that this claim will survive at a later stage, dismissal at this stage would be premature. See also Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, 261 F.R.D. 13, 26 (S.D.N.Y. 2009), aff'd., 382 F. App'x 107 (2d Cir. 2010) ("New York courts generally avoid dismissing a claim of breach of fiduciary duty . . . because it usually involves a question of fact: whether someone reposed trust and confidence in another who thereby gains a resulting superiority or influence."). Thus, Defendants' motion to dismiss Count Five is denied.[16]

The claim against Weisz for aiding and abetting a breach of fiduciary duty also survives. Under New York law, the elements of a claim for aiding and abetting are: (1) "a breach by a fiduciary of obligations to another," (2) "that the defendant knowingly induced or participated in the breach," and (3) "that plaintiff suffered damage as a result of the breach." In re Sharp Int'l Corp., 403 F.3d 43 (2d Cir. 2005). A person "knowingly participates" by providing "substantial assistance to the primary violator." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006). Claims of aiding and

---

[16] Defendants refer to a disclaimer of fiduciary duties in the ALTNOTES I PPM. (See Motion at 3 (citing ALTNOTES I PPM ¶ 2(f).) The Court finds no such statement contained within the PPM or any other document filed by the parties.

abetting a breach of fiduciary duty sounding in fraud must meet the heightened pleading standards of Rule 9(b). See <u>Banco Indus. de Venezuela, C.A. v. CDW Direct, L.L.C.</u>, 888 F. Supp. 2d 508, 514 (S.D.N.Y. 2012); <u>Fraternity Fund Ltd. V. Beacon Hill Asset Mgmt., LLC</u>, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007). As described above, Plaintiffs have sufficiently alleged that Weisz had knowledge of Yieldstreet's wrongful conduct, that Weisz exercised control over Yieldstreet, and that Weisz provided substantial assistance by participating in the very events giving rise to the fraud. Defendants' motion to dismiss Count Six, aiding and abetting a breach of fiduciary duty, is therefore denied.

### 2. <u>Negligent Misrepresentation</u>

Plaintiffs' last claim alleges negligent misrepresentation against the Yieldstreet Defendants. Defendants move to dismiss this claim on the basis that Plaintiffs have not alleged the "special relationship" required under New York law. (<u>See</u> Motion at 3.) Because "the standard of a special relationship in the context of a negligent misrepresentation claim is less rigorous than that of a fiduciary duty," <u>Musalli</u>, 261 F.R.D. at 28, Plaintiffs' allegations substantiating a claim of a fiduciary relationship also create a strong inference that the Yieldstreet Defendants had a special relationship with

Plaintiffs. It is enough that Plaintiffs allege that Yieldstreet "sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information." Century Pac., Inc. v. Hilton Hotels Corp., No. 03 Civ. 8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) ("Courts in this Circuit have held that a determination of whether a special relationship exists is highly fact-specific and generally not susceptible to resolution at the pleadings stage.").

Although not contested, Plaintiffs satisfy the remaining elements of a negligent misrepresentation claim with the allegations giving rise to a Section 10(b) violation described above. See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., 446 F. Supp. 2d 163, 198 (S.D.N.Y. 2006) (stating elements of negligent misrepresentation under New York law). Accordingly, Defendants' motion to dismiss Count Seven for negligent misrepresentation is denied.

## IV.   ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion of the defendants Yieldstreet Inc., Yieldstreet Management LLC, YS ALTNOTES I LLC, YS ALTNOTES II LLC, and Michael Weisz to dismiss the Corrected

Amended Complaint filed by plaintiffs Michael Tecku, David
Finkelstein, and Lawrence Tjok (Dkt. No. 36) is **DENIED.**

**SO ORDERED.**

Dated:      May 2, 2022
            New York, New York

                                    _____
                                         Victor Marrero
                                            U.S.D.J.