# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **MICHAEL TECKU; DAVID FINKELSTEIN;** | ) | |
| **and LAWRENCE TJOK;** | ) | |
| **Individually and on behalf of** | ) | |
| **all others similarly situated** | ) | **CIVIL ACTION FILE NUMBER:** |
| | ) | **1:20-CV-07327 (VM)** |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| **YIELDSTREET, INC.; YIELDSTREET** | ) | |
| **MANAGEMENT, LLC; YS ALTNOTES I, LLC** | ) | |
| **YS ALTNOTES I, LLC; AND** | ) | |
| **MICHAEL WEISZ.** | ) | |
| | ) | |
| *Defendants.* | ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF LAWRENCE TJOK'S MOTION FOR CLASS CERTIFICATION

**Respectfully submitted by:**

**PEIFFER WOLF CARR KANE**
**CONWAY & WISE, LLP**
Daniel Centner.
Joseph Peiffer (admitted *pro hac vice*)
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: (504) 523-2434
Facsimile: (504) 608-1465
jpeiffer@peifferwolf.com
dcentner@peifferwolf.com

**SONN LAW GROUP, P.A.**
Jeffrey R. Sonn, Esq.
Brian B. Pastor, Esq.
One Turnberry Place
19495 Biscayne Blvd., Suite 607
Aventura, FL 33180
Telephone: (305) 912-3000
Facsimile: (786) 485-1501
jsonn@sonnlaw.com
bpastor@sonnlaw.com
service@sonnlaw.com

*Attorneys for Plaintiffs and the Proposed*
*Class*

## <u>TABLE OF CONTENTS</u>

<u>INTRODUCTION</u>…………………………………………………………...……..……...1

<u>OPERATIVE FACTS</u>……………………………………..………..…..………...3

<u>MR. TJOK</u>……………………………………………..………………….………...11

<u>ARGUMENT</u>……………………………………………….………………...12

I.   THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23……..…………….12

   1.  Numerosity …………………………………………………………..………12

   2.  Commonality………………………………………………………..…….13

   3.  Typicality………………………………………………………….15

   4.  Adequacy………………………………………………………………17

   5.  Predominance (Rule 23(b)(3))………………………………………….19

      a.   Individual Questions of Reliance will not Predominate……………………………..21

         i.   *Affiliated Ute*………………………………………………………21

         ii.   Circumstantial Evidence……………………………………………23

   6.  Superiority…………………………………………………………..………25

<u>CONCLUSION</u>……………………………………..…………………………………25

i

## TABLE OF AUTHORITIES

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128, 154 (1972) ............................................................................ 22

*Anwar v. Fairfield Greenwich Ltd.*,
  306 F.R.D. 134 (S.D.N.Y. 2015) (Marrero, J.) .................................. 22, 23, 24, 25

*Audet v. Fraser*,
  332 F.R.D. 53, 78 (D. Conn. 2019) ............................................................. 24

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52, 59 (2d Cir.2000) ..................................................................... 17

*Brown v. Kelly*,
  609 F.3d 467, 483 (2d Cir. 2010) ............................................................... 21

*Burry v Madison Park Owner LLC*,
  84 AD3d 699, 699-700 [1st Dept 2011] ....................................................... 22

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  2017 WL 3608298, at *2 (S.D.N.Y. Aug. 22, 2017) .............................. 12, 13, 14

*Consol. Rail Corp. v. Hyde Park*,
  47 F.3d 473, 483 (2d Cir.1995) ................................................................... 13

*Cromer Fin. Ltd. v. Berger*,
  205 F.R.D. 113, 131 ................................................................................... 23

*Cutler v. Perales*,
  128 F.R.D. 39, 44 (S.D.N.Y. 1989) ...................................................... 14, 15

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  296 F.R.D. 261, 267 (S.D.N.Y. 2014) ......................................................... 13

*Du Pont v. Brady*,
  828 F.2d 75, 78 (2d Cir. 1987) ................................................................... 22

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
  89 F.R.D. 87, 99 (S.D.N.Y. 1981) ....................................................... 16, 20

*Fogarazzo v. Lehman Bros. Inc.*,
  232 F.R.D. 176, 180 (S.D.N.Y. 2005) ......................................................... 14

*Ge Dandong v. Pinnacle Performance Ltd.*,
  2013 WL 5658790, at *10 (S.D.N.Y. Oct. 17, 2013) ..................................... 24

*Gomez v. Lace Entm't, Inc.*,
  2017 WL 129130 at *9 (S.D.N.Y. Jan. 6, 2017) ............................................ 19

*Hart v. BHH, LLC*,
    2017 WL 2912519 at *6 (S.D.N.Y. July 7, 2017) ............................................................. 19

*In re Blech*,
    187 F.R.D. 97, 106 (S.D.N.Y. 1999) ............................................................................. 17

*In re Drexel Burnham Lambert Group, Inc.*,
    960 F.2d 285, 291 (2d Cir. 1992) ............................................................................. 18

*In re IndyMac Mortgage Backed Sec. Litig.*,
    286 F.R.D. 226, 233 (S.D.N.Y. 2012) ............................................................................. 14

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    249 F.R.D. 124, 132 (S.D.N.Y. 2008) ............................................................................. 26

*In re MF Global Holdings Ltd. Inv. Litig.*,
    310 F.R.D. 230, 237 (S.D.N.Y. 2015) (Marrero, J.) ....................................................... 19, 20

*In re Petrobras Sec.*,
    862 F.3d 250, 260 & n.11 (2d Cir. 2017) ............................................................................. 13

*In re Prudential Sec. Inc. Ltd. Pshps. Litig.*,
    163 F.R.D. 200, 208 (S.D.N.Y. 1995) ............................................................................. 16

*In re Sadia, S.A. Sec. Litig.*,
    2010 WL 2884737, at *7 (S.D.N.Y. July 20, 2010) ......................................................... 23

*In re Salomon Analyst Metromedia Litig.*,
    544 F.3d 474, 482 (2d Cir. 2008) ............................................................................. 23

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*,
    941 F. Supp. 326, 341 (S.D.N.Y. 1996) ............................................................................. 18

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
    209 F.R.D. 353, 356-57 (S.D.N.Y. 2002) ............................................................................. 18

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108, 119 (2d Cir. 2013) ............................................................................. 24

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267, 280 (S.D.N.Y. 2003) ............................................................................. 17

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128, 138 (2d. Cir. 2015) ............................................................................. 20, 21

*Marisol A. v. Giuliani*,
    126 F.3d 372, 377 (2d Cir. 1997) ............................................................................. 13

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 ............................................................................. 24

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247, 1252 (2d Cir. 2002) ............................................................... 17, 20

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,*
    2016 WL 7409840, at *11 (S.D.N.Y. Nov. 4, 2016) ........................................... 26

*Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*,
    277 F.R.D. 97, 101 (S.D.N.Y. 2011). ............................................................... 13

*Robidoux v. Celani*,
    987 F.2d 931, 936 (2d Cir. 1993) ..................................................................... 16

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148, 159 (2008)................................................................................. 22

*Teachers' Ret. Sys. of La. v. ACLN Ltd.*,
    2004 WL 2997957, *4 (S.D.N.Y. Dec. 27, 2004) ......................................... 14, 17

*UFCW Local J776 v. Eli Lilly and Co.*,
    620 F.3d 121, 131 (2d Cir. 2010) ..................................................................... 20

*Wal–Mart,*
    131 S.Ct. at 2256 ............................................................................................ 14

*Yi Xiang v. Inovalon Holdings, Inc.*,
    327 F.R.D. 510, 522 (S.D.N.Y. 2018)........................................................ passim

**Rules & Regulations**

Fed. R. Civ. P. 23 ................................................................................................ passim

Plaintiff Lawrence Tjok ("Plaintiff" or "Mr. Tjok") submits this Memorandum in support of his Motion for entry of an Order certifying this action as a class action and appointing Mr. Tjok to represent the class of all persons who purchased a Borrower Payment Dependent Note issued by YS ALTNOTES I or YS ALTNOTES II in connection with the following offerings: Vessel Deconstruction I; Vessel Deconstruction III; Vessel Deconstruction IV; Vessel Deconstruction VI (collectively, the "Vessel Deconstruction Offerings"); and Louisiana Oil & Gas (together with the Vessel Deconstruction Offerings, the "Offerings"), as defined in more detail *infra*.

## INTRODUCTION

Yieldstreet[1] sells investment products through its proprietary online investment portal, www.yieldstreet.com. Its portfolio includes instruments known as borrower payment dependent notes ("BPDNs"), which are debt obligations tied to the performance of a specific underlying loan made by a Yieldstreet-created special purpose vehicle ("SPV").[2] In essence, the SPV lends funds to an undisclosed borrower in the industry advertised by Yieldstreet for that particular BPDN (*e.g.*, vessel deconstruction), and then Yieldstreet raises funds to cover those loans by selling associated notes through the Yieldstreet platform. Ideally, the borrower uses the loan proceeds to buy a specific asset that generates funds sufficient to repay the loan to the SPV, with interest, by the specified maturity date, ultimately generating a profit for the BDPN holders who participated in

---

[1]     Yieldstreet Inc.'s wholly-owned subsidiaries include Yieldstreet Management, an investment advisor registered with the Securities Exchange Commission, and ALTNOTES I and ALTNOTES II. *See, e.g.*, *YS GM MarFin II, LLC et al. v. Four Wood Capital Advisors, LLC et un*., S.D.N.Y. 1:20-cv-03320, at ECF No. 5. To the investing public, Yieldstreet, Inc. and its subsidiaries operate as a cohesive whole under the moniker "Yieldstreet" as demonstrated by, *inter alia*, the generic "Yieldstreet" logo that appears on all of the Series Note Supplements described and attached *infra*, as well as Yieldstreet's private placement memoranda (*see* Centner Decl., Ex. 1, at TJOK000063, Centner Decl., Ex. 2 at TJOK000233) describing each subsidiary's role in offering Notes to be sold through Yieldstreet, Inc.'s website. Collectively, Yieldstreet, Inc. and its subsidiaries are referred to herein as "Yieldstreet."

[2]     *See, e.g.*, Centner Decl., Ex. 2 at TJOK000233 (YS ALTNOTES I Private Placement Memorandum generally explaining the SPV structure).

that loan. All YieldStreet BPDNs at issue in this case were issued by one of two YieldStreet entities, YS ALTNOTES I, or YS ALTNOTES II, on behalf of the SPVs.[3]

YieldStreet makes certain promises to induce investors to participate in YieldStreet's offerings. Most fundamentally, and as demonstrated in detail below, investors are promised that offerings on the Yieldstreet platform are the product of robust and meaningful vetting and due diligence processes. This is key to engendering investor confidence and participation in Yieldstreet's offerings, which generally involve idiosyncratic industries to which investors would not otherwise be exposed. Additionally, Yieldstreet offerings are represented as asset-backed loans that provide downside protection, in the form of collateral and personal guarantees, to backstop losses in the event the underlying borrower is unable to repay the SPV. Yieldstreet professes to be very good at providing this protection and proudly tells potential investors that none of Yieldstreet's offerings has ever lost any principal.

In 2020, information came to light suggesting that what YieldStreet promises is not what it delivers.[4] Thereafter, this lawsuit was brought on behalf of investors in YieldStreet's Vessel Deconstruction and Louisiana Oil & Gas Offerings who were induced to purchase BPDNs on the basis of misleading offering documents that omitted key information concerning YieldStreet's vetting/diligence processes and its prior lending history. YieldStreet's omissions fundamentally misrepresented the stability and attractiveness of these Offerings, resulting in widespread losses when those Offerings eventually defaulted.

---

[3]     *See, e.g.*, Defendants' Answer at ECF No. 59 at ¶ 66.

[4]     *Customer Group Presses Fintech Firm Yieldstreet for Missing Investor Payments*, avail at. https://www.wsj.com/articles/customer-group-presses-fintech-firm-yieldstreet-for-missing-investor-payments-11587720603; *Two U.S. Agencies Examining Investments Sold by Crowdfunding Site YieldStreet*, avail. at https://www.wsj.com/articles/two-u-s-agencies-examining-investments-sold-by-crowdfunding-site-yieldstreet-11597224600 (last accessed February 16, 2023).

Lead Plaintiff Lawrence Tjok now moves to certify this action as a class action. As set forth in more detail below, Mr. Tjok asserts claims premised on issues of fact and law that are common to all class members, which will be proved on the basis of common evidence and which will predominate over any individual issues that may arise. Mr. Tjok's motion should be granted, and this matter certified as a class action under Fed. R. Civ. P. 23(b)(3), for the reasons set forth below.

## OPERATIVE FACTS

YieldStreet provides the same set of common offering documents to each investor considering a YieldStreet Offering.[5] These documents include, in relevant part, a Private Placement Memorandum issued by YS ALTNOTES I or YS ALNOTES II that provides general information applicable to all of these entities' respective offerings, as well as a particularized "Series Note Supplement" providing specific details about individual offerings.[6] Investors who wish to participate in an individual offering after reviewing these documents may do so by executing a "Subscription Agreement" whereby the investor confirms that he or she has read and relied on all of the terms set forth in the foregoing documents.[7]

---

[5]     *See, e.g.*, ECF No. 30, Decl. of Christopher David Nutt, Director of Restructuring at Yieldstreet, Inc. at ¶ 10 (reflecting that the same Private Placement Memoranda and Series Note Supplements were issued to each class member); Centner Decl., Ex. 3 (Yieldstreet's Objections to Requests for Production at Response No. 2), confirming that requested offering documents were "provided to all investors in the same or substantially similar form"; *see also* Defendants' Answer, ECF No. 59, at ¶ 58 (admitting that all potential investors review the applicable "Series Note Supplement" and other offering documents before making their investment decision).

[6]     Information contained in these "Series Note Supplements" is pulled directly from the "Why We Like This Opportunity" section of the internal "Tear Sheets" created by YieldStreet's investment advisory arm, Yieldstreet Management. *See, e.g.*, Centner Decl., Ex. 4 at YieldStreet_00014198 (YieldStreet's Confidential Investment Memorandum Investment Tear Sheet); *see also* Centner Decl., Ex. 5 at YieldStreet_00026653, (Yieldstreet employee Stefanos Fragos noting that Yieldstreet "members get access to a more substantive [offering summary] along the lines of our [Yieldstreet's] internal CC memo.").

[7]     *See, e.g.*, Centner Decl., Ex. 6 at TJOK00007 at ¶ 2(a); Centner Decl., Ex. 7 at TJOK000031 at 2(a); Centner Decl., Ex. 8 at TJOK000042 at 2(a) (each exhibit is a Yieldstreet "Subscription Agreement" for relevant Offerings stating that the investor "has relied solely upon the Memorandum, the Series Note Supplement and the Indenture and independent investigations . . . with respect to [his or her] investment in the Notes.")

YieldStreet's Private Placement Memoranda and Series Note Supplements omitted key information pertaining to the Offerings. Specifically, as set forth in more detail below, investors were given misleading information about Yieldstreet's vetting and due diligence processes, prior performance, and with respect to the Vessel Deconstruction offerings, the fundamental propriety of the loans themselves.

To begin, YieldStreet's offering documents trumpeted the company's supposed reliance on "asset class experts" to source and structure the underlying loans. These statements included claims that YieldStreet "works with and relies on experienced Originators that it believes are usually experts in their specific asset class and have experience and a track record originating and servicing the loans. The Originators usually work with borrowers to structure and fund the loans."[8] Yieldstreet then promised to make lending decisions based on, *inter alia*, the "Originator's expertise in the sector or asset class area."[9]

The Series Note Supplements for each Vessel Deconstruction Offering provided more detail on the Originator-expert's role in the process, describing its "lending methodology" and stating that transactions that did not fit within that "lending methodology" were to be "filtered out."[10] YieldStreet was very clear that the Originator's "credit policies" defined the type of transactions that fit within its lending methodology, and that this underwriting process was "meant

---

[8]     Centner Decl., Ex. 1 (ALTNOTES II PPM) at TJOK00089 at Introduction; Centner Decl., Ex. 2 (ALTNOTES I PPM) at TJOK00364 at Introduction.

[9]     Centner Decl., Ex. 1 (ALTNOTES II PPM) at TJOK00090 at § 2(c); Centner Decl., Ex. 2 (ALTNOTES I PPM) at TJOK00365 at § 2(c).

[10]    *See, e.g.*, Centner Decl., Ex. 9 (Series Note Supplement for Vessel Deconstruction I) at TJOK00400 at SUPPORT PROCESSES – Diligence; *see also* Centner Decl., Ex. 10 (Series Note Supplement for Vessel Deconstruction III) at TJOK00417 (same).

to be the orderly step by step approach to fully vetting the asset, **transaction** and borrower."[11] Yieldstreet stated it would convene a "credit committee" to discuss these findings in totality, with "the Originator's underwriting process [serving as] the framework under which all transactions are reviewed…."[12]

The safeguards associated with this process were important to investors, who were totally reliant upon YieldStreet to communicate accurate information about the offerings.[13] As YieldStreet's Private Placement Memoranda recognized, "investors must make their respective investment decisions based solely on the information provided about the borrower, the Note, the underlying Loan . . . and other material facts," all as provided by Yieldstreet in its Series Note Supplement.[14]

Unfortunately, Yieldstreet failed to provide complete and accurate information with respect to its Vessel Deconstruction offerings. Critically, Yieldstreet failed to disclose that Four Wood

---

[11]   *See, e.g.,* Centner Decl., Ex. 9 (Series Note Supplement for Vessel Deconstruction I) at TJOK000401; Centner Decl, Ex. 10 (Series Note Supplement for Vessel Deconstruction III) at TJOK00418 (emphasis added).

[12]   *See* n. 11, *supra*.

[13]   *See* n. 7, *supra*; *see also* Centner Decl., Ex. 11 (Excerpts from the deposition of Lawrence Tjok) at 161:2-14 (confirming reliance on the offering documents described in paragraph 2(a); 168:25 – 169:5 (confirming reliance on the terms in the series note supplements and statements made in the private placement memorandum and elsewhere that YieldStreet had no "prior principal loss." 247:19-24 (confirming that he relied on YieldStreet's promises of due diligence informing, *inter alia*, collateral and guarantees to safeguard the loan and the appropriateness of the period of time for the loan.); 248:21-249:3 (information in offering documents is not available to investors, who have no way to know—other than via Yieldstreet—that Yieldstreet is not actually working with its Originator as claimed and is in fact in conflict with its Originator in terms of how deals should be structured); and 249:10-16 (confirming reliance on YieldStreet to do its "multistep due diligence process" and how investors didn't even know that vessel deconstruction existed as an industry until YieldStreet introduced it to them).

*See also* Centner Decl., Ex. 12 at YieldStreet_00056445 (email from another Vessel Deconstruction investor stating

███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

[14]   *See, e.g.,* Centner Decl., Ex. 1 at TJOK000064 (excerpt from YSALTNOTES II PPM); Centner Decl., Ex. 2 at TJOK000233-234 (except from YS ALNOTES I PPM).

Capital (d/b/a Global Marine Transport Capital, hereafter, "Four Wood"), *i.e.*, the "asset class

expert" that Yieldstreet retained to vet and structure its Vessel Deconstruction Offerings, had

specifically **warned YieldStreet not to make the underlying loans** because ████████████

████████████████.[15] These "warnings" were communicated on "multiple occasions"

directly to ████████████████ YieldStreet ████████████████████████

████████████████████████████████████████████████

████████████████.[16] Yieldstreet ignored these warnings.████████████████

████████████████████████████████████████████████

████████ ████████████████████████████████.[18] ████████████

---

[15]        Four Wood's Managing Partner, Steven Baffico, provided sworn deposition testimony to the Securities Exchange Commission in connection with its ongoing investigation into YieldStreet and the circumstances leading to investors' losses in the Vessel Deconstruction offerings. During that deposition Mr. Baffico testified at length about the specific ████████████ *See* Centner Decl., Ex. 13 (excerpts from Steven Baffico's SEC testimony, at:

- 76:14-20 ████████████████████████████████████████████
  ████████████████████████████████."

- 80:15-81:6 ████████████████ YieldStreet ignored this advice and increased its exposure to the borrower by approximately $65 million in less than a year's time, without even waiting for outstanding indebtedness to be repaid.

- 227:2 -228:1 ████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████

[16]        *Id*. at 232:15-21. ████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████

[17]        *See, e.g., id.* at ████████.

[18]        Centner Decl., Ex. 14 at YieldStreet   00026556 ████████████████
  ████████████████████████████████████████████████

6

███████████████████████████████████████████

████████████

Four Wood warned Mr. Weisz that he was ████████████████████████████████

██████████████████████████████████████████

██████████████ [20] Four Wood further warned YieldStreet that ████████████

███████████████████████████████████████████

███████████████████████████████████████████

████ [21] As Mr. Baffico later explained, YieldStreet's "own principals' conduct, directly and independently, substantially increased the risks to your investors in the MarFin transactions."[22]

**Class members were not made aware of Four Wood's warnings.** They were instead left to believe that the processes dutifully laid out in Yieldstreet's offering documents were being followed and that the loans in which Class members were investing were the product of a meaningful and informed vetting and diligence process that relied on that expert's advice.

In reality, YieldStreet created its own lending strategy, ████████████████, that

---

████████████████████████████████████████████
████████████████████

19    ██████████████. Meanwhile, members of YieldStreet's marine finance team were not even permitted to vote in Yieldstreet's "Credit Committee" meetings. Centner Decl., Ex. 15 at YieldStreet_00017652 (minutes from credit committee meeting). This was ironic, because at least one of these members—Stefanos Fragos— appears to have recognized the risks of Yieldstreet's lending behavior. *See* Centner Decl., Ex. 16 at YieldStreet_00026053 (internal email recognizing an "exposure issue" and that YieldStreet "cannot put all eggs in one basket.")

20    ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

21    *Id*. 232:4-14 (emphasis added).

22    Centner Decl., Ex. 17 at YieldStreet_00075725.

allowed Yieldstreet to exponentially inflate its fee receipts.[23] An internal pitch deck that Yieldstreet created in the Fall of 2018—right around the time Mr. Weisz created his new lending strategy—described a "Market Maker Case Study" analyzing Yieldstreet's Marine Finance offerings and determining that "over 40% of our investor base has participated after only three offerings."[24] That same pitch deck also described Yieldstreet's "Champagne Prob 1," which was finding ways to cash-in on its "under penetrated user base [that] wants to invest more."[25]

Yieldstreet found a way to solve that "Champagne Problem" by pressing forward with the new lending model that Four Woods warned against. Indeed, not long after the above-referenced internal pitch deck was created, YieldStreet boasted that its newly-expanded vessel deconstruction offerings were selling out in seconds, with 57 percent of Yieldstreet clients were now invested in a marine deal.[26] As one member of Yieldstreet's Marine team observed, "we like these repeat deals [180 day products for North Star] as our effort is minimal and our remuneration is attractive."[27] Another member of Yieldstreet's Marine Team put it more bluntly: "the short term product is eaten up by investors."[28]

Discovery to date has demonstrated how other important information concerning YieldStreet's diligence process, and in particular the collateral and other "backstops" supposedly

---

[23]   Centner Decl., Ex. 13 at 221:4-10

(Emphasis added).

[24]   Centner Decl., Ex. 18 at YieldStreet_000172207.

[25]   *Id.* at YieldStreet_00172205.

[26]   Centner Decl., Ex. 21 at YieldStreet_00030436.

[27]   Centner Decl., Ex. 19 at YieldStreet_00026511.

[28]   Centner Decl., Ex. 20 at YieldStreet_00026556.

in place to guard against the risk of borrower non-payment, was withheld as well. ████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████[29]; the personal guarantees
supposedly in place to protect each loan covered only a fraction of Yieldstreet's total loan exposure
to the borrowers; and the "suite of customary insurances"[30] in place did not provide meaningful
protections to the lender against the known risk of borrower fraud. Indeed, the funds that
Yieldstreet ultimately recovered from all of its insurers were not sufficient to even cover the costs
and fees incurred by its lawyers and others in connection with Yieldstreet's "recovery" efforts.[31]
Moreover, prior to making at least one, and maybe more, Vessel Deconstruction Offering(s),
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████.[32] All of this was concealed from
investors in the Vessel Deconstruction Offerings, who thus received a misleadingly rosy picture
of the stability of their investments, which eventually defaulted.

The Vessel Deconstruction Offerings were not an anomaly. Other YieldStreet offerings
have followed the same pattern, going far beyond the loan's "estimated duration" deadline without
repayment of principal. Yieldstreet concealed, and continues to conceal, these failed offerings from
investors by claiming that on-going "collection efforts" prevent these offerings from going into
default and experiencing "principal loss." Even though internally its own auditors may assess the

---

[29]     Centner Decl., ██████████████████████████████████████████████████████.

[30]     *See e.g.*, Centner Decl., Ex. 10 at TJOK000412, "Why We Like This Opportunity," at Item 1.

[31]     *See* Centner Decl., Ex. 24, reflecting a 2/14/23 update from Yieldstreet re: Marine Default Litigation.

[32]     *See* Centner Decl., Ex. 25 ███████████████████████.

likelihood of recovery as $0.00,[33] YieldStreet maintains investors' principal is never "lost" – the underlying loans effectively carry on in a state of perpetual limbo, leaving investors out to sea.

To that end, in July 2017, YieldStreet's rideshare fleet expansion fund went into default, and no further principal was ever paid on that offering.[34] That offering failed for the exact same reasons the Vessel Deconstruction and Oil & Gas Offerings failed: a borrower defaulted; subsequently it was revealed that the supposed collateral was not properly secured by enforceable liens and that the purported "guarantees" were worthless; YieldStreet attempted to offload blame for that default to others; and substantial amounts of investors' principal was lost.[35]

All the while, at all relevant times hereto Yieldstreet's Private Placement Memoranda have boasted that Yieldstreet's offerings have "suffered no principal loss."[36] This is not true now, and it was not true when Mr. Tjok and the Class members invested in the Offerings. This fact bore directly on the fundamental promises Yieldstreet made to investors in its offering documents—namely, Yieldstreet's ability to protect their investment—and indeed, concealed the functional identical scenario that eventually came to fruition with respect to the Louisiana Oil & Gas Fund, the Vessel Deconstruction Offerings, and possibly other YieldStreet offerings.[37]

## THE PROPOSED REPRESENTATIVE, MR. TJOK

Mr. Tjok purchased Vessel Deconstruction notes.[38] Each of the Vessel Deconstruction

---

[33]    *See* Centner Decl., Ex. 26 at YieldStreet__00211624, 630.

[34]    Centner Decl., Ex. 27, Declaration of Gabriel Morris.

[35]    *See generally* Centner Decl., Ex. 28.

[36]    Centner Decl., Ex. 1 (ALTNOTES II PPM) at TJOK000102; Ex. 2 (ALTNOTES I PPM) at TJOK374.

[37]    The SEC has been investigating YieldStreet for over two years and has requested documentation pertaining to approximately 20 Yieldstreet offerings. Centner Decl., Ex. 19 at YieldStreet_00211521-22.

[38]    *See, e.g.,* Centner Decl., Exs. 7 – 8 (Vessel Deconstruction Subscription Agreements).

Offerings at issue in this case, including those purchased by Mr. Tjok, was issued by Defendants YS ALTNOTES I or YS ALTNOTES II, involved underlying loans made to the "Northstar Group Borrowers," and was originated by Four Wood.[39]  Mr. Tjok also purchased a Louisiana Oil & Gas note issued by ALTNOTES II.[40]  In connection with these purchases, Mr. Tjok received, and acknowledged that he had read and understood[41] and relied upon[42], the same offering documents provided to all other class members.[43]

Mr. Tjok was previously appointed lead plaintiff representing the putative class under the PSLRA, and Peiffer Wolf and Sonn Law were appointed as his lead counsel. He now moves to certify the putative class that he represents. As set forth below, there are more than 2,000 members of that putative class who collectively have lost well in excess of $50 million as a result of their YieldStreet investments.

Each of the class members received identical, misleading offering documents. The facts and circumstances establishing how and why these documents were misleading will be established through common evidence. These common questions will predominate over any purported individual questions, making a class action the far superior method for adjudicating this dispute. Accordingly, Mr. Tjok hereby moves this Court to certify the class as proposed herein, and to appoint Mr. Tjok as Class Representative, with the firms Peiffer Wolf Carr Kane Conway & Wise, LLP and Sonn Law Group appointed as Class counsel.  Specifically, Mr. Tjok proposes that the

---

[39]     *See, e.g.,* ███████████████████████████████

[40]     *See, e.g.*, Centner Decl. Ex. 6 (Oil & Gas Subscription Agreement)

[41]      *See, e.g., id.* at TJOK 000015; Centner Decl., Ex. 7 at TJOK 000039, Centner Decl., Ex. 8 at TJOK000050 (all confirming that Mr. Tjok read and understood Yieldstreet's offering documents).

[42]     *See* n. 11, *supra*.

[43]     *See* n. 7, *supra*.

Court certify the following class:

> All persons who purchased a Borrower Payment Dependent Note (BPDN) issued by YS ALTNOTES I or YS ALTNOTES II in connection with the following offerings:
>
> 1. Vessel Deconstruction I;
> 2. Vessel Deconstruction Fund III;
> 3. Vessel Deconstruction Fund IV;
> 4. Vessel Deconstruction Fund VI; and
> 5. Louisiana Oil & Gas.

Due to the nature of these investments and Plaintiff's claims, there is no need to specify a Class Period. Excluded from the Class are Defendants, any entities in which Defendants have a controlling interest, Defendants' agents and employees, and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

## ARGUMENT

Class certification in this action may be granted upon a showing by a preponderance of the evidence of numerosity, commonality, typicality, and adequacy, *see* Fed. R. Civ. P. 23(a), as well as predominance and superiority, *see* Fed. R. Civ. P. 23(b)(3).

The Second Circuit requires a liberal, rather than restrictive, interpretation of Rule 23 of the Federal Rules of Civil Procedure. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2017 WL 3608298, at *2 (S.D.N.Y. Aug. 22, 2017) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). Courts have substantial discretion in determining whether to certify a class. *See, e.g., In re Petrobras Sec.*, 862 F.3d 250, 260 & n.11 (2d Cir. 2017). Any "[d]oubts about whether Rule 23 has been satisfied should be resolved in favor of certification." *City of Westland Police,*, 2017 WL 3608298, at *3.

Suits like this one alleging violations of the securities laws based on common omissions contained in common offering documents are especially amenable to class action resolution—a

"classic basis for a class action." *See, e.g., Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 101 (S.D.N.Y. 2011).

## I.   THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23

### 1.   Numerosity

Certification requires that the class be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).  Numerosity is presumed where a putative class has 40 or more members. *See e.g. Consol. Rail Corp. v. Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995). Approximately 1,800 investors purchased notes in one of the Vessel Deconstruction Offerings.[44] An additional 449 investors purchased notes as part of the Louisiana Oil and Gas Offering.[45] The numerosity requirement is easily satisfied here.

### 2.   Commonality

This Court has characterized the commonality requirement as a "low hurdle." *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 522 (S.D.N.Y. 2018); *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 267 (S.D.N.Y. 2014). "Commonality is satisfied where a single issue of law or fact is common to the class." *In re IndyMac Mortgage Backed Sec. Litig.,* 286 F.R.D. 226, 233 (S.D.N.Y. 2012) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2256 (2011) ("[E]ven a single common question will do.").

"The commonality requirement has been applied permissively in securities fraud litigation" and is easily met "where putative class members have been injured by similar material

---

[44]     *See* Centner Decl., Ex. 30 (first and last pages of Excel spreadsheet showing total investor count); YS 43196 (listing total investors in Vessel Deconstruction I ▋▋ , III ▋▋ , and IV ▋▋ offerings), as well as 451 investors in Louisiana Oil & Gas. This document was produced at YieldStreet_00078305 in Native format, only, and thus does not contain Bates numbers.

[45]     Centner Decl., Ex. 31 (investor list produced by Yieldstreet showing total investors in relevant offerings). This document was produced at YieldStreet_00043196 in Native format, only, and thus does not contain Bates numbers.

misrepresentations and omissions." *Fogarazzo v. Lehman Bros. Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005). These "course of conduct cases" are well suited to class treatment because the heart of plaintiffs' claim is that defendants withheld the same material information or made the same material misrepresentations to the entire class. *See City of Westland, 2*017 WL 3608298, at *5; *see also Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 207 (S.D.N.Y. 2012) ("[T]he central issue is whether the Offering Documents contain material misstatements or omissions, an issue that is common to all class members").

As this Court has recognized, whether an offering document is false or misleading in one or more respects is "clearly susceptible to common answers." *Yi Xiang*, 327 F.R.D. at 522; *IndyMac*, 286 F.R.D. at 233 (commonality "plainly satisfied in a securities case where the alleged misrepresentations in the prospectus relate to all the investors, because the existence and materiality of such misrepresentations obviously present important common issues."). Moreover, factual variations among class members' claims will not defeat the commonality requirement so long as the claims arise from a common nucleus of operative facts. *Teachers' Ret. Sys. of La. v. ACLN Ltd.*, 2004 WL 2997957, *4 (S.D.N.Y. Dec. 27, 2004). So long as plaintiffs can "identify some unifying thread among the members' claims," commonality is satisfied. *Cutler v. Perales*, 128 F.R.D. 39, 44 (S.D.N.Y. 1989).

Plaintiff in the instant case clear the "low bar" of commonality. As discussed at length above, common offering documents, including YieldStreet's Private Placement Memoranda and Series Note Supplements, were disseminated to all class members. Each of these offering documents contained the same (or functionally identical) language describing YieldStreet's vetting and diligence processes, including its reliance on experts, and its claimed history of no principal loss. *See supra* at pp. 3-5.

14

Common evidence will establish that these common documents omitted material information from potential investors. Again, and all as described above, the "expert" that Yieldstreet claimed to rely upon testified under oath to the SEC that Yieldstreet was warned repeatedly ███████████████████████████████████████. *See supra* at pp. 6-7. Yieldstreet's own documents confirm that it was aware of these risks.[46] YieldStreet's actions deviated entirely from its promised diligence process, as lending decisions were not made the basis of the criteria stated in its offering documents, *e.g.*, the informed "Credit Committee" deliberative process that pledged to use the Originator's underwriting methodology as an "orderly step by step approach to fully vetting the asset, transaction, and borrower." *See supra* at pp. 4-5. Instead, lending decisions were made based on what would manufacture the highest amount of fees for Yieldstreet. *Id*. at pp. 7-8.

YieldStreet's private placement memoranda distributed to all investors in the Offerings also omitted the prior principal loss experienced by investors in the Rideshare Fleet Expansion Fund, instead falsely claiming that YieldStreet's offerings had "suffered no principal loss." *Id.* at pp. 9-10. Again, common evidence will demonstrate that this statement was misleading, and that Yieldstreet's practice is to keep defaulted offerings open in perpetuity to avoid acknowledging a principal loss event.

Common evidence will also establish the bases for Class's fiduciary duty claims—in particular, how the investment advice provided by Yieldstreet's registered investment advisory arm, Yieldstreet Management, was essentially reproduced verbatim to Yieldstreet's members in Series Note Supplements under the heading "Why We Like this Opportunity" in order to induce participation in Yieldstreet's Offerings. *See supra* at n. 6.

---

[46]     Centner Decl., Ex. 16 at YieldStreet_00026053.

In short, common evidence will be used to establish that common statements made in common offering documents were misleading. The "low hurdle" for commonality is cleared under these circumstances.

### 3.   **Typicality**

Rule 23(a)(3) also requires that Lead Plaintiff's claims be typical of the Proposed Class. Typicality refers to the nature of the legal claims of the class representatives, and not to specific facts from which the claims arose or relief is sought. *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981). Like the test for commonality, "[t]he typicality requirement is not demanding." *Yi Xiang*, 327 F.R.D. at 522. The requirement is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *Id.*, citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

Importantly, "[t]ypical does not mean identical." *In re Prudential Sec. Inc. Ltd. Pshps. Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995). In most securities actions, "a difference in the amount of damages, date, size, or manner of purchase; the type of purchaser, and even the specific document influencing the purchase will not render the claim atypical." *Dura-Bilt*, 89 F.R.D. at 99. Instead, the inquiry is whether other members of the class have similar claims arising from the same course of conduct. *Id.; see also Robidoux*, 987 F.2d at 936. C ourts have observed that in the context of claims alleging injury based on misrepresentations, the misconduct alleged will almost always be the same: the making of a false or misleading statement. *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2013 WL 357615, at *9 (S.D.N.Y. 2013), *citing NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012).

Turning to the instant case, Mr. Tjok's claims against YieldStreet are typical of the claims

of other class members because their losses all derive from the same course of conduct: YieldStreet's promulgation of uniform offering documents that concealed material information concerning (i) deviations from its stated vetting and diligence processes, and (ii) its prior operating history, fundamentally misleading investors as to both the stability of the underlying loans and the "protections" supposedly in place.

These omissions will be proved using evidence that is common to the entire Class. Where, as here, "the lead plaintiff alleges a common pattern of wrongdoing and will present the same evidence, based on the same legal theories, to support its claim as other members of the proposed class, courts have held the typicality requirement to be satisfied . . . ." *Teachers' Ret. Sys. of La.*, 2004 WL 2997957 at *4; *see also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met"); *In re Blech*, 187 F.R.D. 97, 106 (S.D.N.Y. 1999) (typicality satisfied because "plaintiffs' claims of fraud arise from the same course of conduct" as the rest of the class).

Moreover, Mr. Tjok's claims are not subject to any "unique defenses" that would preclude a finding of typicality. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir. 2000) (finding class certification inappropriate "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."). YieldStreet's defenses to date have challenged whether statements in the Offering Documents were in fact misleading, whether its generic/boilerplate disclaimers preempt Plaintiffs' claims, and whether claims for rescission are yet ripened in light of YieldStreet's ongoing effort to collect an $86 million default judgment from the underlying borrowers (who are believed to be hiding in Pakistan and whose

17

stated net worth is only a fraction of the amount lost). These defenses are not unique to Mr. Tjok and do not defeat typicality.

    4.    **Adequacy**

Rule 23(a)(4) requires that the representative parties "will fairly and adequately protect the interests of the class."  This requirement is met if: (1) the representative plaintiff's interests are not antagonistic to those of the class; and (2) class counsel is qualified, experienced and able to conduct the litigation.  *Yi Xiang* 327 F.R.D. at 524; *see also In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).

It is well-established that "in complex actions 'named plaintiffs are not required to have expert knowledge of all the details of the case ... and a great deal of reliance on expert counsel is to be expected.'" *Yi Xiang*, 327 F.R.D. at 525 (citing *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.,* 941 F. Supp. 326, 341 (S.D.N.Y. 1996)); *see also In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 356-57 (S.D.N.Y. 2002) (approving class representative where proposed representative did not speak English, but understood "the basic nature of the lawsuit, and, while he d[id] not grasp the nuances of a class action, his interests are clearly aligned with the class members whom he represents").

The proposed class representative in this case, Mr. Tjok, has submitted a declaration in conjunction with this motion describing, *inter alia*, his qualifications to serve as class representative; his involvement in this case to date; and his willingness to continue serving as class representative for the benefit of investors.[47] Courts in this Circuit routinely rely on a class representative's declaration/ affidavit to establish Rule 23(a)(4)'s adequacy requirement. *See, e.g., Gomez v. Lace Entm't, Inc.*,  2017 WL 129130 at *9 (S.D.N.Y. Jan. 6, 2017); *Hart v. BHH, LLC*,

---

[47]    *See generally* Decl. of Lawrence Tjok., attached to the Centner Decl. as Ex.  32.

2017 WL 2912519 at *6 (S.D.N.Y. July 7, 2017); *see also In re MF Global Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 237 (S.D.N.Y. 2015) (Marrero, J.) (noting that "attacks on the adequacy of a class representative" are disfavored).

There are no conflicts of interest between Mr. Tjok and the members of the proposed Class, nor are his interests antagonistic to those of the Class. Simply put, he wants to maximize the recovery for all victims of Yieldstreet's unlawful conduct. He is a more than adequate representative for the class members and he is proud to represent them.

Additionally, Mr. Tjok and other Plaintiffs in this action have retained counsel who have successfully prosecuted numerous securities cases and other complex class and other actions in courts throughout the country. *See* ECF Nos. 57 and 57-1; 58 and 58-1. As the Court already found in granting Mr. Tjok's motion seeking appointment as lead plaintiff and selection of class counsel, the "Court is persuaded that Peiffer Wolf and Sonn Law can adequately represent the class here." ECF No. 67 at p. 15.

Consistent with the above, Plaintiffs' counsel have prosecuted this case for more than two years. During that time they have conducted an extensive investigation into the Class's claims; overcome two motions to dismiss (including the most recent one its entirety) authored by world-class defense attorneys; conducted hundreds of hours of witness interviews and other research into and analysis of Plaintiffs' claims; negotiated a comprehensive case management plan and scheduling order; filed a successful motion for appointment of Lead Plaintiff and Lead Counsel pursuant to the P.S.L.R.A.; commenced written discovery, including both serving and responding to Requests for Production and Interrogatories and working through approximately 275,000 pages of documents produced thus far; defended multiple depositions; and otherwise vigorously represented the Class's interests in this complex dispute.  Plaintiffs' Counsel respectfully submit

that their work to date confirms that they are capable of continuing to prosecute this litigation on behalf of the Class.

5. **Predominance (Rule 23(b)(3))**

Rule 23(b)(3) does not require a complete absence of any individual issues. *See Dura-Bilt*, 89 F.R.D. at 99 ("To be sure, individual issues will likely arise in this as in all class action cases."). Rather, predominance means that "some of the legal or factual questions" can be resolved through "generalized proof," and that "these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

As this Court has explained,

> This inquiry requires examining the elements of the claims and defenses to be litigated to determine whether generalized evidence can prove the elements or if individualized proof will be necessary and predominate over common issues. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d. Cir. 2015). Moreover, although a defense may arise and may affect different class members differently, this does not compel a finding that individual issues predominate over common ones. *Id.*, citing *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010). Indeed, as long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3). *Id.* Ultimately, the court must decide whether classwide resolution would substantially advance the case, examining whether certification will reduce the range of issues in dispute and promote judicial economy. *Johnson*, 780 F.3d at 138.

*Yi Xiang*, 327 F.R.D. at 526–27 (internal quotation marks omitted).

As described *supra*, there are myriad common factual and legal issues that will be resolved through generalized proof, including but not limited to:

- Did the "asset class expert" highlighted in YieldStreet's offering documents issued in connection with the Vessel Deconstruction funds warn YieldStreet not to make the underlying loans?

- Did YieldStreet omit that warning from its Offering Documents?

- Should YieldStreet have made these loans and/or Offerings at all?

- Did YieldStreet's offering documents omit key details of, and deviations from, the

diligence and vetting processes that YieldStreet promised to Class Members?

• Did YieldStreet fail to disclose that prior YieldStreet offerings had in fact lost principal, notwithstanding YieldStreet's claims to the contrary?

• Does the verbatim reproduction of YieldStreet Management's investment advice in the Series Note Supplements distributed to members on the YieldStreet portal give rise to a fiduciary duty?

• Did Michael Weisz exercise control over any or all of the foregoing such that secondary liability attaches?

• Do YieldStreet's boilerplate disclaimers (*e.g.*, "it is possible that you may lose all of your investment") exculpate it from liability for the omissions and breaches described above?

• Is YieldStreet's argument that Class members have not yet sustained 'damages' in light of YieldStreet's ongoing (and apparently failed) collection efforts legally tenable?

• What is the exact dollar amount that remains unpaid to investors on each of the subject Offerings?

Each of the Class Members' individual clams will rise and fall on the basis of common evidence establishing the foregoing.  Whether proceeding as a class or over 2,000 individual suits, Plaintiffs will present the same case-in-chief. Resolving these predominant questions on a class-wide basis is in everyone's best interests, and on that basis predominance is met.

### a.    Individual Questions of Reliance Will Not Predominate

Plaintiff anticipates that YieldStreet will argue that individual questions related to Class Members' reliance will predominate over the common issues discussed above.  The Court should reject that argument, as the reliance element of Plaintiffs' claims[48] is (i) presumed under *Affiliated Ute* as to claims under the federal securities laws, and additionally (ii) may be demonstrated on common, circumstantial evidence, as set forth in more detail below.

### i.    *Affiliated Ute*

---

[48]     Reliance is not an element of Plaintiffs' fiduciary duty claim. *See, e.g.*, *Burry v Madison Park Owner LLC*, 84 A.D.3d 699, 699-700 [1st Dept 2011].

Where there is "an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972)). As this Court has explained "[r]equiring a plaintiff to show a speculative state of facts, *i.e.,* how he would have acted if omitted material information had been disclosed would place an unnecessarily unrealistic evidentiary burden on the plaintiff. *Anwar v. Fairfield Greenwich Ltd*., 306 F.R.D. 134 (S.D.N.Y. 2015) (Marrero, J.).

"Instead, if the plaintiff proves that the facts withheld are material in the sense that a **reasonable investor might have considered them important**, reliance will be presumed." *Du Pont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987) (emphases added)).  The materiality standard is satisfied where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 482 (2d Cir. 2008); *In re Sadia, S.A. Sec. Litig.*, 2010 WL 2884737, at *7 (S.D.N.Y. July 20, 2010) (material facts include those "which may affect the desire of investors to buy, sell, or hold the company's securities.")

The crux of Plaintiff's case is that Defendants' offering documents omitted numerous material facts concerning the propriety of the YieldStreet Offerings at issue in this case, including but not limited to, that the "asset class expert" supposedly providing advice as to how to structure the Vessel Offerings had warned YieldStreet not to make the underlying loans; that YieldStreet's "credit committee" process was a sham that did not vet offerings as promised but instead based decisions on what would inflate YieldStreet's fee receipts; and that one or more of YieldStreet's prior offerings had experienced a principal loss event due to a failure to properly secure collateral and vet the underlying borrowers. *See supra* at pp. 3-10.

22

In *Anwar*, this Court certified a class of Rule 10b-5 claimants alleging a pattern of non-disclosure that is functionally identical to what Mr. Tjok and the Class Members allege here. The *Anwar* plaintiffs alleged that the defendants failed to disclose their internal auditors' "grave doubts" about the propriety of investments that that the defendants were recommending, and that the defendants failed to follow their own, or industry standard, vetting procedures. *See* 306 F.R.D. at 146. The Court found certification appropriate because these omissions were "common to all plaintiffs." *Id.* at 147. As the Court observed, "it is difficult to imagine an investor putting money into any fund without relying on the integrity of the process." *Id.* (citing *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 131. (S.D.N.Y. 2001). *Anwar* also cited with approval *In re Beacon Associates Litigation*, wherein a class was certified where the defendants were alleged to have "withheld the same material information" from all investors concerning the defendant's diligence process. 282 F.R.D. 315, 327 (S.D.N.Y. 2012). Notably, *Beacon* applied the *Affiliated Ute* presumption even where the class representative testified he had not actually read the defendant's offering memoranda.[49] *Id.*

### ii. *Circumstantial Evidence*

Even without applying *Affiliated Ute*'s presumption of reliance, certification is appropriate because reliance may be shown via common general and circumstantial evidence. *See Anwar, supra; see also Audet v. Fraser*, 332 F.R.D. 53, 78 (D. Conn. 2019). As *Anwar* recognized, "the fact that class members will show causation by establishing reliance on a defendant's misrepresentations ... does not place fraud-based claims entirely beyond the reach of Rule 23, provided that individualized issues will not predominate." 306 F.R.D. at 144, citing *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119 (2d Cir. 2013). The question is simply whether

---

[49]     Contrast this case, where Mr. Tjok confirmed that he read all of the documents before he made his investment decision, *see, e.g.*, Centner Decl., Ex. 11 at 148:3-22.

Plaintiffs "can prove reliance on a class-wide basis through common, circumstantial evidence." *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *10 (S.D.N.Y. Oct. 17, 2013).

"Fraud claims based on uniform misrepresentations to all members of a class are appropriate subjects for class certification because, unlike fraud claims in which there are material variations in the misrepresentations made to each class member, uniform misrepresentations create no need for a series of minitrials." *In re U.S. Foodservice Inc.*, 729 F.3d at 118. A showing that a party could not have purchased a product but for the misleading offering documents is sufficient circumstantial evidence of reliance to support certification. *See, e.g.*, *Anwar*, 306 F.R.D. at 144.

This case presents strong circumstantial evidence of reliance. YieldStreet prepared uniform offering documents explaining the nature of the Offerings, and Yieldstreet's materially misleading statements omitted material information concerning the vetting and due diligence processes intended to safeguard those investments. Mr. Tjok testified that he read and relied YieldStreet's offering documents prior to making their investments. *See supra* n. 13; *see Anwar*, 306 F.R.D. at 145 (citing deposition transcripts and declarations by investors testifying that they relied on documents as "common evidence" used to show circumstantial proof of reliance.). In fact, each Yieldstreet investor independently certified that he or she had read, understood, and relied upon the entirety of the offering documents–moreover, each Class member made the decision to invest based "solely" on these offering documents. *See, e.g., supra* n. 7. Under these circumstances, the simple fact the investor made the investment demonstrates the class's circumstantial evidence of reliance on those documents—what else could they have relied upon?

More broadly, it is a common-sense proposition that investors would not want to purchase a note tied to a loan that the lender been warned by its retained "expert" advisor not to make. Similarly, investors being asked to invest in a collateralized loan would want to be told the full

truth about the issuer's past performance—particularly where investor principal had previously been lost due to the issuer's failure to secure promised collateral and guarantees intended to backstop the investment.

For any or all of these reasons, circumstantial evidence could lead a finder of fact to conclude beyond a preponderance of the evidence that each individual plaintiff relied on YieldStreet's offering documents, and certification is therefore appropriate as to all claims where reliance is an element.

6.     **Superiority**

Finally, Rule 23(b)(3) also requires the Court to find that a class action is superior to other possible methods of fairly and efficiently resolving the controversy. "In general, securities suits ... easily satisfy the superiority requirement of Rule 23." *In re Merrill Lynch Tyco Research Sec. Litig.,* 249 F.R.D. 124, 132 (S.D.N.Y. 2008). This securities case is in accord with the general rule. Requiring hundreds of putative class members to proceed individually would be costly and inefficient for the Court, and YieldStreet itself. Moreover, the average YieldStreet investor in the Offerings at issue in this case invested only $30,000[50], approximately, creating a situation where "others may have suffered losses too small for an individual action to be worthwhile or may lack the resources to pursue litigation." *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,* 2016 WL 7409840, at *11 (S.D.N.Y. Nov. 4, 2016). A class action is not only the superior method for vindicating these investors; as a practical matter, it is the only way.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be granted.

Respectfully submitted,

By: */s/Daniel Centner*

---

[50] Centner Decl., Ex. 32 at YieldStreet_00154418.

**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
Daniel Centner.
Joseph Peiffer (admitted *pro hac vice*)
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: (504) 523-2434
Facsimile: (504) 608-1465
jpeiffer@peifferwolf.com
dcentner@peifferwolf.com

**SONN LAW GROUP, P.A.**
Jeffrey R. Sonn, Esq.
Brian B. Pastor, Esq.
One Turnberry Place
19495 Biscayne Blvd., Suite 607
Aventura, FL 33180
Telephone: (305) 912-3000
Facsimile: (786) 485-1501
jsonn@sonnlaw.com
bpastor@sonnlaw.com
service@sonnlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of February, 2023, a copy of the foregoing was served on all counsel of record through operation of the Court's CM/ECF filing system.

_____/s/Daniel Centner_____