# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MICHAEL TECKU; DAVID FINKELSTEIN; AND LAWRENCE TJOK, *individually and on behalf of all others similarly situated*,<br><br>    Plaintiffs,<br><br>  v.<br><br>YIELDSTREET, INC.; YIELDSTREET MANAGEMENT, LLC; YS ALTNOTES I, LLC; YS ALTNOTES II, LLC; AND MICHAEL WEISZ,<br><br>    Defendants. | No.:  1:20-cv-07327 (VM) (SDA) |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF LAWRENCE TJOK'S MOTION FOR CLASS CERTIFICATION

Jonathan A. Shapiro (*pro hac vice*)
**GOODWIN PROCTER LLP**
Three Embarcadero Center, Suite 2800
San Francisco, CA  94111
Tel.: +1 415 733 6000
Fax: +1 415 677 9041
JShapiro@goodwinlaw.com

Robert M. Tiefenbrun
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, CA  90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673
RTiefenbrun@goodwinlaw.com

Brendan F. Quigley
**BAKER BOTTS LLP**
30 Rockefeller Plaza
New York, New York  10112
Tel.: +1 212 408 2520
Fax: +1 212 259 2520
Brendan.quigley@bakerbotts.com

Melissa Lee Brumer
**GOODWIN PROCTER LLP**
620 Eighth Avenue
New York, NY 10018
o  +1 212 813 8800
f  +1 212 214 0813
MBrumer@goodwinlaw.com

*Counsel for Defendants Yieldstreet Inc.; Yieldstreet Management, LLC; YS Altnotes I, LLC; YS Altnotes II, LLC; and Michael Weisz*

March 20, 2023

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

APPLICABLE LEGAL STANDARDS ............................................................................. 3

ARGUMENT ...................................................................................................................... 4

   I.  Tjok Lacks Standing To Represent Investors In 40% Of The Offerings At Issue ............... 4

   A.  Tjok Fails To Establish Article III Standing To Sue In His Own Name ........................... 5

   B.  Tjok Lacks "Class Standing" To Sue For Losses In The Final Different Deals ................. 5

   II.  Tjok Has Not Met His Burden To Show "Predominance" Under Rule 23(b)(3) ................. 9

   A.  The "Personalized Advice" Fiduciary Claims (Counts V & VI) And "Special
Relationship" Negligent Misrepresentation Claim (Count VII) Are Inherently
Individualized ............................................................................................................... 10

   B.  Reliance Is A Necessary Element of Every Claim .......................................................... 11

      1.  Reliance Is A Hopelessly Individualized Factual Inquiry ......................................... 12

        a.  Putative Class Members Invested In Different Offerings ..................................... 13

        b.  Three Plaintiffs Invested For Different And Personal Reasons ............................ 14

        c.  Class Members Received Different Information From Different People ............... 15

        d.  Class Members Reacted *Very* Differently To The *Same* Information ................... 18

      2.  There Is No "Presumption" Of Reliance For Common Law Claims ......................... 20

      3.  There Is No "Presumption" Of Reliance For The Sole Federal Claim ..................... 20

        a.  *Affiliated Ute* Does Not Apply ............................................................................ 21

        b.  *In Re U.S. Foodservice* Does Not Apply .............................................................. 23

   III.  Tjok Does Not Even Address That Choice-of-Law Variances Bar Certification ............... 24

   IV.  Tjok Fails To Satisfy Other Requirements Of Rule 23 ..................................................... 24

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)................................................................................................20, 21, 23

*Am. Exp. v. Italian Colors Rest.*,
    570 U.S. 228 (2013)................................................................................................................3

*Amerio v. Gray*,
    2019 WL 4170160 (N.D.N.Y. Sept. 3, 2019).......................................................................12

*Anwar v. Fairfield Greenwich Ltd.*,
    306 F.R.D. 134 (S.D.N.Y. 2015) (Marrero, J.)........................................................20, 22, 23

*Ashland v. Morgan Stanley*,
    652 F.3d 333 (2d Cir. 2011).................................................................................................12

*Audet v. Fraser*,
    332 F.R.D. 53 (D. Conn. 2019)............................................................................................23

*In re Bibox Grp.*,
    534 F. Supp. 3d 326 (S.D.N.Y. 2021)....................................................................................6

*Borgese v. Baby Brezza Enterprises*,
    2021 WL 634722 (S.D.N.Y. Feb. 18, 2021) (Marrero, J.) ...................................................12

*CGC Holding Co. v. Broad and Cassel*,
    773 F.3d 1076 (10th Cir. 2014) ...........................................................................................21

*Comcast v. Behrend*,
    569 U.S. 27 (2013)..........................................................................................................9, 24

*Crigger v. Fahnestock & Co.*,
    443 F.3d 230 (2d Cir. 2006).................................................................................................13

*De Lacour v. Colgate-Palmolive*,
    2019 WL 4359554 (S.D.N.Y. Sept. 12, 2019)......................................................................24

*In re Digital Music Antitrust Litig.*,
    321 F.R.D. 64 (S.D.N.Y. 2017) ...........................................................................................25

*Emilio v. Sprint Spectrum*,
    2017 WL 3208535 (S.D.N.Y. July 27, 2017) ........................................................................4

*Erica P. John Fund v. Halliburton Co.*,
    563 U.S. 804 (2011)........................................................................................................9, 21

*Ge Dandong v. Pinnacle Performance*,
2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ........................................................23

*Goldberger v. Bear, Stearns & Co.*,
2000 WL 1886605 (S.D.N.Y. Dec. 28, 2000) ..........................................................5

*Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021)..........................................................................................12, 21

*Goodman v. Genworth Fin. Wealth Mgmt., Inc.*,
300 F.R.D. 90 (E.D.N.Y. 2014) ............................................................................24

*Haley v. Tchrs. Ins. & Annuity Ass'n*,
54 F. 4th 115 (2d Cir. 2022) .................................................................................4, 9

*In re Initial Pub. Offerings Secs. Litig.*,
471 F.3d 24 (2d Cir. 2006)......................................................................................18

*Johnson v. Nextel Comms.*,
780 F.3d 128 (2d Cir. 2015)....................................................................................24

*Laub v. Faessel*,
297 A.D.2d 28 (1st Dep't 2002) .............................................................................11

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
27 F. Supp. 3d 447 (S.D.N.Y. 2014)........................................................................4

*In re Lincoln Nat'l COI Litig.*,
2022 WL 4091220 (E.D. Pa. Aug. 9, 2022) ..........................................................10

*In re Livent, Inc. Noteholders Secs. Litig.*,
211 F.R.D. 219 (S.D.N.Y. 2002) (Marrero, J.)................................................18, 24

*N.J. Carpenters Health Fund v. Residential Cap., LLC*,
272 F.R.D. 160 (S.D.N.Y. 2011), *aff'd*, 477 F. App'x 809 (2d Cir. 2012) ...........16

*N.J. Carpenters v. Rali Series 2006-QO1 Tr.*,
477 F. App'x 809 (2d Cir. 2012) ..............................................................................7

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012)....................................................................4, 5, 6, 8

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017)......................................................................................4

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley*,
772 F.3d 111 (2d Cir. 2014)...................................................11, 13, 15, 20, 24

iv

*Retirement Bd. of the Policemen's Annuity and Ben. Fund v. Bank of New York Mellon*,
　775 F.3d 154 (2d Cir. 2014)..................................................................6, 7

*Romero v. Flaum Appetizing*,
　2011 WL 812157 (S.D.N.Y. Mar. 1, 2011) ...................................................18, 24

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
　324 F. Supp. 3d 387 (S.D.N.Y. 2018) (Marrero, J.) ..................................5

*Slade v. Progressive Sec. Ins. Co.*,
　856 F.3d 408 (5th Cir. 2017) .................................................................9

*Teamsters Local 445 v. Bombardier*,
　546 F.3d 196 (2d Cir. 2008).................................................................3

*Tropical Sails v. Yext*,
　2017 WL 1048086 (S.D.N.Y. Mar. 17, 2017) .........................................23

*In re U.S. Foodservice Inc. Pricing Litig.*,
　729 F.3d 108 (2d Cir. 2013)..........................................................20, 21, 23

*In re Vivendi Universal*,
　2004 WL 876050 (S.D.N.Y. Apr. 22, 2004).........................................11

*Waggoner v. Barclays PLC*,
　875 F.3d 79 (2d Cir. 2017)...........................................................12, 21, 22, 23

*Wal-Mart Stores v. Dukes*,
　564 U.S. 338 (2011).................................................................3, 4, 9

**Statutes**

Fed. R. Civ. P. Rule 12 .................................................................11

Fed. R. Civ. P. Rule 23(a)..............................................................*passim*

Fed. R. Civ. P. Rule 23(b)..............................................................*passim*

**Other Authorities**

U.S. Const. art. III .....................................................................1, 4, 5

## INTRODUCTION

Distilled to the core, the class certification question asks whether Plaintiff Lawrence Tjok has shown that trial of his own personal claims will fully and fairly adjudicate the claims of *all* absent class members. The test is "rigorous" and pragmatic, requiring scrutiny of all claims and defenses (*i.e.*, all disputed issues, not just cherry-picked "common questions") and of the existing discovery record, itself a preview of the breadth of evidence to be introduced at trial (*i.e.*, the actual factual disputes, not just what counsel proffers or what some common deal documents say). The burden is squarely on Tjok to demonstrate every element of Rule 23(a) and 23(b)(3) by a preponderance of the evidence. The Motion he filed (ECF 88, "Mot.") does not come close.

First, Tjok **lacks Article III standing** to be certified as the sole "class representative" for a class of high-net-worth "accredited investors" suing for losses in *five separate* private securities offerings. Those private placements closed on various dates over 18 months, but Tjok chose to *not* invest in the final two—he never purchased the securities at issue from one of the issuers he sued. Article III thus excludes **40% of the offerings** and **one of the defendants** right out of the gate.

Second, the Motion rests on the false premise that all five offerings were functionally equivalent, with "identical" investor disclosure. Not true. These were **distinct private securities transactions, offered on various dates in 2018 and 2019**, through deal-specific SPVs that held different loans that were separately negotiated with different economics (rates of return and duration) and that always were secured by different collateral. An oil & gas deal is nothing like a marine financing. Nor are all marine financings alike. Tjok's premise that the offerings were "same, same" is also belied by great variance in the results. Two marine deals returned more than 100% of principal while the final two that were sold in 2019 with new and different risk disclosures so far have returned around 5%. The diverse facts of the offerings are real, and they do matter.

1

<u>Third</u>, Tjok cannot expect the Court to certify a class for trial of **seven claims** by filing a Motion that bizarrely **only addresses two** of them. Tjok simply **ignores all five common law claims**—fiduciary duty, fraudulent inducement, and negligent misrepresentation (Counts I, II, V, V–VII). That is a show stopper because each of the ignored claims require proof of elements that, by definition, are investor-specific such that "common proof" will never "predominate" at trial.

<u>Fourth</u>, common evidence will not predominate even as to the federal securities claim that Tjok does address in the Motion. To win a Section 10(b) claim, every plaintiff (and absent class members are plaintiffs) must prove that they personally and reasonably relied on defendants, and were defrauded as a result. For one example, according to the CAC (ECF 51, "CAC"), all investors were duped by Yieldstreet's failure to disclose that the marine vessel collateral was "not secure" and thus not available in the event of default. Tjok testified that he personally would *never* have invested with Yieldstreet had the loss of ships been disclosed, and that no "reasonable" investor would invest knowing those facts. That may be Tjok's testimony, but at trial it will *not* be "common proof" of whether absent class members also considered that risk critical to their own decision-making. That is because the actual investor responses to the loss of collateral are so contradictory that they foreclose predominance. **43% of marine investors made a personal choice to again invest with Yieldstreet**, **after being told** that the collateral was lost at sea. That hard data means that proposed "class representative" Tjok's personal reliance and decision-making—and views on what is "reasonable"—are the *opposite* of nearly half of the "class" he seeks to represent.[1]

<u>Finally</u>, the individualized, fact-bound nature of this case is an immutable function of the **atypical nature of Yieldstreet's business**. This is *not* the usual securities class action against a

---

[1] Tjok has contradicted his Motion by *repeatedly denying* that his own decision making (*i.e.*, what he deemed important and relied on) would be "common proof" of claims by absent class members. **"I don't know what other people think . . . I only know for myself investment decisions I made for myself."** Tjok 60:25-61:2. When it comes to "warnings about [] speculative and risky investments," **"I don't know what other investor[s] would think."** *Id.* 208:6-12.

public company that communicates with investors only through uniform SEC filings and disclosure, with the same words at the same time. Yieldstreet offerings are *private market alternative investments sold as private placements, to accredited investors*, who are urged to (and do) consult their own personal financial advisers. Yieldstreet's "high touch" IR team talks to investors every day, addressing *individual questions on a one-one basis*, including *19,911 inbound emails*. The record is clear that plaintiffs themselves conducted a range of independent research before investing, going well beyond the "common" offering documents that the Motion focuses on to the exclusion of *everything else* that investors say they rely on. Tjok cannot credibly claim that his investment calculus is "common proof" of others after testifying that he invested on the *private advice of his "very smart" mentor*, and after *"personal connection and discussion" with a Yieldstreet co-founder* about the very default risk that he claims was concealed—all personalized data points in which others plainly did not rely.

Simply put, for these and the reasons set out below, this case is a terrible candidate for class certification. Tjok has not met his Rule 23 burden. The Motion respectfully should be denied.

## APPLICABLE LEGAL STANDARDS

Tjok must demonstrate by a preponderance of the evidence that the case satisfies all four prongs of Rule 23(a) plus the still more demanding requirements of Rule 23(b)(3). *Teamsters Local 445 v. Bombardier*, 546 F.3d 196, 201-03 (2d Cir. 2008). Rule 23 "imposes stringent requirements for certification that in practice exclude most claims," *Am. Exp. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013), because it is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348 (2011). Tjok must "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."

*Id.*, 564 U.S. at 350 (emphasis in original). Courts "must conduct a 'rigorous analysis'" to "ensure that a plaintiff has '***in fact***' shown" that Rule 23 "has been satisfied." *Emilio v. Sprint Spectrum*, 2017 WL 3208535, at *7 (S.D.N.Y. July 27, 2017) (emphasis in original).

The Supreme Court is clear that it is *never* enough to list superficially "common" questions and call it a day—which is *precisely* what Tjok does here. *See* Mot. 11, 20-21. Class certification does *not* hinge on "common questions—even in droves." *Dukes*, 564 U.S. at 349-50. To show that common issues "predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3), Tjok must address the *entire case*—the elements of every claim, and the fact-driven defenses to each—to show that a "class-wide proceeding [will] generate common ***answers*** apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350; *In re Petrobras Sec.*, 862 F.3d 250, 273 (2d Cir. 2017) (Plaintiff has "burden of showing that, more often than not, [he] can provide common *answers*"). That means Tjok <u>*must*</u> go beyond some list of common items to show that defenses can be tried to verdict with common proof. *Haley v. Tchrs. Ins. & Annuity Ass'n*, 54 F. 4th 115, 122 (2d Cir. 2022) (vacating certification for failure to consider affirmative defenses).

Just like *every* plaintiff, Tjok must demonstrate both Article III standing to sue each defendant "in [his] own right," and from there separately demonstrate "class standing." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 481 (S.D.N.Y. 2014) (citing *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158 (2d Cir. 2012)).

## ARGUMENT

## I.   Tjok Lacks Standing To Represent Investors In 40% Of The Offerings At Issue

Tjok asks the Court to certify him as the <u>**sole**</u> "Representative" and fiduciary on behalf of every investor in five Yieldstreet offerings. Mot. 1. But Tjok never even addresses the threshold question of whether he personally has Article III standing to sue Yieldstreet in his *own* name for all those offerings. This is an insurmountable problem because, although never disclosed in his

Motion, he invested in only *three of the five* offerings at issue, and never purchased any of those securities from one of the issuer defendants. As a result, Tjok lacks standing to sue for himself, much less on behalf of absent class members, for damages arising from the last two offerings (Deconstruction or "Decon" IV and VI) or to sue one defendant (YS ALTNOTES II) for anything.

## A.  Tjok Fails To Establish Article III Standing To Sue In His Own Name

"Article III standing is a threshold question in every federal case." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 397 (S.D.N.Y. 2018). "To establish Article III standing in a class action . . . for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant." *NECA*, 693 F.3d at 159. The law is clear: If Tjok has no right to bring a claim in his own name, as a matter of law he cannot pursue that claim on behalf of a class—even if some of the absent class members themselves might have such a claim. *Goldberger v. Bear, Stearns & Co.*, 2000 WL 1886605, at *1 (S.D.N.Y. Dec. 28, 2000).

Here, the question is not close. Having ignored the question of his standing, Tjok *a fortiori* hasn't demonstrated it (and plaintiffs who ignore standing also are not "adequate"). He could never have Article III standing to bring an individual claim against <u>YS ALTNOTES II</u> because it was the issuer for only one of five deals at issue, <u>Decon IV</u>, and he chose *not* to invest in it. Ex. 1 ¶ 18[2] ("Ex." are exhibits to Tiefenbrun Declaration herewith). Tjok also chose *not* to invest in the final offering, <u>Decon VI</u>. He thus lacks Article III standing to bring an individual claim to recover losses from those offerings, or to sue on behalf of those who made the different choice to invest in them.

## B.  Tjok Lacks "Class Standing" To Sue For Losses In The Final Different Deals

Even if one could ever overlook an Article III problem, the Motion also does not explain how Tjok would have "class standing" to "lead" a challenge to the two deals he had nothing to do

---

[2] Tjok falsely declares that he purchased a BPDN from YS ALTNOTES **II** in the Decon III offering. Centner Ex. 32 ¶ 13.c. The deal documents make clear that Decon III was issued by YS ALTNOTES **I**. Ex. 6.

with (Decon IV and VI), having decided to stop investing with Yieldstreet in April 2019. Ex. 12. As a matter of law, Tjok lacks standing to be the "class representative" for claims against the final two deals that turn on "very different proof" and are "sufficiently different in character and origin" than the earlier deals in which Tjok did invest, a test shorthanded as not implicating the "same set of concerns." *See NECA*, 693 F.3d at 162-64; *Retirement Bd. of the Policemen's Annuity and Ben. Fund v. Bank of New York Mellon*, 775 F.3d 154, 162 (2d Cir. 2014) (no class standing in *different* RMBS trusts because misconduct must be "proved loan-by-loan and trust-by-trust").[3]

Tjok cannot paper over key differences between the marine deals in which he did invest (Decon I & III) and the final ones he passed on (Decon IV & VI) with his ***false*** assertion that everyone "received identical, misleading offering documents." Mot. 11. That is just not true. Decon IV and VI differed from the earlier ones in which Tjok invested, including with respect to *(i)* disclosure of the risk; *(ii)* defendants' (alleged) knowledge at the time of disclosure; and *(iii)* loss of the collateral that caused the harm. As noted, even the issuer of Decon IV, *i.e.*, the alleged primary violator, is different.

**<u>First</u>, investor disclosure changed in the final deals**. Although Tjok acknowledges that each offering was pursuant to "a particularized Series Note Supplement" ("SNS") providing specific details about individual offerings," Mot. 3,[4] he ignores that the SNSs for the final deals had new, markedly different disclosure on a topic that plaintiffs say mattered to them personally.

Specifically, the CAC and Motion both complain that Yieldstreet created a "concentration

---

[3] Claims against five distinct marine and oil & gas offerings—***five different securities, sold on at least six different dates*** (Ex. 1 ¶¶ 14, 18)—necessarily must be proven separately, meaning that a preponderance of evidence cannot show that all the claims uniformly "implicate[] the same set of concerns." *See In re Bibox Grp.*, 534 F. Supp. 3d 326, 335 (S.D.N.Y. 2021) (no class standing as to crypto assets plaintiff did not trade).

[4] Each SNS included different disclosures, reflected the unique terms of each offering (including total investment amounts, interest rates, estimated durations, management fees, payment frequency, and other key features), and involved different collateral, meaning that the due diligence for each offering entailed different vessels that were unique in their scrap value, purchase price, and sale price, among other differences. *See* Ex. 3.

[] risk" by lending too much money to the same borrower. CAC ¶¶ 158, 178, 195; Mot. 6 n.15, 7, 9. Tjok and Tecku doubled down on that theory testifying that borrower concentration was important to them personally—**"exponentially important"** as Tecku put it. Tecku 9:5-12; Tjok 195:8-17. Having affirmatively injected "concentration risk" into this case, Tjok conspicuously avoids the fact that borrower concentration was *not* disclosed in any of the deals that he purchased (Oil & Gas, Decon I and III), but *was explicitly disclosed to the dollar* in the two final deals that Tjok chose *not* to invest in (Decon IV and VI).[5] That fundamental change in "concentration risk" disclosure bears on the legal elements, proof and defenses—including reliance (investors like Tjok concerned by risk concentration may have passed on the final deals), materiality and falsity of the disclosure, and scienter (with the new concentration risk disclosure plainly indicia of good faith).

**<u>Second</u>, the underlying facts changed a lot *after* Tjok stopped investing.** At its core, this case is about whether Yieldstreet fell short of any disclosure or other duty *at the time* of each deal—and those dates range from June 2018 to September 2019. Trial will be a deal-by-deal debate over what Yieldstreet disclosed *at the time*, what it *knew at the time* of disclosure, and what caused subsequent losses for each deal. It is not all "same, same." Yieldstreet's dealings with the borrower changed substantially *after* Tjok's final investment (April 2019), Centner Ex. 25, bringing Yieldstreet new information about what the borrower was saying and doing. *Retirement Bd.*, 775 F.3d at 163 (no class standing where, as here, deals bring "significant differences [in] proof"); *N.J. Carpenters v. Rali Series 2006-QO1 Tr.,* 477 F. App'x 809, 814 (2d Cir. 2012) (no certification where, as here, various offerings sold over 18 months such that "purchasers of each security who purchased at different times would have had available different levels of public information.").

Specifically, the CAC seeks to recover losses in deals where *both* the borrower failed to

---

[5] *See* Ex. 7, at 10 (<u>Decon IV</u>: "total outstanding exposure to the Borrower is $86.3M as of May 2019."); Ex. 8, at 10 (<u>Decon VI</u>: "total outstanding exposure to the Sponsor is $74.9M (excluding this transaction) as of August 2019.").

pay *and* the vessels that served as "collateral [were] not properly secured." Mot. 9-10; CAC ¶ 186. Critically, the *borrower never missed a single payment before Tjok's last investment*—but only missed a payment *after* Tjok walked away. Ex. 1 ¶ 21. The great majority of the collateral (8 of 11 ships) that allegedly were "not properly secured" were, in fact, not lost until *after* Tjok invested. Ex. 16. And in a case where plaintiffs must prove that Yieldstreet knew but did not disclose risk of "not properly secured" vessels, the earliest "storm warnings" that there *might* be a collateral problem came in July 2019, again *after* every one of Tjok's deals. *See* Centner Ex. 25.[6]

**Third**, deal economics and outcomes varied substantially.** Yieldstreet offerings are *not* public company common stock or classes of the same securities—they are ***all different, and cannot be airbrushed as "identical" and "uniform."*** *See* Mot. 11, 14, 24. The loan economics were separately negotiated for each deal, with different collateral for every deal. As set out in the Klopfer Declaration, investment performance varied greatly, as one would expect from separate securities sold on different dates. Of Tjok's deals *(i)* Oil & Gas returned 45% of invested principal; *(ii)* Short Term Vessel Refinancing fully returned principal and was slightly profitable (100.7%), a deal in the CAC but that Tjok *drops* from his "class" Motion; *(iii)* Decon I returned some principal but remains open (13.4%); and *(iv)* Decon II returned more than 100% of principal—to others *but not* to Tjok, who *chose* not to invest. Ex. 1 ¶¶ 17, 19. By contrast, the final deals that Tjok also declined are performing far worse, to date returning 5.6% and 4.8%. *Id.* at ¶ 19.

At bottom, the disclosures, underlying facts, and losses pertinent to Decon IV and VI are "sufficiently different in character and origin," and will require "very different proof," at trial than claims based on the earlier oil & gas and marine deals in which Tjok invested. *See NECA*, 693

---

[6] Tjok acknowledges that this critical factual change came *after* he stopped investing *See* Mot. 9 ("[P]rior to making at least one, and maybe more, Vessel Deconstruction Offering(s), Yieldstreet was made aware of an 'industry flaw' that allows for vessels subject to mortgages/liens to be broken down without assurance of payment to the lender").

F.3d at 163-64. That bars Tjok's standing to sue for those who did invest in Decon IV and VI, and exposes the fallacy that "common proof" will "predominate" claims by 2,000+ class members.

## II.   Tjok Has Not Met His Burden To Show "Predominance" Under Rule 23(b)(3)

That Tjok does not even reach the "predominance" prong until late in his Motion (page 20) itself a red flag because "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast v. Behrend*, 569 U.S. 27, 34 (2013). When he finally gets there, Tjok offers a string of generic "trust-me" conclusions that there are "myriad common factual and legal issues" (he lists 10), insisting that all investor claims "rise and fall on the basis of common evidence," and bald assertions that the "same case in chief" will work for everyone. *Compare* Mot. 20-21 *with Dukes*, 564 U.S. at 349-50 (certification does not hinge on "common questions—even in droves").

Those superficial *conclusions* ignore that any "[c]onsider[ation of] whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011). Tjok nowhere addresses the elements of the claims sustained in a 53-page Court Order that he also does not address. Nor does the Motion address Yieldstreet's fact-driven defenses even though Rule 23(b)(3) requires that they, too, be considered. *Haley*, 54 F.4th at 122-23; *see supra*, 3-4.

Indeed, the Motion *simply ignores five of seven claims* that the Court sustained. Tjok offers no explanation whatsoever as to how the Court could ever certify a class action for breach of fiduciary duty (Counts V & VI), negligent misrepresentation (Count VII), and common law fraud (Counts I & II). That is a game-ender because, as a matter of law, courts cannot certify slivers of cases under Rule 23(b)(3) unless the lost value of the waived claims is outweighed by the strategic value of the decision to waive the claims. *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 413-

15 (5th Cir. 2017) (no certification where value of waived/excluded claims not considered).[7]

Ultimately, the Motion only addresses one element ("reliance") and even there **only** in the context of the one federal securities claim (Count III). Mot. 21-25. And then Tjok does not show how even that single element, of that single claim, could be tried with "common proof."

### A. The "Personalized Advice" Fiduciary Claims (Counts V & VI) And "Special Relationship" Negligent Misrepresentation Claim (Count VII) Are Inherently Individualized

Tjok does not explain how his fiduciary duty claim could ever be certified under Rule 23(b)(3). Last year this Court set out the inherently individualized factual question of whether Yieldstreet assumed a fiduciary duty to any particular investor: "The existence of a fiduciary duty is a question of fact that depends on the circumstances, principally the nature of the advice given." ECF 34, at 6 (quotation omitted). "Generally, an investment advisor owes a fiduciary duty to a person if the advisor 'provide[s] personalized advice attuned to a client's concerns, whether by written or verbal communication.'" *Id.* (quoting *Lowe v. SEC*, 472 U.S. 181, 208 (1985)).

Here, Tjok cites endlessly to the offering documents as if they will be the only evidence at trial, even asking "what else could they have relied upon?" *See, e.g.*, Mot. 3-5, 10-11, 14-15, 24. But he does not try to explain how evidence of *not*-personalized documents would predominate at a trial of a claim requiring each absent class member to prove individual reliance on "personalized advice attuned to [that particular] client's concerns." ECF 34, at 6. Tjok's personal dealings with Yieldstreet were unique to him—for example, he had a "personal connection and discussion" with Yieldstreet leadership at its offices in September 2018, a curated event not attended by other class

---

[7] Tjok **cannot satisfy Rule 23 by silently abandoning nearly every claim** in the CAC. No "adequate" Lead Plaintiff and Counsel would ever jettison the common law claims that *belong* to absent class members, especially when the non-fraud claims bring lower proof standards that benefit class members. *See In re Lincoln Nat'l COI Litig.*, 2022 WL 4091220, at *23 (E.D. Pa. Aug. 9, 2022) (denying certification and questioning adequacy where plaintiff sought to sacrifice certain class claims to certify larger class).

members. Ex. 2 ¶ 13. Tecku too had direct contact with *different* Yieldstreet personnel, but did not conscientiously read Yieldstreet's emails—*i.e.,* more individualized evidence. Tecku 93:1-15. Simply put, if the fiduciary claim was too fact-bound and "personalized" for dismissal under Rule 12, for the same reasons there is no basis to find that "common proof" will resolve it at trial.

Trial of the negligent misrepresentation claim similarly calls for individualized, investor-by-investor fact-finding because to win (at least under New York law, which doesn't uniformly apply, *infra* Section III), *each* class member must prove that they had a "special relationship" with Yieldstreet." *In re Vivendi Universal*, 2004 WL 876050, at *13 (S.D.N.Y. Apr. 22, 2004). Proof as to Tjok will never be "common proof" as to all class members because the very existence of a "special relationship" requires a "fact-intensive, case-by-case inquiry." *Id.*

## B. Reliance Is A Necessary Element of Every Claim

The *only* element of any claim addressed in the Motion is reliance, which all plaintiffs will be required to prove at trial for *each* of their claims.[8] ECF 52, at 36 (citing *Emergent Cap. Inv. Mgmt. v. Stonepath Grp.*, 343 F.3d 189, 195 (2d Cir. 2003)). Even Tjok does not argue that proof of why he invested, and what he read and relied on, could ever prove whether any absent class members also relied (and if so, which ones), and of those, on what particular statements or communications they relied, and whether any or all of it was "reasonable." *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley*, 772 F.3d 111, 121 (2d Cir. 2014) (no class-wide reliance where, as here, there are "significant differences in the investment decision processes of the various putative class members, a variance [that may be] compounded by [ ] differences between the [ ] types of notes offered.").

---

[8] The argument that a fiduciary claim does not require "reliance" is misleading, Mot. 21 n.48, because there is a "causation" element that presents the same investor-specific factual question. *Laub v. Faessel*, 297 A.D.2d 28, 30 (1st Dep't 2002) (Plaintiff must show "alleged misrepresentations [ ] were the direct and proximate cause" of losses).

1.  **Reliance Is A Hopelessly Individualized Factual Inquiry**

Factual questions of reliance—why a plaintiff decided to do something, based on what information, and whether it was reasonable—are as investor-specific as they come.[9] That is why claims that require proof of reliance are textbook examples of what courts do *not* certify under Rule 23(b)(3). *See Borgese v. Baby Brezza Enterprises*, 2021 WL 634722, at *6 (S.D.N.Y. Feb. 18, 2021) (Marrero, J.) ("[C]laims involving fraud and negligence are not typically appropriate for class treatment because they require highly individualized inquiry to determine liability."); *Amerio v. Gray*, 2019 WL 4170160, at *7 (N.D.N.Y. Sept. 3, 2019) ("[W]ithout a presumption of reliance in favor of the entire proposed class . . . negligent misrepresentation plaintiffs could not establish that common issues predominate, and class certification would also be inappropriate."). Absent a presumption of reliance, "class certification under Rule 23(b)(3) is usually impossible because reliance would have to be proven on a plaintiff-by-plaintiff basis." *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017); *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958–59 (2021) (absent a reliance presumption, "individualized issues of reliance ordinarily would defeat predominance and 'preclude certification' of a securities-fraud class action.").

At trial, every class member must prove that they relied, and that it was reasonable under their particular circumstances. *See* ECF 52, at 36 (citing *Emergent*, 343 F.3d at 195); *Ashland v. Morgan Stanley*, 652 F.3d 333, 337 (2d Cir. 2011) ("[P]laintiff's reliance on the defendant's misrepresentation must have been reasonable in order for the claim to proceed."). "In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the

---

[9] To be sure, investors certified they were not relying on information from Yieldstreet other than that contained in the offering documents (Ex. 10 at 2), and Yieldstreet submits that, on the merits, Tjok will not be able to prove the falsity of any statements in those documents. However, in considering how this case is to be tried (a class action or individual actions), investors' individual knowledge and interactions with Yieldstreet and others will be front and center, given that they are probative of the materiality of any alleged misstatement (because they alter the "total mix" of information available to them) and the reasonableness of their reliance.

transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." ECF 52, at 36 (citing *Emergent*, 343 F.3d at 195). ***Here, every investor is a sophisticated, high-net-worth accredited investor***. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of the access, New York courts are particularly disinclined to entertain claims of justifiable reliance."[10] *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006).

Indeed, this case in key respects is like *Abu Dhabi Com. Bank v. Morgan Stanley*, which held that individual issues of reliance predominated and thus denied class certification for fraud claims based on the purchase of notes issued by a structured investment vehicle. 269 F.R.D. 252, 253-54 (S.D.N.Y. 2010). As in *Abu Dhabi*, the record exposes "material differences among investors" as to their decision-making process, diligence inquiries, and communications with the sellers. *Id.* at 261. The Court also noted evidence that some investors "chose not to rely—or relied only minimally—on the [alleged misrepresentations]" prior to investing and found that individual reliance issues predominated. *Id.* at 265. Rule 23(b)(3) cannot be satisfied where, as here, the record is "replete with significant differences in the investment decision processes of the various putative class members, a variance compounded by the differences between the [] types of notes offered." *Morgan Stanley*, 772 F.3d at 121.

### a. Putative Class Members Invested In Different Offerings

Putative class members invested in offerings that themselves present different factual issues. As noted in Section I.B and Ex. 3, the five offerings were sold on six different dates over a 15-month period, involved different loan terms and durations, collateral, disclosures, and,

---

[10] The offerings were offered only to accredited investors (under SEC Regulation D), with each certifying they were "thoroughly familiar with the proposed business, operations, and financial condition" of the investments and that they (or their investment advisors, whom they were encouraged to consult) had "knowledge and experience in financial and business matters that will enable [them] to utilize the information made available to evaluate the merits and risks of the prospective investment and to make an informed investment decision with respect thereto." *E.g.*, Ex. 9, at 2-3.

particularly after July 2019, allegedly new "red flags" about the collateral. The results also varied widely, with two marine offerings having fully returned 100% of invested principal, by contrast to the final two that have returned around 5%. Of course, an Oil & Gas deal is nothing like a marine financing—different industry, borrowers, SNS disclosure, and returns (45% returned to date).[11]

### b.  Three Plaintiffs Invested For Different And Personal Reasons

The inherently individualized nature of the reliance question is immediately apparent from all three plaintiffs' testimony about why they personally decided to invest in various Yieldstreet offerings. Tjok plainly did not believe the offering documents—which warned of the great risk of investing in non-diverse, single-borrower loans "so highly speculative" that investors must have "THE FINANCIAL ABILITY AND WILLINGNESS TO ACCEPT SUCH RISKS, INCLUDING . . . THE RISK OF LOSING [YOUR] ENTIRE INVESTMENT." *E.g.*, Ex. 12, at 5. In a textbook example of the individualized proof of "reliance," Tjok chose Yieldstreet because diversification is important to him, Tjok 60:3-61:7, 80:13-81:12, which obviously sets him apart from class members who may disagree that an investment tied to a single-borrower loan was "diverse." Tjok's personal opinion that *Yieldstreet was "safer than the stock market," a "safe bet," and "a very stable investment"* is plainly not "predominant"—"common" or "typical"—because "safe and stable" is the opposite of the "highly speculative" danger that Yieldstreet warned about. *Id*. at 76:18-20, 78:3-79:9, 80:8-12, 135:23-136:6.

The non-lead plaintiffs selected Yieldstreet deals for their own personal reasons. After filing a Complaint alleging that the short-term duration of some marine loans was the problem, CAC ¶¶ 93-109, Finkelstein testified that he reached the opposite conclusion—he chose short-term deals because he considered them to be safer. Finkelstein 59:16-62:17. Unlike the other plaintiffs,

---

[11] Notably, unlike the Oil & Gas SNS, the Decon offering documents expressly state that other loans originated by the Originator had defaulted in the past, and distinguished any such "default" from a "principal loss." Ex. 3. How investors interpreted that disclosure is yet another individualized issue. Tjok 74:11-15; Finkelstein 163:14-19.

Finkelstein makes investment decisions for truly unique reasons that had literally nothing to do with the *merits* of the deal. Finkelstein instead only wants to invest in deals so popular that they sell out fast—essentially a ***personal "fear of missing out" or FOMO***—to the point that Finkelstein asked Yieldstreet to make a special accommodation to rescind an investment after he subscribed simply because it did not sell out (and Yieldstreet agreed). *Id.* at 143:8-144:22. Finally, for Tecku the ***"main selling point"*** was a statement about "zero principal loss" that he recalled from a *website* that may or may not have included "videos," but that apparently mattered more to him than the offering documents—because Tecku sometimes ***didn't "understand" what he read*** in the documents (never mind that he certified that he *did* understand what he read). Tecku 12:9-13:7, 111:9-15, 87:8-16. Tecku candidly denied having any idea if other investors also ranked the website as their "main selling point" because "I don't know the hearts and minds of anybody [else]." *Id.* at 110:24-118:12, 106:6-16 (testifying that "everybody has to make their own decisions," "based on the facts available to them" "[o]r no facts.").

Simply put, certification is improper because there are "significant differences in the investment decision processes of the various putative class members, a variance [that may be] compounded by [] differences between the [securities] offered." *Morgan Stanley*, 772 F.3d at 121.

### c.  Class Members Received Different Information From Different People

Tjok also cannot establish that "common proof" will predominate at trial because the record is clear that he and other class members received, considered, and relied on vastly different information when deciding to invest. That information ***goes far beyond*** the offering documents despite the Motion's false assertion that only the "offering documents" are the "crux," and the false rhetorical question about "what else could they have relied upon?" Mot. 22, 24.

Tjok personally conducted independent research that started at a Menlo Park meeting with his ***"very smart" mentor who recommended Yieldstreet because "there's no principal loss,"*** *i.e.,*

the false statement alleged in this case. Tjok 69:21-70:10. Next **Tjok "got on google and did as much research" about Yieldstreet as he "needed to do to be comfortable,"** even researching the *different* registered investment adviser that "originat[ed]" and brought marine deals to Yieldstreet.[12] Tjok 296:18-297:24. **Even Tjok agrees that the only way to know if class members also conducted independent research would be to "ask them."** Tjok 297:25-298:15. The testimony from Tjok and non-lead plaintiffs is clear that **investors rely on information from self-selected, disparate sources** such as family and friends, Yieldstreet's website and marketing materials, and random internet forums, such as **Reddit** and something called **Bigger Pockets**.[13]

Yieldstreet also explicitly *encouraged* investors to consult their personal accountants, financial and other advisors before investing. *E.g.*, Ex. 10, at 3. Investors regularly did just that. Ex. 2 ¶ 8.[14] The nature of the advice given by private advisers to class members about the "risks and rewards" of investing in any given deal presents inherently individualized questions that foreclose "predominance." *See N.J. Carpenters Health Fund v. Residential Cap., LLC*, 272 F.R.D. 160, 168-69 (S.D.N.Y. 2011), *aff'd*, 477 F. App'x 809 (2d Cir. 2012) (no predominance where plaintiffs' investment advisors may have knowledge precluding reliance or causation).

The record is also clear that investors have **many one-on-one communications** directly with Yieldstreet—and those communications vary significantly. During the twelve-month period

---

[12] Ex. 17, at 6 ("[Tjok] recalls performing internet searches regarding Four Wood[.]").

[13] Tjok 33:20-25, 69:21-70:17, 72:11-24, 73:7-9, 74:12-74:10 (Tjok chose Yieldstreet on advice of Long Chen); Finkelstein 53:3-25 (Finkelstein chose Yieldstreet on advice of brother-in-law). Regarding reliance on the website: Tjok 187:6-20, 189:15-21, 313:6-14 (Tjok relied on website); Finkelstein 58:8-60:23; Tecku 45:23-46:10 (Tecku talked to friends and "looked at the website pretty thoroughly"). All three relied on marketing materials or random, and anonymous investor forums. Tjok 240:15-241:3; Finkelstein 65:9-66:6; Tecku 78:4-16.

[14] Tjok decided *not* to consult his personal advisor to avoid spending money, Tjok 65:16-66:19, while Tecku did enlist his personal advisor's assistance to satisfy the "accredited investor" criteria but denies discussing other aspects of his investment decision. Tecku 52:17-53:24. Yieldstreet **urged all investors to consult personal advisors**, but the **only way to know how each class member relied on their advisors** when investing, much less what was advised, **would be to separately depose each of them**—which was the only way Defendants learned what Tjok and Tecku did.

16

when some of the five deals were sold (September 2018 through September 2019), *Yieldstreet fielded roughly 19,911 inbound emails, numerous telephone inquiries*, and hosted *22 webinars* with investors. Ex. 2 ¶¶ 5, 12. The Investor Relations team responded to investors in a "high-touch" personalized way, such that each communication was unique and focused on the specific circumstances shared by the investor. *Id.* at ¶ 9. For one prime example, one plaintiff individually emailed about principal losses in prior offerings. Tjok 109:24-112:3; *see* CAC ¶¶ 7, 10, 63, 66, 75, 135 (alleging Yieldstreet's non-disclosure of principal losses in prior offerings).

As another prime example, Tjok and a handful of others (but not Tecku and Finkelstein) participated in an *in-person briefing at Yieldstreet's office*, where *Tjok had a "personal connection and discussion" with a Yieldstreet co-founder that was "important in making investment decisions" and dealt with the precise issues in this case*—*i.e.*, whether prior deals experienced "principal loss." Tjok 112:14-117:11.[15] Tjok admitted that at the Yieldstreet office he personally learned "specific information about Yieldstreet," including about the underlying Rideshare borrower default that is the *very same* information that the CAC claims was hidden from everyone. Tjok 115:5-7, 121:9-12. Tjok's one-on-one conversation with the co-founder was *"different than something [he] just read on the internet,"* and won his confidence in Yieldstreet. Tjok 114:23-117:7.[16] Yieldstreet hosts in-person and video investor sessions *all the time*—and the only way to litigate whether those *individualized* sessions contributed to, or foreclosed,

---

[15] Plaintiff's "principal loss" claim is based on a failure to distinguish between: (1) a default on the securities issued on the Yieldstreet platform; and (2) a default by a borrower on a loan underlying those securities. *See* Ex. 1 at ¶ 11 n. 2. When a borrower defaults on an underlying loan, that does not mean that the investments at issue (BPDNs) are in default or will default. *Id.* Rather, investors can fully recover after a borrower default through, for example, borrower negotiations, legal proceedings, collection from guarantors, and insurance claims. *Id.*

[16] The other plaintiffs also had personal interactions with Yieldstreet, but at different times and on different topics. Tecku, for instance, emailed with Yieldstreet, although he now admits that he may not have read what Yieldstreet sent him. Tecku 93:1-15. All in, *Tjok and Tecku had 19 and 91 emails, respectively, while Finkelstein had 1,062 emails*. Ex. 2 ¶ 10. It may very well be that only some of those emails matter to a fair a trial—but the fact that they privately communicated with Yieldstreet in different ways, with such different frequency, belies any notion 2,000+ investor claims can be tried with "common proof" from just Tjok.

"reasonable reliance" in any given deal, would be to ask each class member on the stand.

For this reason, class certification must be denied because class members had access to information well beyond common offering documents. *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 44 (2d Cir. 2006) (reversing certification where, as here, questions concerning knowledge of allegedly misrepresented information "would precipitate individual inquiries as to the knowledge of each member of the class," and defeat predominance); *In re Livent, Inc. Noteholders Secs. Litig.*, 211 F.R.D. 219, 223-24 (S.D.N.Y. 2002) (Marrero, J.) (issues of reliance predominated where some plaintiffs spent no time investigating, while others conducted substantial diligence).

### d.  Class Members Reacted *Very* Differently To The *Same* Information

The investment history of the absent class members confirms that they, too, made varied, individualized decisions—and critically shows that ***many class members did not rely on the alleged misrepresentations***. Indeed, a large subset of the class decided to subscribe to new Yieldstreet investments after *being told* of the very facts that Plaintiff claims were "concealed." That raises investor-specific questions about their reliance on Yieldstreet before subscribing to the deals, and separately supports an affirmative waiver defense based on their conduct thereafter. *See Romero v. Flaum Appetizing*, 2011 WL 812157, at *3 (S.D.N.Y. Mar. 1, 2011) (denying certification due to lack of typicality as result of potential waiver defenses); ECF 59, at 34-37 (Defendants' Affirmative Defenses include waiver, ratification, and related doctrines).

Specifically, Tjok—who claims to be "typical" of everyone—testified that a reasonable investor would *not* continue to invest with Yieldstreet after learning of marine defaults. Tjok 282:3-10. Tecku also testified that he would be surprised if any investors continued to invest with Yieldstreet after learning of the marine defaults, although (unlike Tjok) he would not go so far as to say that it would be "unreasonable" to do so. Tecku 118:23-120:4. Finkelstein had a still

18

different reaction, testifying that he would continue to invest even if told of prior principal loss but would reduce the amount invested. Finkelstein 155:8-19. Those three individualized reactions to the allegedly concealed "truth" contrast starkly with how absent class members actually exercised their own investment judgment. ***Following notice of borrower default in the marine offerings, 43% of investors in the those offerings again invested on the Yieldstreet platform***. Ex. 1 ¶ 23.

Tjok backpedaled when he learned that 43% of marine investors (and a large subset of his supposed "class") reacted to a critical fact in what he deemed an "unreasonable" manner.  Now even Tjok agrees that questions about the significance of, and reliance on, the allegedly concealed facts are hyper-individualized—as Tjok put it, what investors think and do depends ***on investors' "personal circumstances" and "previous interaction[s]"*** with Yieldstreet. Tjok 282:11-283:15. That testimony contradicts the very basis for Tjok's certification motion, *i.e.*, that only "common proof" of his personal claim is necessary for him to "represent" everyone else at trial.

The fact-bound, individualized nature of these claims is also apparent from Tjok's own reaction to his investment in the Oil & Gas offering, which experienced a borrower default that was disclosed to him on February 21, 2019. Ex. 1 ¶ 15. Despite receiving personal notice of that borrower default, Tjok *continued to invest on the Yieldstreet platform*, including in Decon III. *Id*. ¶ 16; Ex. 12. Another 151 investors notified of the default in Oil & Gas similarly invested in the marine offerings. Ex. 1 ¶ 16. On that record, how could Tjok possibly conclude that "common proof" will answer why some investors kept investing with knowledge of prior borrower defaults?

As if that were not enough, 35% of Rideshare investors chose to invest with Yieldstreet even after personal notice of that borrower's default, with 16% later investing in marine offerings. *Id.* at ¶ 13. That contrasts starkly with Tjok's not-common, not-typical testimony that he never would have invested in marine deals had he been told about the Rideshare default. Tjok 277:17-

279:20. Leaving no doubt that "common proof" from Tjok will never prove whether or not anyone else relied on "no principal loss" disclosure, Tecku testified that it would not surprise him if others provided with the same information did the opposite—continued to invest. Tecku 106:5-16.

The big picture point: investors reacted in diametrically opposite ways to disclosure of the very defaults that the CAC alleges were concealed—wildly diverse investor behavior that alone debunks Tjok's fact-free Motion that common proof will predominate trial of claims by thousands of diverse investors. *See Abu Dhabi*, 269 F.R.D. at 265 (certification denied where some investors "chose not to rely—or relied only minimally" on facts that were allegedly misrepresentations). As Tjok testified, ***the only way to "know how other people interpret warnings about how speculative and risky investments are," would be "to ask them."*** Tjok 208:15.

### 2. There Is No "Presumption" Of Reliance For Common Law Claims

As noted, the CAC asserts common law claims for fraud, negligent misrepresentation, and breach of fiduciary duty. Yet Tjok does not address predominance in the context of any of those claims. *See supra*, Section II. Although Tjok argues that "presumptions" of reliance allow for certification of his federal securities claim (under misconstrued precedent, addressed below), as a matter of law those presumptions never could apply to the common law claims (Counts I, II, V, VI, and VII), which could never be certified under Rule 23(b)(3).[17]

### 3. There Is No "Presumption" Of Reliance For The Sole Federal Claim

Recognizing that any "reliance" claim ordinarily could never be tried as a "common proof" class action under Rule 23(b)(3), Tjok argues that he will fix the problem for the federal claims

---

[17] *See Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 145 (S.D.N.Y. 2015) ("Courts in this District have found consistently that the *Affiliated Ute* presumption applies only to federal securities laws, but is 'not appropriate in the common law context.'") (quoting *Int'l Fund Mgmt. v. Citigroup*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011) (collecting cases)); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (addressing federal RICO claims); *compare Morgan Stanley*, 772 F.3d at 121 (judicial presumptions of reliance do not apply to common law claims because that would "eliminate the need to prove reliance, a traditional element of common law fraud.").

(Counts III and IV) by invoking a judicial "presumption" that everyone relied. Mot. 21. The Supreme Court has limited any *rebuttable* presumption of reliance in a Section 10(b) case to two situations: 1) claims based on publicly-traded stock sold an efficient market, *i.e.,* the *Basic* "fraud-on-the-market" presumption that never applies to *private* securities sales; and 2) if the alleged misrepresentations are "primarily omissions" such that proof of reliance is impossible under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Without a presumption, "class certification under Rule 23(b)(3) is usually impossible because reliance would have to be proven on a plaintiff-by-plaintiff basis." *Waggoner*, 875 F.3d at 95; *Goldman Sachs*, 141 S. Ct. at 1958-59 ("[I]ndividualized issues of reliance ordinarily would defeat predominance and 'preclude certification'. . . ."). Here, Tjok's stretch for a "presumption" loophole is academic; even if he could trigger a presumption of reliance, individualized issues would still "predominate" because *Yieldstreet is entitled to rebut any presumption with respect to each individual investor*.[18]

### a. *Affiliated Ute* Does Not Apply

The *Affiliated Ute* presumption applies only to claims "involving primarily a failure to disclose." 406 U.S. at 153. And because clever counsel often try to recast affirmative misstatements as omissions, the *Affiliated Ute* presumption can *only* apply where reliance is "impossible to prove" because "no positive statements exist." *Waggoner*, 875 F.3d at 95. "The *Affiliated Ute* presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents." *Id.* at 96.

---

[18] *See Waggoner*, 875 F.3d at 102 (*Affiliated Ute* **presumption is rebuttable**); *CGC Holding Co. v. Broad and Cassel*, 773 F.3d 1076, 1093 (10th Cir. 2014) (*In re U.S. Foodservice* is **rebuttable and does not shift burden to defendants**). Even though investors were required to acknowledge that they carefully read the offering documents prior to investing, Mot. 3, *reliance requires individual inquiries as to whether each investor was in fact "[ ]aware of the relevant statement." Erica P. John Fund,* 563 U.S. at 810. Yieldstreet's defense is not at all speculative—two of the three plaintiffs already have testified against their own personal reliance at deposition. *See* Finkelstein 73:12-21, 76:2-23 (**rushed his investment decisions**); Tecku 10:17-12:17 (**"I read it, but didn't understand it apparently . . . .").**

Here, the CAC explicitly targets affirmative written statements. As to the alleged misrepresentations about principal loss, this Court has already held that "[t]he statement at issue . . . appears in both PPMs." ECF 52, at 22-23. The CAC itself frames these as affirmative misrepresentations, *e.g.*, CAC ¶ 66, with Tjok personally claiming to have read statements when investing. *See* Mot. 5, n.13; Tjok 168:25-169:5, 293:7-15. Tecku meanwhile claims to have relied on different affirmative statements on a website. *See infra*, Section II.B. Still other claims explicitly challenge "the diligence process *described in the* Vessel Deconstruction Funds offering documents" (emphasis added), which this Court has addressed. ECF 52, at 27-28; *see* Mot. 4-5 (alleging affirmative diligence misrepresentations). The CAC itself framed those as affirmative statements, *e.g.*, CAC ¶¶ 8, 76-86, with Tjok personally focused on affirmative diligence statements. *See* Mot. 5, n.13; Tjok 236:15-237:17, 247:19-24. Thus, the "complaint alleges numerous affirmative misstatements," and "Plaintiffs are therefore not in a situation in which it is impossible for them to point to affirmative misstatements." *Waggoner*, 875 F.3d at 96.

Tjok cannot reinvent the CAC's affirmative misrepresentation claims as "omissions."[19] For example, Tjok argues that Yieldstreet failed to disclose that Mr. Weisz favored shorter-duration loans than recommended by the originator Four Wood. Mot. 6. That is not some standalone "omission"—instead it is the factual predicate of the undisclosed truth that allegedly renders false affirmative statements about the diligence process, *i.e.*, that Four Wood (not Yieldstreet) would select potential deals aligned with its lending methodology. *E.g.*, ECF 52, at 27-28 ("alleged fact that Weisz identified and vetted his own potential opportunity in October 2018 renders false the diligence process promised in the SNS. . . ."). Tjok is playing the same "call-it-all-omissions" word

---

[19] The cases relied on by Tjok involved primarily omissions that were "at the heart of Plaintiff's claims," and did not merely reframe affirmative misrepresentations as pure omissions. *Anwar*, 306 F.R.D. at 146-147 (quoting *In re Beacon Associates Litigation*, 282 F.R.D. 315, 327 (S.D.N.Y. 2012)).

game that courts reject as not triggering *Affiliated Ute*. *See Waggoner*, 875 F.3d at 96.

### b. *In Re U.S. Foodservice* Does Not Apply

Tjok also cannot invoke a class-wide inference of reliance under *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013).[20] That narrow doctrine is triggered only in extreme cases where courts conclude—that is, resolve as a factual matter—that "no reasonable investor would have purchased" but for the concealment of some galactically offensive fact—such as where defendants concealed that they were "*part of a Ponzi scheme,*" *Audet v. Fraser*, 332 F.R.D. 53, 77 (D. Conn. 2019), or where defendants concealed that they were hopelessly conflicted to the point that they would benefit from the collapse of the investment. *Ge Dandong v. Pinnacle Performance*, 2013 WL 5658790, at *10 (S.D.N.Y. Oct. 17, 2013). Tjok does not help himself by citing this Court's inapposite opinion in *Anwar v. Fairfield Greenwich Ltd.*, where defendants failed to disclose that they stopped doing diligence on *Bernie Madoff*. *See* 306 F.R.D. 134 (S.D.N.Y. 2015).

The CAC does not allege any of the revolting facts that triggered the limited presumption in *Anwar*, *Audet*, and *U.S. Fooodservice*. No one claims a "Ponzi scheme" or that Yieldstreet somehow benefits from failure on a private investor platform where offerings so rarely fail. *See* Ex. 1 ¶ 3 (of 400+ offerings, only 8 closed without returning principal). That the High Court of England has **entered judgment in favor of Yieldstreet as the victim of the marine borrower fraud** (Centner Ex. 25, at 3)—and again that 43% of those invested in marine offerings chose to again invest with Yieldstreet *after* learning of the loss of marine collateral (Ex. 1 ¶ 23)—means that the Court cannot conclude that "no reasonable investor would have invested" if told the truth.[21]

---

[20] Unlike *In re U.S. Foodservice*, this case does not involve the payment of an inflated invoice, and Plaintiff's various theories of misrepresentation show that this case does not involve a similar "one-dimensional decision." *Tropical Sails v. Yext*, 2017 WL 1048086, at *14 (S.D.N.Y. Mar. 17, 2017).

[21] Because the **discovery record is all over the lot** as to which investors relied on what information, and investors plainly had conflicting reactions to the allegedly concealed facts—with some like Tjok fleeing from Yieldstreet, and yet 43% investing more in new offerings—"**it would be pure speculation to assume that every member of the putative**

### III.     Tjok Does Not Even Address That Choice-of-Law Variances Bar Certification

Tjok ignores—and therefore, has not met—his "ultimate burden to demonstrate that any variations in relevant state laws do not predominate." *De Lacour v. Colgate-Palmolive*, 2019 WL 4359554, at *3 (S.D.N.Y. Sept. 12, 2019). Although Yieldstreet sells securities in ***nearly every state***, Ex. 1 ¶ 8, Tjok has not provided the Court with any basis to find that differences in the substantive law of the many class member jurisdictions are not themselves individual issues that bar certification. *E.g.*, *Johnson v. Nextel Comms.*, 780 F.3d 128, 147-48 (2d Cir. 2015) (differences in state fiduciary and tort law defeat predominance).[22]

### IV.     Tjok Fails To Satisfy Other Requirements Of Rule 23

Tjok also must satisfy the four Rule 23(a) prerequisites—numerosity, commonality, typicality, and adequate representation—and must show that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Comcast*, 569 U.S. at 33. The adequacy and typicality prongs may cut against certification based on "the size of the individual claims, the sophistication of the parties, and, most importantly, the variances in each putative class member's investment strategy and decision-making process and in the notes themselves." *Morgan Stanley*, 772 F.3d at 121 n.4. Certification is improper if Tjok's unique situation will require "fact intensive inquiries" at trial to determine whether his claims are barred by his non-reliance, lack of justifiable reliance, or other defenses.[23]

---

*class relied upon defendants' representations in deciding to invest[.]" See Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90 (E.D.N.Y. 2014) (no inference of reliance on alleged misrepresentations).

[22] The multi-state problem was obvious during the depositions. Tjok lives in *Seattle, WA* (although he claims Yieldstreet solicited him in *New Jersey*), Tjok 9:7-24, the mentor who advised Tjok to invest with Yieldstreet is in *California*, Tjok 82:18-83:1, Finkelstein is from *Florida* and *New York* (so unclear *where* he was solicited), and Tecku spends "six months and a day" in *Texas* (to avoid taxes) but told Yieldstreet that he was in *Wisconsin* (so unclear *where* he was solicited), Tecku 83:19-84:2. ***Yieldstreet sells securities in nearly every state***. Ex. 1 ¶ 8.

[23] *See Romero*, 2011 WL 812157, at *3 (certification denied where, as here, plaintiff atypical given waiver defense); *In re Livent*, 211 F.R.D. at 223 (certification denied where, as here, plaintiff subject to unique defense for lack of research, and "merits of these contentions would seem to be materially affected by the difference in research and analysis between classes of investors as a function of reliance").

Numerosity aside, Tjok fails to satisfy Rule 23(a), and a class action is not superior to individual trials under Rule 23(b)(3). As the predominance analysis shows, Tjok is far from typical, but rather brings the factual variability that bars certification. Tjok is subject to unique defenses because he concedes receiving notice of a borrower default in his Oil & Gas deal *before* he invested in Decon III and was told about "no principal loss" by his very smart mentor. *See supra*, Section II.B. That exposes Tjok to trial defenses that he did not rely on any "principal loss" statement made by Yieldstreet, did not invest under some false belief about prior defaults, and that his purported reliance was not reasonable. The unique defenses are also evidenced by Tjok's disregard for the offering documents themselves (again, he deemed an offering sold as "highly speculative" to somehow be "safe" and "solid") and reliance on a private conversation about defaults with a Yieldstreet co-founder (that was "different" than what was on a website). *See supra*, Section II.B.

Finally, Tjok's testimony that no "reasonable" investor would invest with Yieldstreet after learning of the loss of the marine collateral *directly impeaches, and thus cannot "represent," the 43% of the marine investors who did just that*. *Supra* at II.B. Tjok has no incentive to pursue claims to recover losses from Decon IV and VI, the final offerings in which he chose *not* to invest, which presents a difficult conflict with his class because the final deals (i) performed *far* worse than his marine deals; but (ii) will present unique proof problems at trial because those deals were sold with greater risk disclosure. *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 88 (S.D.N.Y. 2017) (proposed representative atypical because *absent class members* subject to unique defenses).

## CONCLUSION

Tjok has not met his Rule 23 burden, which requires denial of his Motion.

Dated: March 20, 2023

Respectfully submitted,

By:_____

Jonathan A. Shapiro (pro hac vice)
**GOODWIN PROCTER LLP**
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111
Tel.: +1 415 733 6000
Fax: +1 415 677 9041
JShapiro@goodwinlaw.com

Brendan F. Quigley
**BAKER BOTTS LLP**
30 Rockefeller Plaza
New York, New York  10112
Tel.: +1 212 408 2520
Fax: +1 212 259 2520
Brendan.quigley@bakerbotts.com

Robert M. Tiefenbrun
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, CA 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673
RTiefenbrun@goodwinlaw.com

Melissa Lee Brumer
**GOODWIN PROCTER LLP**
620 Eighth Avenue
New York, NY 10018
o  +1 212 813 8800
f  +1 212 214 0813
MBrumer@goodwinlaw.com

*Counsel for Defendants Yieldstreet Inc.;*
*Yieldstreet Management, LLC; YS Altnotes I,*
*LLC; YS Altnotes II, LLC; and Michael*
*Weisz*