# SONN LAW GROUP

December 17, 2023

The Honorable Stewart D. Aaron
United States Magistrate Judge, SDNY

    Re: Motion to Compel Production of Documents
      *Tecku, et al. v. YieldStreet, Inc., et al.* Case No. 1:20-cv-07327

Dear Judge Aaron:

Plaintiffs move to compel production of documents set out below. Certification of counsel in accordance with Your Honor's individual practices is attached hereto as Exhibit 1.

**BACKGROUND:** YieldStreet is an investment company that offers investors access to investment products exclusively through its proprietary online investment portal. YieldStreet pre-screens and selects each of the products it offers for sale on its platform. Its investment-product portfolio consists primarily of debt instruments known as borrower payment dependent notes ("BPDNs"), which are debt obligations tied to the performance of a specific underlying loan made by a YieldStreet-created special purpose vehicle ("SPV"). YieldStreet decides to lend millions to borrowers (whose identity is hidden from investors) in highly complex industries, and then raises funds from investors through the YieldStreet platform to fund the loan.

YieldStreet induces investors to participate in YieldStreet's offerings through its promises that offerings on the YieldStreet platform are the product of robust and meaningful vetting and due diligence processes, *and that its track record is perfect with no prior principal losses*. YieldStreet further induces investors through promises of asset-backed loans that provide reliable downside protection in the form of first-position lien/mortgages on collateral, personal guarantees, and insurance to cover losses in the event the borrower defaults. These promises, contained in YieldStreet's marketing and offering documents, are key to engendering investor confidence, and ultimately their participation, in loans made in exotic and highly complex industries to which investors would not otherwise be exposed.

In 2020, investors learned that what YieldStreet promised is not what it delivered. Thereafter, investors brought this lawsuit concerning four of YieldStreet's failed Vessel Deconstruction offerings, as well as its failed Louisiana Oil & Gas offering (collectively, "Offerings"), alleging they were induced to purchase YieldStreet BPDNs on the basis of misleading offering documents that omitted key information concerning YieldStreet's vetting and diligence processes[1] and prior lending history. YieldStreet's omissions

---

[1] These failures are particularly damning with respect to the four vessel deconstruction offerings at issue in this case. For example, discovery to date confirmed that long before the first vessel loan was made, YieldStreet was warned that the borrowers were "devious crook[s]" and that YieldStreet should not do business with them. YieldStreet was also warned that the "short term" loan structure it was pioneering over its originator-expert's advice was not viable and presented unsafe levels of risk for YieldStreet's investors. Other critical missteps were made, including failing to obtain appropriate personal guarantees sufficient to cover even a third of YieldStreet's total exposure to the "crook" borrowers, failure to warn investors that so-called "mortgages" on vessels set for deconstruction were largely meaningless and offered little if any protection to lenders, and a failure to ensure that many of the vessels purportedly securing the loans even existed, let alone were tracked. In spite of all of these risks, YieldStreet's acting "One Man Credit Committee," President Michael Weisz, made the decision to plow forward, inflating YieldStreet's fees at the expense of its investors and loaning almost $90 million of investors' money to the vessel deconstruction borrowers without warning those investors of these very real risks.

fundamentally misrepresented the risks and attractiveness of these Offerings, resulting in widespread losses when those offerings eventually defaulted. More than 2,000 investors sank nearly $90 million into these Offerings.

In 2022 Judge Marrero denied YieldStreet's motion to dismiss, and earlier this year Your Honor issued a recommendation that a class be certified across three of the five funds at issue. The individual investors who purchased interests in those two funds that were not recommended for certification are still pursuing claims in their individual capacities. Subsequently the SEC entered into a Consent Order with YieldStreet with respect to the later offerings and fined the company nearly $2 million for what appears to be some of the same failures that happened with respect to all of the offerings in this case, including but not limited to failing to adopt and implement policies and procedures reasonably designed to prevent misleading disclosures to investors concerning the collateral securing YieldStreet's vessel deconstruction offerings.

The parties are now approaching the end of fact discovery. Discovery has revealed a pattern by YieldStreet of negligent due diligence, failure to secure reliable liens, then blaming its own outside agents and professionals in defaults in investor funded loan offerings prior to the offerings in issue. Plaintiffs requested YieldStreet produce certain categories of key documents that will inform these and other issues. Defendants have objected to producing the documents for the reasons set forth below. The parties made good faith attempts to resolve their disputes to no avail, as described in more detail in the accompanying Certification of Counsel, and on that basis, Plaintiff moves to compel production of the following:

**DOCUMENTS CONCERNING PRIOR PRINCIPAL LOSSES (RFP 28[2]).** Defendants offered a litany of objections before agreeing to produce documents concerning only the ride share/fleet expansion offering described in Plaintiffs' complaint. The requested documents have not been produced, despite Plaintiffs' repeated requests, and should be produced immediately.

During the parties' meet-and-confer exchanges Defendants argued that any other offerings in default were not relevant, as Plaintiffs only described the ride share offering in their complaint. This is a red herring. When the complaint was filed Plaintiffs were in possession of concrete evidence showing that YieldStreet had misrepresented the ride share principal loss event—but that does not limit Plaintiffs from discovering the extent that other defaults prior to the offerings at issue could arguably be considered as additional principal losses. To that end, Defendants have produced internal spreadsheets confirming that as of Q1 2019, *before* three of the five offerings at issue in this case were sold, at least 7 other YieldStreet offerings had gone into default with principal still outstanding. YieldStreet will argue that these offerings had not lost principal, but Plaintiffs are entitled to evaluate the documents—which are solely in Defendants' possession—that inform those arguments. "Trust me" is not a valid basis for avoiding discovery.

Accordingly, Plaintiffs seek documents that will show how each defaulted offering was accounted for internally, *i.e.*, were they considered a bad debt expense or doubtful account, or otherwise written off, and when? Consistent therewith, YieldStreet has produced 2020 audit opinions for certain Offerings at issue in this lawsuit showing that YieldStreet wrote off the underlying loans in their entirety—internally. YieldStreet thus appears in its own audits to have acknowledged principal loss events, while maintaining outwardly that there was no principal loss. What other YieldStreet offerings received similar treatment? YieldStreet's records and/or communications should reveal whether there were facts and circumstances suggesting the company was so unlikely to recover a material portion of the underlying principal in other investments, that it should have declared a principal loss, but failed or refused to do so. Related work papers and communications are highly relevant because they may reveal whether YieldStreet was challenging its

---

[2] The Requests at issue in this Motion, and YieldStreet's Responses and Objections thereto, are reproduced in full in the accompanying Exhibit 2.

accountants and financial record keepers to not recognize a principal loss so that YieldStreet could maintain its facade of no supposed prior principal losses to unsuspecting investors. Work papers normally include reference and/or analysis over when and whether to characterize a default as a loss – an issue often in debate.

Additionally, documents concerning the reasons for prior defaults may reveal additional evidence of what should have been disclosed to investors and when. For example, YieldStreet assures investors that it has insurance, reliable liens, and personal guarantees in place to protect investors. Plaintiffs have developed independent evidence showing this was not the case in the failed ride share/fleet expansion offerings. The same appears to be true for a failed Art Fund offering. The requested discovery into the prior defaults may well support a pattern of obtaining defective liens, insufficient or defective personal guarantees, insurance that did not cover investor losses, *and* a strategy of YieldStreet blaming everyone but itself when investments went south (defaulted) by suing the borrowers, loan originators, and YieldStreet's other consultants/experts for negligence and fraud.

**DOCUMENTS CONCERNING ACCOUNTING/FINANCES AND WORKPAPERS OF FUNDS THAT FAILED TO REPAY PRINCIPAL BY THE TARGET MATURITY DATE (RFP 34).** Accounting information is important for damages purposes, *i.e.*, understanding when and where investor funds that were received were paid and what remains owed to investors. They are also important to understanding YieldStreet's total compensation in these defaulted deals (including greater fees created when vessel offerings were switched to the experimental short-term loans over the originator-expert's warnings). Defendants offered the same litany of objections described above and indicated they would produce documents concerning the five Offerings at issue in the case, and the ride share/fleet expansion offerings, in the form of "audited financial statements and an exemplar Form K-1." Few of these documents have been produced, particularly with respect to the ride share funds, and the accounting for the subject Offerings remains a "black box." While Defendants have produced limited summaries concerning fees charged to the offerings in this case, this is insufficient. *Plaintiffs are entitled to the detailed underlying accounting, memos, communications and work papers for each*. Discovery to date suggests there is "smoke" here—for example, one internal document reflects a highly-placed YieldStreet employee complaining about both exorbitant fees charged to the marine offerings and the inaccuracy of the company's marine offering accounting records. Moreover, YieldStreet recently entered into a multi-million dollar settlement with the insurers for some of the vessel offerings at issue in this case, yet it has not distributed a dime of those settlement proceeds to investors. Where was that money spent? On what? When? Have investors received all they are owed? Only an Order to produce the underlying accounting records and related documents can give investors the information necessary to determine whether YieldStreet has paid them appropriately, as well as whether YieldStreet improperly enriched itself at their expense.

**POLICIES AND PROCEDURES (RFPs 12, 35). RFP 12** requests YieldStreet's diligence and underwriting policies and procedures. **RFP 35** seeks the company's policies and procedures for determining when an offering has suffered "principal loss." Through these requests Plaintiffs seek to test YieldStreet's claims that it had robust and principled underwriting and diligence processes, and to shine a light as to how the company defines "principal loss" for purposes of marketing to investors. Defendants objected, stating that they would construe the Requests as limited to the five Offerings at issue in this case only, even though the principal loss claims necessarily turn on events **prior** to those Offerings. Subject to that objection, Defendants stated they would produce diligence and underwriting policies, if they exist, while claiming that no policies exist for determining "principal loss." *To date no policies or procedures of any kind have been produced.* It seems highly unlikely that the company makes up its diligence and underwriting processes as it goes along. Similarly, Defendants' private placement memoranda made the explicit claim that none of its prior offerings had lost principal. There must be some objective basis YieldStreet used to evaluate this statement. This Court should Order Defendants to withdraw their objections and produce these policies and procedures, or affirmatively certify that no such documents exist if that is in fact the truth.

Sincerely,

*/s/Brian Pastor*

Brian B. Pastor, Esq.